IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN DIVISION

| | |
|---|---|
| PREVIN MANKODI,<br><br>    Plaintiff,<br><br>  v.<br><br>TRUMP MARINA ASSOCIATES, LLC, A NEW JERSEY LLC, SUSAN FLOORPERSON, and J. DEALER, Trump Marina Associates' employees whose real names are not known,<br><br>    Defendants. | CIVIL ACTION No.<br><br>Judge<br><br>**COMPLAINT WITH**<br><br>**JURY DEMAND & DESIGNATION**<br><br>**OF TRIAL COUNSEL** |

Attorney for Plaintiff
Thomas B. Duffy
739 Bayview Drive
Absecon, NJ  08201-1208
Phone: 609-457-6700
Email: Tom@DuffyLaw.org
Court ID: TD1940

Co-Counsel for Plaintiff
Robert A. Nersesian, Esq.
Nevada Bar No. 2762
Nersesian & Sankiewicz
528 S. Eighth Street
Las Vegas, Nevada  89101
Telephone:  702-385-5454
Facsimile:   702-385-7667
Email: VegasLegal@aol.com
(*pro hac vice* application to be made in future)

## JURISDICTIONAL ALLEGATIONS

1. Plaintiff is a resident of, has domicile in, and is a citizen of the State of Louisiana.

2. Defendant Trump Marina Associates, LLC is a New Jersey Limited Liability Company with its principal place of business, a casino, in Atlantic City, New Jersey which does business under the name "Trump Marina" and may be referred to simply as "Marina" in this complaint. Susan Floorperson and J. Dealer (who shall be denoted hereinafter only by their job description fictitious last names) are employees of the Marina entity. By law, these casino employees, being licensed to run and manage games in a New Jersey Casino, must have residence, be domiciled, and be citizens in New Jersey.

3. Diversity of citizenship of the parties exists pursuant to the preceding two paragraphs.

4. The amount at issue in this litigation is in excess of $75,000.00, exclusive of interest and costs.

5. This Court's Jurisdiction is based on 28 USC § 1332(a)(1) (Diversity).

## ALLEGATIONS COMMON TO ALL ACCOUNTS

6. On August 3, 2009, Plaintiff was a business invitee of the Trump Marina defendant. (When defendant is used in the singular it will mean Trump Marina; when "defendants," it will the Marina and its employees.) Trump Marina is responsible for all the actions of two fictitiously named employees above and all other employees mentioned in this complaint under the doctrine of *Respondeat Superior*. If that theory is inapplicable, Marina negligently or intentionally did not teach employees to do their jobs, including gaming and security procedures.

7. Plaintiff was playing "21" or blackjack in defendant's casino.

8. Plaintiff placed a bet of approximately $3,700.00 on a hand of 21.

9. Dealer began play at the plaintiff's table, dealing plaintiff an ace.

10. Pursuant to the rules of the game, the plaintiff's ace was dealt face up, and plaintiff, through Marina counsel, has been informed that this event exists on film.  Also, by rule, once the first card has been displayed on the 21 table, all the players and casino are obligated to complete the hand.  The main reason for this is so that the casino cannot cheat players by leaving them to finish the game with poor expectation first cards (2-9) or hands (4-8; 12-17) while terminating fist cards (10 & Ace) or hands (9-11; 18-21) where the players have a positive expectation.  (Or so players cannot cheat the casino by reversing the process.)  The expectation of being dealt an ace as a first card, with no other cards known, is commonly cited in learned works and computer studies of the game as 50.4%.

11. After dealing plaintiff an ace, Dealer, who is an Asian female, was instructed by Susan Floorperson (only her first name is known), to shuffle the cards and not complete the hand.

12. Under basic strategy and mathematics, the expected profit on the hand dealt to plaintiff with the ace up totaled $1,864.80 ($3700 * 50.4%) (rounded to $1,865).

13. The rules of the game, and the law within the state of New Jersey, prohibit a casino from calling back a hand in the circumstances described, and reshuffling and re-dealing without completing the hand.  This cuts right to the legislature's purpose in passing the Casino Control Act: that there be "game integrity" and "fair odds to players" with no cheating on either side of the table.

14. When Dealer was instructed to shuffle the already commenced hand, plaintiff protested.

15. As Dealer paused, Susan Floorperson came over, and plaintiff protested that the actions being undertaken by defendants constituted cheating and a violation of the law, and requested that the hand be completed.

16. Floorperson essentially ignored plaintiff's entreaties, and again instructed Dealer to shuffle the cards, terminating the high expectation hand already dealt to plaintiff.

17. As plaintiff continued to protest this outright theft and cheating by defendants, the dealer pulled in the cards and reshuffled. On information and belief, at or about that time Floorperson, or other supervisory employees, called for security in the employ of Defendant Marina due to plaintiff's peaceable and legitimate protests.

18. Plaintiff continued to protest the theft and cheating of defendants, and requested that the employee of the New Jersey (State Police) Division of Gaming Enforcement be called over to intervene and stop defendants cheating and theft.

19. Security then arrived, and plaintiff attempted to protest the actions to security.

20. At that point, rather than address the cheating and theft by the defendants, defendant's security informed plaintiff that due to his protests they were demanding that he forthwith leave the defendant's casino.

21. Plaintiff continued the protest stating that he recognized that an employee of the Division of Gaming Enforcement (DGE) or Casino Control Commission (CCC) was on site, and that he had a right to take the matter to this employee of the State of New Jersey.

22. Security acquiesced, but stated that plaintiff would have to report the cheating to the State employee at the booth provided by the casino, and thereafter leave the casino.

23. Plaintiff complied with security's demands, and security escorted plaintiff to the DGE/CCC booth.

24. Plaintiff described the circumstances to the State employee.

25. The DGE or CCC employee, despite being charged with policing exactly the activities described, brushed plaintiff off, grossly failed to undertake his job, and stated to plaintiff that if he desired to make a complaint he should do so in writing to the Casino Control Commission.

26. Plaintiff then left the casino as demanded by security.

27. It is important to note that Plaintiff was in no way permanently banned from the casino, and was never informed that he was not invited to return. Nor could he have been as he did nothing wrong: he was merely attempting to stop and, later, to report a criminal gaming irregularity.

28. That evening plaintiff returned to the casino seeking to speak to the casino manager who would then be on site, and would not have been on site in the early morning hours when plaintiff was cheated by Defendant.

29. Upon asking for the casino manager on reentry into the casino, rather than presenting a casino manager, plaintiff was surrounded by security officers in the employ of defendant.

30. Without cause or provocation, defendant's security personnel tackled and grabbed plaintiff physically, and placed him in handcuffs. It must have been quickly apparent that Marina had no cause to arrest plaintiff (e.g. he was not trespassing because he had never been evicted) because plaintiff heard the guards attempting to make up a charge against him.

31. Defendants security employees then forcefully took plaintiff to a room within defendant's casino, such room being a private room out of public view.

32. Without cause or reason, defendant's security personnel then subjected plaintiff to an invasive search of his person and property.

33. Defendant continued to hold plaintiff for over an hour against his will.

34. Plaintiff was then released and purportedly formally told that he was not to return to the property of the defendant. At no time was he told he had done anything wrong.

35. Although plaintiff never filed a complaint with the Casino Control Commission, after plaintiff placed defendant on notice of possible litigation it appears that the CCC or DGE, or likely both, did review the circumstances. Pursuant to this review, the CCC confirmed that defendant had illegally dealt the game to plaintiff as discussed above.

## FIRST CAUSE OF ACTION

### (Battery)

36. Plaintiff incorporates all previous paragraphs above as though fully restated herein.

37. In placing hands upon plaintiff, tackling plaintiff, placing handcuffs on plaintiff, and keeping the handcuffs on the plaintiff, defendant, through its employees, did batter the plaintiff.

38. The battery upon plaintiff was uncalled for, inexcusable and contrary to all proper course of conduct in a civilized society. It was also undertaken by defendant's personnel within the scope of their employment with malice and oppression.

39. As a result of the battery upon plaintiff, plaintiff did suffer emotional distress, mental suffering, outrage, and pain and suffering, exemplified by contusions on and about his wrists, and muscle strain throughout his body.

## SECOND CAUSE OF ACTION

### (False Imprisonment)

40. Plaintiff incorporates all previous paragraphs above as though fully restated herein.

41. Defendant, through its employees acting within the scope of their employment, falsely imprisoned plaintiff.

42. The false imprisonment of plaintiff was undertaken with oppression, fraud, and malice, and was contrary to all societal norms.

43. As a result of the false imprisonment of the plaintiff, plaintiff has suffered damages inclusive of emotional distress, mental suffering, and outrage as well as loss of liberty.

## THIRD CAUSE OF ACTION

### (Explicit Case of Action under Uston v. Resorts)

44. Plaintiff incorporates all previous paragraphs above as though fully restated herein.

45. Uston v. Resorts stands for the proposition that the casinos are not free to ban patrons from their games based on the patrons' skill levels. Certainly, the casinos cannot cheat and subject players to violence as a *de facto* method of barring them from the games.

46. Yet, this is exactly what occurred in this case.

47. Whether Uston allows for an action for its violation or it is just an important case defining the Common Law of this State, as reflected in the other counts in this complaint, the plaintiff intends to rely heavily on this case.

48. The defendants are so put on notice.

49. The defendants' violation of the principles of Uston was undertaken with oppression, fraud and malice, and is contrary to all societal norms. It was extreme and outrageous and shows an utter disrespect for both the case and statutory law of this State.

50. As a result of the principles of Uston v. Resorts, plaintiff has suffered loss of income, embarrassment, emotional distress, humiliation, and mental pain and suffering.

## FOURTH CAUSE OF ACTION

### (Negligence / Premises Liability)

51. Plaintiff incorporates all previous paragraphs above as though fully restated herein.

52. Defendant has a duty to keep its premises reasonably safe for all members of the public partaking in the services it offers.

53. As a result of the foregoing, the premises maintained by Defendant were not reasonably safe. Additionally, through such actions coupled with their oppressive and malicious nature, it is evident that defendant took the negligent hiring and training of the individuals within its security office.

54. As a result of the negligence of the defendant, plaintiff has suffered damage in the form of emotional distress, embarrassment, loss of reputation, mental suffering, pain and suffering, and loss of the value of his blackjack hand in the amount of $1,865.00.

## FIFTH CAUSE OF ACTION

### (Breach of Contract / Tort of Conversion)

55. Plaintiff incorporates all previous paragraphs above as though fully restated herein.

56. When defendant's personnel breached the regulations of the New Jersey Gaming Control Commission, and cheated and stole plaintiff's hand with a present value of $1,865.00, it breached the gaming agreement between that it had with plaintiff.

57. As a result of this breach of the gaming agreement, plaintiff has lost the value of $1,865.00.

58. At the time of the illegal shuffle, which was cheating, plaintiff nevertheless held a reasonable expectation of a gain of $1,865.00, and defendant's employee's actions converted this sum directly to the benefit of the defendant.

59. The conversion of Plaintiff's expected value in the blackjack hand was undertaken with oppression, fraud, and malice by the defendant's employees, and the defendant's employees acted in an extreme and outrageous manner and undertaking such shuffle and theft despite knowledge that it was illegal and constituted cheating and plaintiff's protest.

## SIXTH CAUSE OF ACTION

### (Tortuous Breach of the Duty of Public Accommodation)

60. Plaintiff incorporates all previous paragraphs above as though fully restated herein.

61. Defendant's business is that of a public amusement.

62. Pursuant to the common law, as a public amusement defendant does not have the right to eject persons from its premises absent good cause.

63. No good cause existed for the initial ejection of the plaintiff. Indeed, they should have taken an incident report of his claim of being cheated. Likewise, when he came back to try peaceably to settle the matter with the casino manager, there was no good cause to tackle,

handcuff and hold him prisoner – as is evidenced by his release without charges. There was no good cause to evict the plaintiff on that occasion either.

64. The actions set forth above undertaken while plaintiff was not acting in any way improperly, and also undertaken in furtherance of the theft of plaintiff's expectations, constitute an attempt "to cover up" the Marina's cheating, and a breach of the duty of public accommodation by defendant.

65. Defendant's breach of the duty of public accommodation was undertaken with oppression, and malice, was extreme and outrageous, and is contrary to all societal norms, and plaintiff has suffered emotional distress, loss of liberty and access, and outrage as a result thereof.

## SEVENTH CAUSE OF ACTION

### (Trespass to Chattels)

66. Plaintiff incorporates all previous paragraphs above as though fully restated herein.

67. Upon placing plaintiff in the security office, the defendant unceremoniously placed their hands about plaintiff and searched plaintiff. This was a second search followed by an initial search undertaken on the floor of the casino in front of other patrons.

68. During the search of plaintiff, the defendant removed chattels in plaintiff's possession and dispossessed plaintiff of the same.

69. The physical invasion of plaintiff's chattels constitutes tortuous conversion as well as trespass to chattels.

70. The torts within this cause of action were undertaken by defendants with oppression, and malice, and were extreme and outrageous.

71.     As a result of the trespass to chattels, plaintiff has suffered emotional distress, outrage, and mental suffering.

## EIGHTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

72.     Plaintiff incorporates all previous paragraphs above as though fully restated herein.

73.     All of the above actions of the defendant were calculated to cause emotional distress upon the plaintiff and did cause such emotional distress.

74.     First, he was intentionally and willfully cheated out of $1,865.00 in front of dozens of witnesses.  Second, Marina security inflicted additional distress on him by having him leave (when they should have been taking an incident report from him about a claimed gaming irregularity) and then arresting him for no reason when he came back to work on the dispute peaceably with high level management.  This intentional infliction of distress was intentionally and maliciously done to punish the plaintiff for having the audacity to suggest that Marina had cheated him and otherwise asserting his legal rights.  A possible reason for this harsh treatment was the security and gaming personnel wanted "to cover up" the gaming irregularity (and lack of an incident report regarding it) from the high level manager with whom plaintiff wished to discuss the matter or State officials, or both.

75.     At some point, however, it had become clear to Marina that the plaintiff's claim that he had been cheated was legally correct.  This made it even more critical that the plaintiff be silenced and be taught "a lesson" that there would be severe consequences if he wished to continue assert his legal rights, including the assertion he was cheated.

11

76. The exact point of the discovery the plaintiff was legally correct about being cheated is unknown. It is alleged that when he was arrested when he returned to Marina even though he had <u>not</u> been told not to come back, that had to be part of a "cover up," or of the plan to teach the plaintiff "a lesson" about asserting his rights, including that he was cheated, or likely both.

77. The torts within this cause of action were undertaken by defendants with oppression and malice, and were extreme and outrageous.

78. As a result of this intentional infliction of emotional distress, plaintiff has suffered emotional distress, outrage, and mental suffering.

## NINTH CAUSE OF ACTION

### (Negligent Infliction of Emotional Distress)

79. Plaintiff incorporates all previous paragraphs above as though fully restated herein.

80. If in the unlikely event the defendants did not undertake to inflict distress upon the plaintiff intentionally, it was still negligent to have a "standard procedure" where a person, such as the plaintiff, who was asserting his legal rights and was making a very serious legal allegation would be "hauled away" by security. Clearly, surveillance and the casino's compliance officer (or legal counsel) should have been contacted and the dispute resolved in a legally ethical manner.

81. Similarly, there should have been a procedure in place that, before arresting someone (as was done when he returned to talk to the casino manager), the Marina's records should have been checked to see if the person in question had actually done something wrong and had even actually been given notice not to return to the casino. This would have avoided the

plaintiff's second arrest where they had to let him go when they found there was no basis for his arrest.

82. This extreme indifference and negligence toward that plaintiff's legal rights and right to be free from arrest resulted in the negligent infliction of severe emotional distress on the plaintiff.

83. The torts within this cause of action were undertaken by defendants with, at a minimum, extreme indifference and negligence to the rights of persons, such as plaintiff, who had a right to be free from emotional distress while trying to play a game in a casino or to resolve a legal dispute with the defendants.

84. As a result of this negligent infliction of emotional distress, plaintiff has suffered emotional distress, outrage, and mental suffering.

## TENTH CAUSE OF ACTION

### (Harassment to Civil Litigant)

85. Plaintiff incorporates all previous paragraphs above as though fully restated herein.

86. It had to have been clear to the Marina at all times enumerated above that plaintiff had a legitimate dispute with the defendants which, as is being done here, could be asserted and resolved through legal process.

87. Instead of allowing the plaintiff to pursue his legal remedies peaceably, the defendants instead sought to harass, demean and intimidate him from asserting his legal rights. Such a cause of action has long been recognized in New Jersey to facilitate the peaceable and reasonable resolution of disputes without resort to violence, threats of violence, false arrests and harassment of both actual and potential civil litigants.

88. The harassment, intimidation and other violent acts committed by the defendants constitutes tortuous interference with the legal rights of the plaintiff and harassment of a civil litigant.

89. The torts within this cause of action were undertaken by defendants with oppression and malice, and were extreme and outrageous.

90. As a result of the harassment of plaintiff as a civil litigant, plaintiff has suffered emotional distress, outrage, and mental suffering.

## ELEVENTH CAUSE OF ACTION

### (Common Law Fraud)

91. Plaintiff incorporates all previous paragraphs above as though fully restated herein.

92. There was a legal contract between the plaintiff and defendant Marina which was initiated when Marina opened its tables to the public and plaintiff put his wager in the betting circle.  Both agreed to play by the rules of the game; the Marina did not by stopping play, against the rules, when plaintiff had a 50% winning first card.

93. Specifically, going through the elements of fraud: 1) the defendant made a representation of a game of "21" played according to the rules; 2) which was either false (that they would illegally stop play when a potentially winning hand was dealt) or recklessly made the assertion that the rules would be followed without training its staff properly about what the rules were; 3) which was either known to be false or was a reckless assertion which was made without knowledge of its truth (e.g. that employee would never stop a "21" hand mid-play); 4) the defendants made the representation of a game played by the rules to solicit players to its tables and the plaintiff was so solicited and accepted the offer, thinking he would never be cheated; 5)

obviously plaintiff acted in reliance on the representation that the rules would be followed; 6) the plaintiff suffered damages when an ace with an expected value of 50% of his wager was illegally taken away from his hand after play started; his loss being this lost expectation.

94. The totally illegal move of taking away a player's card(s) mid-game constitutes common law fraud.

95. The torts within this cause of action were undertaken by defendants with oppression and malice and were extreme and outrageous.

96. As a result of the fraud plaintiff has suffered a loss in expectation of $1665.00 as stated above.

## TWELFTH CAUSE OF ACTION

### (Statutory Consumer Fraud)

97. Plaintiff incorporates all previous paragraphs above as though fully restated herein.

98. If the plaintiff proves common law fraud, he has automatically proven statutory consumer fraud as well and he demands treble damages under this count or punitive damages under the Common Law count, whichever is more.

99. Additionally, if plaintiff cannot prove all the strict elements of Common Law Fraud, the defendants' actions certainly were an unconscionable commercial practice and false advertising within the ambit of the Consumer Fraud Act.

100. Both the cheating and the subsequent violence that was committed on him to convince him not to assert his legal rights are exactly such an unconscionable commercial practice.

101. As a result of this Consumer Fraud, plaintiff has suffered lost income, emotional distress, outrage, and mental suffering.

## THIRTEENTH CAUSE OF ACTION

### (*Per Se* Tort)

102. Plaintiff incorporates all previous paragraphs above as though fully restated herein.

103. The cheating in this case is either a *per se* tort for violation of State's Regulations and Rules of the Game of "21" or the violation of the regulations and rules will be heavily relied upon to prove the allegations of cheating against the Marina.

104. Clearly, these rules and regulations were put in place to stop exactly the kind of cheating which occurred in this case and keep the public safe from fraudulent practices. As a casino patron, plaintiff belonged to the class of persons whom the rules and regulations were designed to protect. The harm suffered here is exactly of the kind the rules and regulations were designed to protect against – that casinos would do whatever they wanted and cheat customers if left to their own devices. Finally, the violation of these rules and regulations was the exact and only cause of the plaintiff's financial injury in this case: the loss of the 50% expectation on the ace he was dealt.

105. As a result of this cheating and rules violations, the plaintiff suffered damages from the loss of the financial expectation from being dealt an ace for a first card.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against the defendants, jointly and severally, in an amount sufficient to compensate for his injuries, including lost income, suffering, humiliation, mental anguish and embarrassment from the above actions which were perpetrated against him, plus punitive damages or statutory treble damages (Consumer Fraud Act only), whichever is more, due to the intentional cheating, deprivation of rights and humiliation and anguish to which the plaintiff was subjected above, as well as attorney' fees, costs and expenses for bringing this action as allowed by rule or law (such as the Consumer Fraud Act), both pre- and post-judgment interest to the maximum extent allowed by law, and such other relief which the Court may deem just.

## CERTIFICATION
## (NO OTHER ACTION TAKEN)

I hereby certify that the matter in controversy is not the subject of any other action pending in any court and is likewise not the subject of any pending arbitration proceeding. I further certify that I have no knowledge of any contemplated action or arbitration proceeding which is contemplated regarding the subject matter of this action and I am not aware of any other parties who should be joined to this action.

## JURY DEMAND

Plaintiff demands a jury in this case.

## RULE 11 CERTIFICATION

I have read Rule 11 of Federal Rules of Civil Procedure and certify that this complaint is true to the best of my knowledge and belief.

## DESIGNATION OF TRIAL COUNSEL

Robert A. Nersesian, Esquire, of the Nevada Bar is hereby designated as trial counsel for Plaintiff. *Pro Hac Vice* papers will be filed before he must serve in this capacity.

Dated: August 2, 2011

_____
Thomas B. Duffy, Esquire