IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN DIVISION

|  |  |
|---|---|
| PREVIN MANKODI,<br><br>                    Plaintiff,<br><br>     v.<br><br>TRUMP MARINA ASSOCIATES, LLC, A NEW JERSEY LLC, SUSAN FLOORPERSON, AND J. DEALER, Trump Marina Associates' employees whose real name are not known,<br><br>                Defendants. | CIVIL ACTION No. 1:11-cv-4478<br><br>Judge Joseph H. Rodriguez<br><br>**BRIEF IN OPPOSITION TO DISMISSAL & IN SUPPORT OF CROSS-MOTION TO EXTEND TIME FOR SERVICE UNDER F.R.C.P. 4(M)** |

Attorney for Plaintiff & On the Brief
Thomas B. Duffy
739 Bayview Drive
Absecon, NJ  08201-1208
Phone: 609-457-6700
Fax: 815-371-1377
Email: Tom@DuffyLaw.org
Court ID: TD1940

## Table of Contents

FACTUAL BACKGROUND ........................................................................ 10

PRELIMINARY STATEMENT ................................................................... 13

ARGUMENT ........................................................................................... 16

POINT I: THE TIME FOR SERVICE SHOULD BE EXPANDED AS THE
PLAINTIFF HAD "GOOD CAUSE" FOR NOT SERVING THE DEFENDANT WITHIN
120 DAYS OR BECAUSE APPLYING THE FEDERAL RULE WILL BE "OUTCOME
DETERMINATIVE" COMPARED TO THE SIMILAR NEW JERSEY RULE. ................... 16

POINT I(A): GOOD CAUSE EXISTS MAINLY DUE TO MISREPRESENTATIONS ABOUT THE
STATUS OF THE ENTITY AFTER IT HAD CEASED DOING BUSINESS. ..................... 16

POINT I(B): EVEN IF THERE IS NO "GOOD CAUSE" THE COURT HAS DISCRETION TO
EXTENDED THE TIME FOR SERVICE DUE TO THE EQUITIES IN THIS CASE. ................. 20

POINT I(C): DISMISSING THE ACTION ON SERVICE GROUNDS WOULD BE "OUTCOME
DETERMINATIVE" SINCE, IF FILED IN STATE COURT, THE ACTION WOULD NOT BE
DISMISSED AS THE "REQUIRED PROCEEDING" OF BOTH SERVICE AND ANSWER DID OCCUR
WITHIN THE 180 DAYS REQUIRED UNDER STATE COURT RULE 1:13-7. .................... 21

POINT II: THE COMPLAINT IN THIS CASE ALLEGES NUMEROUS ILLEGAL
ACTIVITIES, THEIR EXACT EFFECT ON THE PLAINTIFF AND THAT THE
PLAINTIFF IS ENTITLED TO RELIEF ON BASED ON THOSE CAUSES AND
EFFECTS ON THE FACE OF THE COMPLAINT. ............................................... 23

POINT III: THERE IS A CAUSE OF ACTION UNDER COUNTS THREE AND SIX AGAINST AN INNKEEPER OR PUBLIC AMUSEMENT FOR UNREASONABLY EJECTING A PATRON; FURTHER, HERE THE DUTY, UNDER THE CASINO CONTROL ACT, WAS TO TAKE A REPORT OF THE ALLEGED ILLEGAL ACTIVITY, NOT TO ASK THE CUSTOMER TO LEAVE AND THEN LATER EVICT HIM FOR NO REASON. .................................................................... 24

POINT IV: SIMILAR TO THE LAST POINT, IT IS A QUESTION OF FACT WHETHER THE MARINA'S ACTIONS WERE REASONABLE SO THE CLAIMS FOR BATTERY AND FALSE IMPRISONMENT (COUNTS ONE & TWO) ARE VIABLE. .... 25

POINT V: THE PLAINTIFF HAS STATED AN ACTIONABLE CLAIM FOR NEGLIGENCE (COUNT FOUR): THIS CASE REEKS OF NEGLIGENT BEHAVIOR, PARTICULARLY WHEN JUDGED AGAINST THE GAMING REGULATIONS. ................ 27

POINT VI: COUNT FIVE STATES A CAUSE OF ACTION IN BOTH CONTRACT AND CONVERSION BECAUSE THE CASINO'S ABILITY "TO SHUFFLE AT WILL" IS TIGHTLY CIRCUMSCRIBED BY REGULATION: THE "AT WILL" IS A MISNOMER AS THE CASINO CAN ONLY SHUFFLE AS A "COUNTER-MEASURE" AFTER THE COMPLETION OF ANY ROUND OF PLAY. ................................................... 28

POINT VII: THE PARTICULARS OF TRESPASS TO CHATTELS, COURT SEVEN, HAS NOT BE DEFINED BY THE NEW JERSEY SUPREME COURT SO THE CLAIM SHOULD BE VALID. .................................................................... 30

POINT VIII: THE COUNTS FOR INTENTIONAL (COUNT EIGHT) AND
NEGLIGENT (COUNT NINE) INFLICTION OF EMOTIONAL DISTRESS AND FOR
HARASSMENT OF A POTENTIAL CIVIL PLAINTIFF (COUNT TEN) ALL STATE
A CAUSE OF ACTION UNDER VERY SIMILAR THEORIES. ........................................ 31

POINT IX: THE PLAINTIFF IS SKIPPING THIS POINT NUMBER SO THIS
BRIEF'S POINT HEADINGS MATCH THE DEFENSE BRIEF. ...................................... 33

POINT X: THE CCC HAS ALREADY DETERMINED THAT A GAMING VIOLATION
OCCURRED; AFTER THAT EXERCISE OF PRIMARY JURISDICTION, ONLY THE
COURTS HAVE JURISDICTION TO ENTERTAIN THE THIS ACTION FOR FRAUD
AND CONSUMER FRUAD AS WELL AS CHEATING, BATTERY, FALSE
IMPRISONMENT AND OTHER INTENTIONAL OR NEGLIGENT CONDUCT. ............... 33

POINT XI: THE PLAINTIFF'S DAMAGES CAN BE CALCULATED TO A HIGH
DEGREE OF ACCURACY. ..................................................................................... 40

POINT XII: PER COUNT THIRTEEN, THE PLAINTIFF CAN MAKE OUT A
CAUSE OF ACTION FOR A REGULATORY VIOLATION WHEN, AS HERE, THE
REGULATORY AUTHORITY WITH PRIMARY JURISDICTION HAS RULED THERE
WAS A VIOLATION AND THE COURT MUST ONLY ADDRESS THE STATUTORY
AND COMMON LAW DAMAGES THAT FLOW FROM THE VIOLATION. ......................... 44

POINT XIII: THE LAW IS CLEAR: PLAINTIFFS MUST GO TO THE COURTS
FOR MONEY DAMAGES; SOMETIMES A REFERRAL OF SOME QUESTIONS TO THE

AGENCY WITH PRIMARY JURISDICTION MAY BE WARRANTED WITH THE COURT

CASE HELD IN ABEYANCE IN THE MEANWHILE. .......................................................... 46

POINT XIV: THIS CASE IS WITHIN THE DIVERSITY JURISDICTION OF

THIS COURT. ................................................................................................................. 47

CONCLUSION................................................................................................................. 49

Table of Authorities

CASES

Annitto v. Trump Marina Hotel Casino, A-1233-04T1, 2006 N.J.
  Super. Unpub. LEXIS 1769 (App.Div. July 25, 2006) 43, 44, 45, 46

Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937 (2009)........ 23

Buckley v. Trenton Savings Fund Soc., 111 N.J. 355, 366-7 (1988)
  ......................................................... 31

Campione v. Adamar of New Jersey, Inc. 302 N.J.Super. 99, 103
  (App. Div. 1998), mod. aff'd 155 N.J. 245 (1998)........ passim

Carvalho v. Toll Brothers & Developers, 143 N.J. 565, 572 (1996)
  ......................................................... 27

Chrysler Corp. v. Quimby, 144 A.2d 123, 134 (Del. 1958)....... 40

Columbia Gas Transmission Corp. v. Tarbuck, 62 F.3d 538, 541 (3d
  Cir. 1995).................................................. 47

Computec Systems Corp. v. General Automation, Inc............. 40

Cox v. Sears, 138 N.J. 2 (1994)............................... 40

D'Alessandro v. Hartzel, 422 N.J.Super. 575, 579 (App. Div.
  2011).................................................... 27

Daggett v. DiTrani, 194 N.J.Super. 185, 189 (App. Div. 1984).. 27

Doug Grant, Inc. v. Greate Bay Casino Corp., 3 F.Supp.2d 518
  (D.N.J. 1998) aff'd. 232 F.3d 173 (3d Cir. 2000) cert. denied
  532 U.S. 1038 (2001)............................... 14, 32, 33

Greate Bay Hotel & Casino v. Tose, 34 F.3d 1227, 1230, 1234-35
  (3d Cir. 1994)............................................ 35

Hakimoglu v. Trump Taj Mahal Assocs., 70 F.3d 291, 292 (3d Cir. N.J. 1995), aff'g 876 F. Supp. 625 (D.N.J. 1994) ............ 45

Henderson v. United States, 517 U.S. 654, 662, 116 S. Ct. 1638, 134 L. Ed. 2d 880 (1996) .................................. 20

Jaconski v. Avisun Corp., 359 F.2d 931, 935 (3d Cir. Pa. 1966) 47

Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 696 A.2d 546 (1997) ........................................ 34, 35

Liu v. Oriental Buffet, Inc., 2006 U.S. Dist. LEXIS 3542, 11-12 (D.N.J. Jan. 30, 2006) ...................................... 16

Petrucelli v. Bohringer & Ratzinger, 46 F.3d 1298, 1305-1306 (3d Cir. Pa. 1995) ............................................. 20

Prinz v. Greate Bay Casino Corp., 705 F.2d 692, 693 (3d Cir. Pa. 1983) ................................................... 48

Reiter v. Cooper, 507 U.S. 258, 268 (1993).................... 46

Simone v. Golden Nugget Hotel & Casino, 844 F.2d 1031, 1032 (3d Cir. Pa. 1988) ........................................... 48

Smerling v. Harrah's Entertainment, Inc., 389 N.J. Super. 181, 193 (App. Div. 2006) ...................................... 37

Smith v. Fergus County, 39 P.2d 193 (Mont. 1934)............. 40

Suber v. Chrysler Corp., 104 F.3d 578, 583 (3d Cir. 1997)..... 47

Talalai v. Cooper Tire & Rubber Co., 360 N.J. Super. 547, 562-563 (Law Div. 2001) ...................................... 41

Uston v. Resorts International, 89 N.J. 163 (1982)........... 23

STATUTES

N.J.S.A. § 56:8-2............................................. 37

RULES

§ 13:69F-2.3................................................. 28

§ 13:69F-2.5................................................. 28

OTHER AUTHORITIES

Journal of the American Statistical Association (1956)........ 42

**NOTE THIS BRIEF IS AVAILABLE IN PDF OR MS WORD FORMAT AT:**


www.DuffyLaw.org/MankodiBrief.pdf

or

www.DuffyLaw.org/MankodiBrief.doc


Please be careful to make the "B" in Brief a capital.  If you download the PDF or DOC, the hyperlinks should be active – but they will be slow.  The hyperlinks are superior in the DOC version (use CTRL+Click).  However, if you just view the brief in your browser (either format), the hyperlinks will work faster.  Ultimately, the fastest way to view the Appendix to the Brief is to have it downloaded to your computer and paginate manually.  Finally, many of the cases are hyperlinked to Lexis if you are signed into that service.


The Complaint & Brief Appendix are, respectively, available at:


www.DuffyLaw.org/MankodiComplaint.pdf

www.DuffyLaw.org/MankodiAppendix.pdf


Once again, you have to be careful with the capitals "F", "A" & "C" in the Complaint hyperlink and the capitals "M" & "A" for the Appendix.


Please also note the body of this brief is 40 pages, the pages

up to this point do not count.  (I do not use Roman Numerals so

the actual and PDF page numbers are the same.)

**Factual Background**

    The base facts in this case are very simple.  The Plaintiff was playing blackjack at the defendant's casino.  The dealer began play, dealing him an <u>ace</u> to the betting box in which he had placed a $3700.00 wager.[1]  Complaint, para. 7-9. The ace is the most favorable card in the deck.  A single ace, without other cards being known, gives the player a 50.4% advantage. See Complaint, para. 10-12.

    The dealer's supervisor, Defendant Susan Floorperson, ordered a shuffle.  Complaint, para. 11.  This is illegal: the casino can "shuffle at will" AFTER any round of play (and, therefore, BEFORE the start of any round of play) but, fairly obviously, once a card is dealt, all parties,[2] including the casino, are locked into the bets on the table.  This is particularly important at blackjack as the player's fate can be predicted with good accuracy even after one card has been revealed, as stated above.  <u>See generally</u>, <u>id</u>. at para. 10-13.

    As any player would, the plaintiff <u>peaceably</u> and legitimately protested this illegal activity. Complaint, para.

---

[1] In the Casino Control Commission's investigation, their attorney stated the amount as $3600.  See Appendix, p. 20 (hereinafter A20): Seth Brilliant, Esq. Letter of October 21, 2009.  The correct amount can easily be determined in discovery from the tape of the incident.

[2] Though not relevant here, this includes players who have not received any cards just the same as the first player with his or her single card.

17.   Security was called and plaintiff tried to explain that he had been cheated.   Instead of taking his report of illegal activity as required by Casino Control Act, security told him he would have to leave.   They did allow him to go to the CCC/DGE booth to complain.   The plaintiff was not allowed to file a CCC complaint because he was "being escorted out."  See A19: Inspection Staff Report quoted in Kenneth Doss Letter of October 1, 2009.  With that the plaintiff left the casino.   Id. at para. 14-26.

It is important to note the Plaintiff was not told he could not return to the casino: in a word, he was not evicted. Complaint, para. 27.   The eyewitness statement of the Inspector, above, totally comports with this fact: he was being "escorted out," not evicted.  A19.  If he was evicted, they would have hauled him in a back room, demanded ID, taken his picture, etc. – as happened when he was (illegally) evicted later that day.

Many hours later, when the Casino Manager was on duty who would hopefully be conversant in the gaming regulations, Plaintiff returned to discuss the cheating with the manager.  He asked for the manager but was instead thrown to the floor and forcibly taken to a non-public room where he and his possessions were searched.  Complaint, para. 28-32.

It was immediately apparent that Mankodi should not have been arrested as he heard the guards attempting to come up with

a bogus criminal charge against him to justify their outrageous behavior.  Complaint, para. 30.  They eventually freed the Plaintiff.  At no time was he ever told he had done anything wrong.  Despite this, on this occasion he was evicted and told not to return to the property.  Id. at 33-34.

However, the inspector who felt he could not take Mankodi's complaint because Mankodi was being "escorted out," did discharge his duties under the Casino Control Act and, as requested by Plaintiff, immediately conducted an investigation of the oral complaint.  The inspector cited the Marina with a violation of N.J.A.C. 19:47-2.5(a)(can only shuffle after completion of any round of play).  A19. See Point Heading VI for a discussion of this regulation and its implications.

Further, co-counsel consulted with an officer or attorney of the Marina who admitted the video showed a shuffle mid-round after a card had been dealt.  A19 (Certification of Co-Counsel). Co-counsel also wrote to the CCC which led to the October 1, 2009 letter that Marina had been cited (A19) as well as Mr. Brilliant's letter of October 21, 2009 (A20-22) explaining the CCC's policy and position regarding money damages awards to players.

As concerns this case, Mr. Brilliant stated, "The Commission Inspector subsequently reviewed the surveillance tape on that same day.  He noted that it did appear to show the

dealer shuffling the cards after a card was dealt to Mr. Mankodi, <u>which would have been a violation of the Commission's blackjack regulations</u>.  A20, 3rd new para. (emphasis added).  As to damages for this illegal procedure, Mr. Brilliant wrote, "But the Commission is not a court, and it lacks the jurisdiction and legal authority to award monetary damages to a patron in matters involving a casino licensee.  See *Campione v. Adamar*, 155 N.J. 245 (1998). … Accordingly, <u>the New Jersey patron complaint process is not an exclusive remedy, and you are not precluded from pursuing other possible remedies in other forums</u> if you believe you believe your client is entitled to monetary relief."  A21, 2nd new para. (emphasis added).

**Preliminary Statement**

The defense brief is very difficult to comprehend because it does not address any recent case law or developments.  As such, it raises some issues outside the scope of the brief including the replacement of the CCC by the DGE.[3]  The brief also does not take into account that the CCC has addressed this case and found, as above, if there was a shuffle mid-round, it was a violation but that the Plaintiff must invoke the jurisdiction of a Court, such as this one, to obtain money damages.

---

[3] About 14 months ago, "Division of Gaming Enforcement" (DGE) took over all functions of the Casino Control Commission (CCC), except the licensure of casinos and high-level gaming executives.

Per the opening of the defense brief, this case may be another "episode in the conflict between Atlantic City's casinos and certain blackjack players known as card counters" (Brief, p. 1) as our Appellate Division stated in <u>Campione v. Adamar of New Jersey</u>, Inc. 302 N.J.Super. 99, 103 (App. Div. 1998), mod. aff'd 155 N.J. 245 (1998). Few, if any, of these cases would arise if the casinos followed the law and behaved in a reasonable manner. But instead they prefer to make work for attorneys and the Court Systems.

However, it is believed to be a matter of first impression on both the issues that a) a casino has blatantly cheated a customer at its gaming tables; and b) a casino roughed up a customer either as part of a cover-up of, or because his report led to a CCC/DGE citation.

It is important to note that in <u>Campione</u> and most of the other cases cited by the defense, the cases were heard in the Superior Court – they were not dismissed out of hand as the Defendants request. In those cases, there just <u>may have been</u> a referral of a gaming question to a particular set of facts. In effect, using the CCC's primary – but not exclusive – jurisdiction to make sure the casinos are not subjected to differing interpretation of the gaming rules.

The Plaintiff's case has no similarity to <u>Doug Grant, Inc. v. Greate Bay Casino Corp.</u>, 3 F.Supp.2d 518 (D.N.J. 1998) aff'd.

232 F.3d 173 (3d Cir. 2000) cert. denied 532 U.S. 1038 (2001)in which Mr. Grant attempted to associate the "shuffle at will" "card counter counter-measure" with cheating.  Basically, this rule allows the casino to make a decision essentially the same as ones made by card counters regarding when <u>to make</u> a large bet.  Instead, the casino can decide not <u>to take</u> the bet.  This is not cheating: it's just a mathematical fact of the game.

However, the "shuffle at will" is tightly circumscribed by casino regulations to "**before the commencement** of any hand." Obviously, when the casino decides to shuffle mid-hand as here, knowing that the player has been dealt an astronomically favorable card, <u>it is cheating</u>.  The Plaintiff just asks for symmetry in the playing rules.

For example, if he had been dealt an unfavorable card, decided not to play anymore and ran off with his bet, he would have correctly been charged with cheating.  However, in his restitution to the casino, it would be obvious that the amount stolen would be less than the entire bet – no matter the card, there would be a decent chance that he would have won.

Symmetrically, the Plaintiff just asks for his lost expectation as damages.  However, if the Marina wishes, the Plaintiff would be happy to play out the hand.  There are a number of problems with completing the hand, not the least of which is that Defendant no longer has a gaming license.

Finally, it is interesting that the allegation in Paragraph 35 in the Complaint (which is explained in detail above), that the CCC has ruled Marina's conduct a violation, has not been rebutted.  <u>Since all factual allegations must be accepted a true, this has the effect of voiding large parts of the defendants' brief</u> (without regard to the CCC ruling at A20.) The CCC has exercised its primary jurisdiction and found a gaming violation.  It has no power to award damages to the Plaintiff, even for being cheated.  As a result, the Plaintiff comes to this Court for damages (or triple or punitive damages) for the cheating and for being imprisoned and assaulted for trying to report the incident (or, in the alternative, for being responsible for the casino being cited for a violation).

## ARGUMENT

## Point I: The Time for Service Should Be Expanded as the Plaintiff Had "Good Cause" for Not Serving the Defendant within 120 Days or Because Applying the Federal Rule Will be "Outcome Determinative" Compared to the Similar New Jersey Rule.

The Plaintiff has several good reasons, even if not "good cause," for the troubles encountered attempting to serve the out-of-business Marina.

## POINT I(A): Good Cause Exists Mainly Due to Misrepresentations about the Status of the Entity after it Had Ceased Doing Business.

The "good cause" was that Defendant Marina ceased doing

business and the registered agent told plaintiff's counsel that the Trump Marina Associates, LLC, had been dissolved and he was not the agent and to serve one of the officers.  A3-4 (#11-12).  The agent may have believed that the Marina was dissolved and he was out of a job.  It was still a misleading event that was "good cause" for the delay of 56 days in serving the defendant.

The most recent case from this district also involved difficult to locate defendants, who were served <u>years</u> past the 120 day period, and this Court held as follows:

> This Court denied OBI Defendants' motion to dismiss and found good cause to extend the time for Plaintiffs to serve OBI Defendants with the Amended Complaint, pursuant to the standard set out in F.R.C.P. 4(m), which states, in relevant part, HN6"if the plaintiff shows good cause for the failure [to serve the complaint within 120 days of filing], the court shall extend the time for service for an appropriate period." F.R.C.P. 4(m). See also MCI Telecommunications Corp. v. Teleconcepts, Inc., 71 F.3d 1086, 1098 (3d Cir. 1995) (citing Petrucelli v. Bohringer and Ratzinger, 46 F.3d 1298, 1305 (3d Cir. 1995), [*12] and staring that HN7when considering a motion to extend the time to serve, a district court must "first … determine whether good cause exists for an extension of time. If good cause is present, the district court must extend time for service and the inquiry is ended. If, however, good cause does not exist, the court may in its discretion decide whether to dismiss the case without prejudice or extend time for service.").

[Liu v. Oriental Buffet, Inc., 2006 U.S. Dist. LEXIS 3542, 11-12 (D.N.J. Jan. 30, 2006)](#)

Plaintiff's counsel expended a good deal of "due diligence" before and after filing this Complaint.  A2-6 (#1-18).  First, due to frequent Trump bankruptcies, the "bar date" on claims was checked and this case was not subject to a bankruptcy.  A9-10, "Bar Date" Motion.

After filing, research was done to locate this ephemeral

limited liability company (LLC).  Research at the New Jersey
Treasury showed that the LLC was still "on the books" but these
records are not kept up to date.  In any case, counsel was
familiar with the registered agent of the Company, John
Donnelly, so counsel gave him a call to check into the status of
the LLC.  A3(#8-10).

There was a 20 minute conversation in which Mr. Donnelly
denied being the agent and also stated that the LLC was either
dissolved or close to dissolution.  He told counsel to serve
Fred Cunningham, one of the officers of the LLC.  A3-4.

That day or the next, an envelope was addressed to
"Fredrick Cunningham, Esquire, Trump Marina Hotel & Casino, 1000
Boardwalk, Atlantic City, NJ 08401."  This was returned as
undeliverable.  This envelope was not kept as all it was thought
to document was non-service.  Further, it just confirmed what
Mr. Donnelly had told counsel that there was not much, if
anything, left of the Marina.  A4 (#13-14).

Before the 120 days passed, it was decided to wait to see
if there was an update as to the Marina's status as of the New
Year.  The sales agreement was researched and it possibly had an
immunization clause for some liabilities.  A4-5 (#15-17).  See
also Service Letter, A15-17, for a discussion of the legal
status of the liabilities of the Marina.

There were no changes as of the New Year and

inconsistencies came out about what counsel had been told about
the Marina.  A5(#16).  A letter was prepared to personally serve
the agent – who was still listed as agent three months later –
and mail a copy to the buyer of the assets of the casino.  A5
(#17).  Those two services resulted in the answer to the
complaint from the agent's law firm.  Plaintiff is not sure
which was considered valid but suspects it was the service on
the agent.

So, if counsel had not been misled, the mail service to Mr.
Cunningham would have been directed to Mr. Donnelly, who
apparently was and still is the LLC's agent.  If an answer was
not forthcoming in 21-30 days, out of courtesy, a personal
service would have been made in middle or late November, well
within the 120 days.  A5 (#19).

Further, there is no prejudice against the defendants.
First, counsel notified Marina to preserve evidence of this
event on August 5, 2009, a few days after the Plaintiff was
cheated, assaulted and imprisoned.  Second, since the CCC had
some investigation into this matter, one would hope Marina
counsel still has copies of the videos and documentation, if
only to abide by our Supreme Court's records preservation
standards.  Third, in the asset sales agreement, in addition to
possible indemnification, Trump is still managing all the
records of the new owner for 1 year (which will be until May

2012).  A14, Note 2, para. 3.  Fourth, there was actual notice to Mr. Donnelly (A3, #11), whatever his status is.

So there is no prejudice as the documentation ought to be available as if the asset sale never happened.  As a result of the due diligence of plaintiff's counsel, the "good cause" resulting from the highly unusual circumstances of the asset sale (which we assume confused the agent as to the exact state of the LLC) and the misrepresentations (we assume accidentally) made, plaintiff's counsel respectfully requests that the time for service be extended for 56 days such that the service on January 26, 2012 would be allowable under F.R.C.P. 4(m).

**POINT I(B): Even if There is no "Good Cause" the Court has Discretion to Extended the Time for Service Due to the Equities in this Case.**

The Third Circuit has held, pursuant to the plain language of the F.R.C.P. 4(m), that the Court has discretion to extend the service time even in the absence of "good cause:"

> Next, we find that the Advisory Committee note on the Rule 4(m) amendment to be instructive. The Committee explained: The new subdivision explicitly provides that the court shall allow additional time if there is good cause for the plaintiff's failure to effect service in the prescribed 120 days, and authorizes the court to relieve a plaintiff of the consequences of an application of this subdivision <u>even if there is no good cause shown.</u> Fed. R. Civ. P. 4(m) advisory committee's note (1993) (emphasis added). Thus, the "even if" language of the note indicates that the district court may extend time for service where there is no good cause shown. …
>
> The Advisory Committee note provides some guidance as to what factors the district court should consider when deciding to exercise its discretion to extend time for service in the absence of a finding of good cause. Although the list is not exhaustive, the Committee explained that, "<u>relief may be justified, for example, if the applicable statute of limitations would bar the refiled action, or if the defendant</u>

is evading service or conceals a defect in attempted service." Id. (citation omitted) (emphasis added).

Petrucelli v. Bohringer & Ratzinger, 46 F.3d 1298, 1305-1306 (3d Cir. Pa. 1995) (emphasis added & footnote omitted); see also Henderson v. United States, 517 U.S. 654, 662, 116 S. Ct. 1638, 134 L. Ed. 2d 880 (1996) (in dicta, also quoting 1993 Advisory Committee's Notes on F.R.C.P. 4 and noting the then new availability of an extension without "good cause").

Both of the reasons cited by the Advisory Committee are present here: a) the Plaintiff's tort claims will be beyond the statute of limitations and b) the Defendant misled counsel about the status and availability of the agent for the LLC.

**POINT I(C): Dismissing the Action on Service Grounds Would Be "Outcome Determinative" since, if Filed in State Court, the Action Would not be Dismissed as the "Required Proceeding" of both Service and Answer Did Occur Within the 180 Days Required under State Court Rule 1:13-7.**

The Federal Rules have to be relaxed when the Federal Rules would result in a non-meritorious dismissal while the similar State Rule would not. The nearly identical State Rule, R. 1:13-7(a), takes a slightly different approach to lack of prosecution matters. Like FRCP 4(m), it looks to an initial 120 day period ("four months") but instead of this period being the time within which to effect service, it is the reference period to which the New Jersey Courts look for the absence of "a required proceeding having been taken" in the case. As with the Federal Rule, the passage of the 120 days (but usually about 180 days as with the

Federal Notice in this case) marks a point for sending out warnings of dismissal.  The dismissal warnings are remarkably similar in that both state that unless good cause can be shown for the delay, the case will be dismissed.  The Federal Notice puts the dismissal date 30 days in the future, and the State Notice, 60 days.  This difference is irrelevant in this case.

Under the State Procedure, if one of four documents is filed in the case (including an answer or an affidavit of service), the dismissal notice is terminated and the case goes forward.  The Federal Procedure is basically the same as the dismissal notice in this case was terminated either on the appearance or filing of defense brief by the adversary.

The outcome determinative difference, is the defendant can go "back in time," so to speak, in Federal Court and make the F.R.C.P. 4(m) argument without regard to the termination of the dismissal notice.  The State has the same 120 day reference period but it cannot be argued to defeat otherwise good service as long as there is a "required proceeding" before the end of the "warning period."

In most cases, and hopefully this one, the difference is immaterial as there is good cause, due diligence and good faith[4] which makes the results under the two Rules the same.

---

[4] Perhaps a little too much good faith by taking another attorney at his word as to the status of the LLC and his agency.

Ironically, it seems counsel would have been better served if the defendants had not answered as it is probably a certainty that extra time would have been granted "to hunt down" a non-operational entity when all standard methods of service had failed (service on an officer, service on agent and service on purchasing entity which agreed to assume some liabilities of the possibly defunct entity).

Finally, an F.R.C.P. 4(m) dismissal should clearly be without prejudice.  And, as a result, many, if not most, of the causes of action are governed by New Jersey's 6 year contract and fraud statute of limitations and that part of the case will just be refiled.  This waste of time is a final consideration in not granting an F.R.C.P. 4(m) dismissal.

**Point II: The Complaint in this Case Alleges Numerous Illegal Activities, Their Exact Effect on the Plaintiff and that the Plaintiff is Entitled to Relief on Based on Those Causes and Effects on the Face of the Complaint.**

The Plaintiff will not belabor the actual rules and cases – we have no quarrel with what the adversaries have laid out.

The complaint lays out facts in 29 paragraphs stating the facts related above.  Those paragraphs are then explicitly referenced in the Causes of Action in the Complaint.  The effect of the Defendants' wrongful actions on the Plaintiff are spelled and then those causes and their effects are related to the various Causes of Action in the Compliant which explicitly state

why and what type of relief the Plaintiff is entitled.

In short, the Complaint was specifically drafted to conform to any possible interpretation of Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937 (2009).  If a complaint in this detail, including even the mathematical basis and causation of damages, is dismissed, then there just is no hope of filing an action such as this against a casino until Iqbal is displaced.

**POINT III: There is a Cause of Action under Counts Three and Six against An Innkeeper or Public Amusement for Unreasonably Ejecting a Patron; Further, here the Duty, under the Casino Control Act, was to Take a Report of the Alleged Illegal Activity, not to Ask the Customer to Leave and then Later Evict Him for no Reason.**

It is true that Counts Three and Six must be read together or in the alternative.  Uston v. Resorts International, 89 N.J. 163 (1982) makes it clear there is a right of public access to places that are opened to the public – especially when such invitation to the public is based on a profit motive.

What is clear here is that both the casino gaming (or pit) and the security personnel had a duty under the Casino Control Act to take a complaint of any gaming irregularity, especially including cheating.

In any case, as will be stated throughout this brief, the nature of the Plaintiff "protests" are a factual issue for later resolution.  Similarly, the reasonability of removing the Plaintiff from the casino (rather than taking a report) and then

assaulting and imprisoning him when he returned peaceably to report (and perhaps settle) the cheating (or, at least, severe irregularity) to the casino manager is open to debate and factual interpretation.  The only fact not in dispute is that the CCC ruled in the Plaintiff's favor on the initial incident: that the Plaintiff's hand was not dealt according to law.

In fact, the Complaint specifically alleges that he was attacked specifically to keep the information about the cheating to the casino manager, who was more likely to have reported it to the CCC (as required by law) and "written up" anyone involved in the cheating or subsequent cover-up.  Otherwise, what's the harm in letting him talk to the casino manager?

**POINT IV: Similar to the Last Point, It is a Question of Fact Whether the Marina's Actions Were Reasonable so the Claims for Battery and False Imprisonment (Counts One & Two) are Viable.**

It is a classic question of fact whether the casino's behavior was reasonable or whether it was part of a failed attempted cover-up of the illegal activity.

All of the facts that are available point to the fact that the Plaintiff behaved reasonably.  First, they have a video of the cheating incident (and one would assume everything thereafter) and at least a partial video of when the Plaintiff returned.  One of the Marina's Vice-Presidents has admitted to co-counsel Nersesian that the video shows there was a shuffle

after the Plaintiff was dealt and ace on a "4 figure" bet.  A18
(#4).  If this or any other video showed the slightest
impropriety on the part of the Plaintiff, Your Honor would have
a copy of it with this motion (although it would then be a
Summary Judgment Motion).

Second, the fact they let the Plaintiff go without any
criminal charges speaks volumes as to his behavior on the day in
question.  This is especially so when security was in the
planning phases of "trumping-up" a bogus charge against him.

Third, in a similar vein, during the initial incident, he
was not even told not to come back to the casino.

Defense Counsel also tries to "trump-up" a case against him
with outrageous suppositions such as "Clearly he became
disruptive."  Defense Brief, p. 10, three lines from bottom.
The claim "Defendant clearly had legal justification to make
sure Plaintiff was no carrying weapons or otherwise a danger to
the premises and then to escort him off the premises" (Id., p.
11, bottom) is almost laughable.  Where does any of that come
into play with somebody who is asking to see the casino manager?

Further, was it reasonable to detain him for an hour?  The
above makes it sound like he was just taken to the door again,
as he was the first time.  As noted by Defense Counsel,
Plaintiff instructed counsel not to sue for false imprisonment
for the first event.  He wanted to leave the cheating casino,

the guards let him complain to authorities and then he left.
They did not assault him; he was not evicted.  Whether their
behavior was reasonable or unreasonable, there were no damages
so he is not suing for being "escorted out."

Clearly, the Court should not hold it against the Plaintiff
that he admits he has no damages from being asked to leave the
first time – he wanted to leave anyway.  Why didn't they just
ask him to leave again?  No, instead they decided to tackle,
assault, handcuff and imprison him.

**Point V: The Plaintiff Has Stated an Actionable Claim for
Negligence (Count Four): this Case Reeks of Negligent Behavior,
Particularly when Judged Against the Gaming Regulations.**

Plaintiff is not going to go on like a broken record like
the Defendant.  Plaintiff has no dispute with the legal
propositions that the Defendant's duty is determined by the
circumstance that brought him to the casino and duty and scope
of duty are both questions of law.  D'Alessandro v. Hartzel, 422
N.J.Super. 575, 579 (App. Div. 2011) (citing to Daggett v.
DiTrani, 194 N.J.Super. 185, 189 (App. Div. 1984) and Carvalho
v. Toll Brothers & Developers, 143 N.J. 565, 572 (1996),
respectively).

Here, there is no claim that the Plaintiff was told he
could not come back as explicitly stated in the Complaint, para.
27.  Mankodi was, therefore, still a business invitee when he

came back to discuss, and perhaps settle, the cheating incident
with someone who had authority "to make things right."  He came
for the business and legal purpose of adjusting[5] the amount of
his damages with the manager.

One would hope the Court would extend a duty to someone who
comes on a property to report a grossly illegal act and perhaps
to settle the matter.  This is especially true when the person
was never told <u>not</u> to return.

In all events, the facts need to be determined before the
Court can determine the scope of duty owed to the plaintiff.
All the facts in the Complaint point to the Plaintiff being at
the Marina, at all times, as a business invitee.  If anything,
his status the second time while was attempting to report and
adjust an illegal irregularity should be given more legal
protection than a mere business invitee.

**Point VI: Count Five States a Cause of Action in Both Contract
and Conversion Because the Casino's Ability "To Shuffle at Will"
is Tightly Circumscribed by Regulation: The "at Will" is a
Misnomer as the Casino can only Shuffle as a "Counter-Measure"
AFTER the Completion of Any Round of Play.**

Even if the CCC had not ruled in this matter, the following

---

[5] The term "adjusting" is used intentionally to denote that there
seems to be no serious "dispute" in this case.  The plaintiff
was the victim of what can most charitably be called "a severe
gaming irregularity."  The casino has admitted this through its
vice-president.  The CCC has cited the casino for the incident.
So liability has been either conceded or determined and all that

regulation is clear:

§ 13:69F-2.5 Shuffle and cut of the cards

(a) Immediately prior to commencement of play, unless the cards were pre-shuffled pursuant to N.J.A.C. 13:69E-1.18(r), **after any round of play as may be determined by the casino licensee** and after each shoe of cards is dealt, the dealer shall shuffle the cards so that they are randomly intermixed.

N.J.A.C. 13:69F-2.5 (emphasis added – formerly 19:47-2.5, with identical wording).

This rule becomes ever more clear when the following regulations are referenced:

§ 13:69F-2.3 Wagers
…
(c) Except as otherwise provided in this subchapter, **no wager shall be made, increased or withdrawn after the first card of the respective round has been dealt**.
…
(f) Once the first card of any hand has been dealt by the dealer, no player shall handle, remove or alter any wagers that have been made until a decision has been rendered and implemented with respect to that wager except as explicitly permitted by this subchapter.

N.J.A.C. 13:69F-2.3 (emphasis added).

The Regulation in 2.3 (c) is very clear but it is also clear the (c) regulation applies to the casino as well as the patrons when compared to 2.3(f) (only the players are not allowed to touch their bets – the dealer can). So the casino can shuffle after (and one would assume before) any round of play but just like the players, it is "locked" into the hand once the first card comes out.

_____

remains is the determination of damages (and whether they should

Page 29

Stated negatively: the casino cannot shuffle in the middle of play on any hand or round of hands; it must finish any and all of them.  At that end of a round, it will again have the opportunity to shuffle.

This is clearly a breach of contract as the game is offered to the public as mandated in the above rules (and others) and the Marina's filings with the CCC.  As to conversion, the Plaintiff believes the tort is flexible enough to encompass the cheating activity here.  The Defendant looks at it from the wrong perspective.  From the standpoint of conversion, the item converted was the ace which the Plaintiff had license to use in his hand in that round.  It was literally taken back from him before his license expired at the end of the hand.  That's a conversion of an item legally possessed at that time.

If Your Honor does not see conversion so broadly as the plaintiff, that's fine.  It is not a major part of the case – the fraud, cheating, assault and imprisonment are.

**Point VII: The Particulars of Trespass to Chattels, Court Seven, has not be defined by the New Jersey Supreme Court so the Claim Should be Valid.**

The defendant cites to a historical reference by the U.S. Supreme Court and, per that Court, to Prosser & Keeton.  There is no cite to New Jersey Law – and we could find none either.

---

be trebled, etc).

So Your Honor must engage in attempting to portend what the New Jersey Supreme Court would do with the issue.  New Jersey is very liberal on such issues and the Plaintiff believes mere touching would be enough for the New Jersey Court.

No claim is made the personal possessions were damaged so if Your Honor believes the New Jersey Supreme Court would agree with the Defendant's view regarding actual damages, this Count should be dismissed.

**Point VIII: The Counts for Intentional (Count Eight) and Negligent (Count Nine) Infliction of Emotional Distress and for Harassment of a Potential Civil Plaintiff (Count Ten) All State a Cause of Action under Very Similar Theories.**

First, Harassment of a Civil Litigant is a form of Outrage or Intentional or Negligent Infliction of Emotional Distress. All the Plaintiff wished to make clear is that his outrageous treatment was alleged to be based on his complaints about being cheated, which obviously make him a potential civil plaintiff. This is especially so after the CCC officer on duty told the casino it was being cited for a violation.

We agree that Buckley v. Trenton Savings Fund Soc., 111 N.J. 355, 366-7 (1988) is the relevant cases against which to measure both intentional infliction of emotional distress.  We just disagree with the application.

The Plaintiff simply believes it is outrageous to be sitting at a blackjack table and to be cheated while no one

bothers to behave in a civilized fashion such as a) consulting the detailed rules which should be readily available in every pit, b) per the Casino Control Act (CCA), take the Plaintiff's complaint about any claimed cheating activity (applies to both pit and security personnel) or c) calling surveillance to see if the card was dealt before taking the cards out of the shoe to shuffle or just calling surveillance to ask what the rule is before shuffling.[6]

Ironically, if the casino had just listened to the Plaintiff at all, they would not have been cited for a gaming violation as any minimal consultation with any authority, be that the pit manual, surveillance or CCC/DGE staff, would have quickly led to the conclusion the hand had to be completed.

In any case, if this matter had been handled in a manner which is acceptable in a civilized society, the casino would not have been cited for a violation, Mankodi would have learned the actual result of his bet and a lot of CCC/DGE and judicial time

---

[6] When there is any irregularity, pit personnel are supposed to call surveillance to see if they have a video of the incident or, if not, to start making a video from that point onward. Almost to a certainty, surveillance would have looked at video, told the pit it was too late to stop the hand, to give the player his ace back from the top of the discard pile and to finish the hand with the cards waiting in place in the shoe. (If they wished to shuffle at the end of THAT hand, that's fine – it happens to the Plaintiff all the time and he knows an inter-hand (or round) shuffle is just part of the rules of the game. Once the shuffling started mid-hand, it was impossible to fix the irregularity and it matures into citation for cheating.

would have been saved.  It's outrageous that those costs have
been imposed on the Plaintiff and society in general because the
Casino was looking for a reason, any reason – valid or not – to
evict a card counter from their casino.

**Point IX: The Plaintiff Is Skipping This Point Number so This
Brief's Point Headings Match the Defense Brief.**

**Point X: The CCC has already determined that a gaming violation
occurred; after that Exercise of Primary Jurisdiction, only the
Courts Have Jurisdiction to Entertain the This Action for Fraud
and Consumer Fruad as well as Cheating, Battery, False
Imprisonment and other Intentional or Negligent Conduct.**

Defense counsel does a good job of obfuscating the issues
regarding fraud and consumer fraud for gaming violations, mainly
by not citing any cases decided in the last 12 years.

Even in Campione and Doug Grant, there was an explicit
recognition that the CCC only had primary jurisdiction over
applying the gaming rules to the facts of a particular case.  In
Campione, there was going to be such a referral on remand (which
never happened because the case settled).  In Doug Grant, both
this Court and the Third Circuit found it so clear that inter-
round shuffling was not cheating (or that such a question would
subject the casinos to possibly conflicting results), the Courts
made the determination themselves without bothering the CCC.

All of these cases explicitly recognize that the
legislature did not give the CCC exclusive jurisdiction over the

casinos.  Casino battery and imprisonment suits, despite the
fact the casino can usually relate its actions to some gaming
rules, are ubiquitous in the New Jersey Courts – at least in
Atlantic County.  As in the letter to Mr. Mankodi, the CCC does
not, nor could it, take a position such actions.  A21.

Fraud and Consumer Fraud actions are more rare because most
casinos do not cheat their customers.  In any case, this case is
controlled by the two Supreme Court cases, <u>Campione</u> and
<u>Lemelledo</u>, and their progeny.

As the Court in <u>Campione</u> explained with particular
reference to the CCC:

> The pervasiveness of the regulatory scheme controlling the casino industry indicates
> that the Legislature intended to invest the CCC with <u>primary jurisdiction to regulate
> the casino industry</u>. To the extent that the resolution of a plaintiff's claim depends on
> an interpretation of the Act or administrative regulations**,** the CCC should have the
> first opportunity to provide that interpretation. A referral to the CCC should assure
> the resolution of the controversy consistent with the views of the entity best
> positioned to consider the matter. Retaining primary jurisdiction in the courts could
> dislocate the intricate regulatory structure governing a sensitive industry. Permitting
> courts and juries across the State to interpret statutory and administrative regulations
> could introduce confusion where uniformity is needed. The lack of uniform
> interpretations, in turn, could effect [sic] the stability of the industry.

> <u>Campione, 155 N.J. at 264</u>.

The plaintiff has no quarrel with this.  The CCC has
already set down the rule of decision: if there was a mid-round
shuffle, it was a gaming violation.  There should be no need for
referral to the CCC (or now DGE): the application of the facts
to the rules has already been done.  If the Court disagrees, the

Plaintiff sees no harm in referral to the DGE so it can reiterate the CCC's position.

Specifically applying these principles to the CFA, Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255 (1997) provides considerable guidance.  This case involved loan packing, the practice of increasing the principal amount of a loan by adding loan-related services that the borrower does not want.  The Supreme Court held that the mere existence of an alternative regulatory scheme in the Department of Banking and Insurance did not automatically eliminate the applicability of the Consumer Fraud Act (CFA). Id. at 270.

The Supreme Court reasoned "[i]n determining whether the existence of other regulations creates an exemption to the CFA for particular conduct that otherwise would fall within its provisions, it should ordinarily be assumed that the CFA applies to the covered practice."  Id. at 268. Then the Court held:

> We are loathe to undermine the CFA's enforcement structure, which specifically contemplates cumulative remedies and private attorneys general, by carving out exemptions for each allegedly fraudulent practice that may concomitantly be regulated by another source of law. The presumption that the CFA applies to covered practices, even in the face of other existing sources of regulation, preserves the Legislature's determination to effect a broad delegation of enforcement authority to combat consumer fraud.
>
> Id. at 270.

Campione makes it clear that our courts are not denied jurisdiction over common law damage claims against casinos

merely because the claims arise from gambling transactions. See also Greate Bay Hotel & Casino v. Tose, 34 F.3d 1227, 1230, 1234-35 (3d Cir. 1994) (holding that the Casino Control Act did not vest the CCC with exclusive primary jurisdiction over a gambler's claims against a casino for his losses while intoxicated).  In explaining preemption of the Consumer Fraud Act, the Lemelledo Court ruled:

> In order to overcome the presumption that the CFA applies to a covered activity, a court must be satisfied . . . that **a direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme or schemes**. It must be convinced that the other source or sources of regulation deal specifically, concretely, and pervasively with the particular activity, implying a legislative intent not to subject parties to multiple regulations that, as applied, will work at cross-purposes. We stress that the conflict must be patent and sharp, and must not simply constitute a mere possibility of incompatibility.
>
> Lemelledo, 150 N.J. at 270.

There is no such "working at cross-purposes" in this case. The CCA and the CFA are totally consonant that they seek to protect players from outright cheating and other gaming violations.  The CCA has the additional goal making sure the casinos conform to the highest standards of integrity.  Members of the public will severely question the regulatory scheme for casinos if a casino were allowed "to walk" on such a major and obvious cheating maneuver as is involved here.

Such public distrust of the casino regulatory scheme should never arise as the casino will not be allowed to escape liability, the CFA will "fill in" where the CCA is deficient and

see that the player is made whole and the casino is punished for its reprehensible actions.

In a more recent Appellate Division case embodying the principles above regarding a casino's deception and failure to honor gaming coupons,[7] the Court summed up as follows:

> To be sure, the Casino Control Act regulates all manner of casino advertising, including presumably the ads in issue here. However, that does not mean the CCC has usurped the entire field. As the <u>Campione</u> Court noted, "the Legislature did not intend to prevent patrons from seeking vindication of common-law claims in the courts." 155 N.J. at 264-65, 714 A.2d 299. Indeed, for purposes here relevant, both the consumer fraud and casino control schemes regulate with a mutual view toward "assuring that such advertisements are in no way deceptive." Compare N.J.S.A. 5:12-70(o) and N.J.A.C. 19:43-14.2 with N.J.S.A. 56:8-2. Thus, to the extent, if at all, that plaintiffs' consumer fraud claims implicate advertising regulations under the Casino Control Act, we discern "no direct and unavoidable conflict" between the dual regulatory schemes despite the trial court's speculative and unsupported finding to the contrary; nor do we perceive that judicial construction would affect the uniformity of the interpretation or application of the Casino Control Act's statutory or regulatory requirements. We conclude, therefore, that it was error for the trial judge to have dismissed the first two counts of plaintiffs' complaint alleging statutory causes of action [under the CFA and the Truth-in-Consumer Contract, Warranty and Notice Act] based on the alleged false and misleading nature of defendants' casino advertisements, and direct they be reinstated. **Indeed, any other result would leave plaintiffs remediless since the Casino Control Act clearly does not empower the CCC to award damages in private matters**. <u>Campione</u>, supra, 155 N.J. at 249, 260-62, 714 A.2d 299

> <u>Smerling v. Harrah's Entertainment, Inc., 389 N.J. Super. 181, 193 (App. Div. 2006)</u>

In this case, while advertising implying the casinos are "fair" and will play by the rules is implicated, the situation here is better described as deceptive and unconscionable practice which results in non-performance as promised.  Here is

---

[7] The coupons also had a predictable expected value – in this case between $10 and $1000 – to be determined from the odds of receiving each prize amount.

the primary operative section of the CFA:

§ 56:8-2. Fraud, etc., in connection with sale or advertisement of merchandise or real estate as unlawful practice

The act, use or employment by any person of any <u>unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation,</u> or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, <u>or **with the subsequent performance of such person** as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice</u>; provided, however, that nothing herein contained shall apply to the owner or publisher of newspapers, magazines, publications or printed matter wherein such advertisement appears, or to the owner or operator of a radio or television station which disseminates such advertisement when the owner, publisher, or operator has no knowledge of the intent, design or purpose of the advertiser.

N.J.S.A. § 56:8-2

   As the Smerling court did, the Plaintiff would compare this general proclamation in the CFA to the <u>casino</u> anti-cheating statute which reads:

5:12-115 Cheating games and devices in a licensed casino; penalty

a. It shall be unlawful:
    (1) Knowingly to conduct, carry on, operate, deal or allow to be conducted, carried on, operated or dealt any cheating or thieving game or device; or
    (2) Knowingly <u>to deal, conduct, carry on, operate or expose for play any game or games played with cards,</u> dice or any mechanical device, or any combination of games or devices, which have in any manner been marked or tampered with, or placed in a condition, or <u>operated in a manner, the result of which tends to deceive the public or tends to alter the normal random selection of characteristics or the normal chance of the game which could determine or alter the result of the game</u>. …

c. Any person who violates this section is guilty of a crime of the fourth degree and subject to the penalties therefor, except that the amount of a fine may be up to $50,000, and in the case of a person other than a natural person, the amount of a fine may up to $200,000.

<u>N.J.S.A.</u> 5:12-115(a)(1), a(2) & (c)

This statute is totally consonant with the CFA's main

section at <u>N.J.S.A.</u> 56:8-2.  The Plaintiff has included the grading and fine section to show that the penalties for casino cheating are far more serious than the usual $10,000 penalty imposed for an ordinary Crime of the Fourth Degree.  N.J.S.A. 2C:43-3b(2).

The amount involved in cheating event would usually be less than the amount involved here and yet the legislature has seen fit to impose a maximum fine of $200,000 on an offending entity such as the Marina.  The Plaintiff believes this evinces a legislative attitude that there is no excuse for casino cheating and such behavior is totally unacceptable.

In fact it is interesting to note that when the Marina opposes this action, it is just proving that it had, and continues to have, a <u>purposeful</u> *mens rea* to have cheated the Plaintiff.  This is apparent when it claims it has no liability when its own executives admit the video shows damning activity. The Plaintiff mentions this because he hopes these actions would be admissible to show intention (and the applicability of punitive damages) under his Common Law Fraud Count.

Finally, as to Common Law Fraud, it is clear that all of the above regarding the CFA would apply with equal force to the a claim for Common Law Fraud, if only because <u>Campione</u> held that such Common Law Claims were valid and would be heard in the Courts.

**Point XI: The Plaintiff's Damages Can Be Calculated to a High Degree of Accuracy.**

This is, by far, the most outrageous Point Heading in the Marina's entire brief.  Just to make sure the Plaintiff has this "right:" a casino cheats you out of a hand with the most favorable expectation in Blackjack, and the player has no recourse because one cannot say for sure what the result of the stolen hand would be?[8]

On the contrary, the expectation from an ace as a first card is known with a high degree of accuracy.  Much more accuracy than where a judge (or jury) is faced with defense "low ball" and a plaintiff's "pie in the sky" numbers to repair some damage or account for a misrepresentation.

Expected profit is a compensable damage – it's that simple. See Computec Systems Corp. v. General Automation, Inc., 599 F. Supp. 819, 826 (D.P.R. 1984); Smith v. Fergus County, 39 P.2d 193 (Mont. 1934); Chrysler Corp. v. Quimby, 144 A.2d 123, 134 (Del. 1958).

---

[8] In Marina's Brief, p. 25, the defense asserts, "what if the probabilities went against the Plaintiff and the house won the hand?" Besides being an absolute admission that the probabilities favor the player, the Plaintiff could similarly be asking for $5550 for a winning blackjack or, better yet, $7400 from a winning pair of split aces or a soft double down.  All these possibilities, win, lose or draw are impounded into the probability or expected value of +50.4% for the player.

Page 40

Also, the argument that the Plaintiff may have lost goes directly against the proper damages in a breach of an executory contract.  This is the case here: it started and it never finished.  Damages are determined at the time of the breach as to what would be expected by performance, and here, unlike most cases, this can be determined with mathematical precision.

Similarly, citing to the seminal case of Cox v. Sears, 138 N.J. 2 (1994), here is what the Law Division ruled in the most similar case the Plaintiff has been able to find:

> In Cox v. Sears Roebuck Co. [] the New Jersey Supreme Court set forth what a plaintiff must prove to demonstrate a loss under the CFA. The Court found that a plaintiff only has to supply an estimate of damages, calculated in a reasonable degree of certainty and, thus, the "the victim is not required actually to spend the money for the repairs before becoming entitled to request a claim." Id at 21, 647 A.2d 454. Here, plaintiffs have met their burden. Plaintiffs need not, in other words, prove that each plaintiff in the putative class has expended monies on the repair of their tires. Rather, plaintiffs need only demonstrate an ascertainable loss--namely, an estimate of the price to replace the tire(s). See also, Miller v. American Family Publishers, supra ("for [plaintiffs'] money, they received something less than, and different from, what they reasonably expected in view of defendant's presentations. That is all that is required to establish 'ascertainable loss'. . . .")

Talalai v. Cooper Tire & Rubber Co., 360 N.J. Super. 547, 562-563 (Law Div. 2001) (emphasis added).

In this case the probabilities are far less daunting than predicting the lifespan of a human or a tire.  In the interest of avoiding such a mathematical proof, plaintiff's counsel obtained the 50.4% figure from Michael Shackleford ("The Wizard of Odds") who is a professional actuary.  Here is the relevant appendix from his website:

http://wizardofodds.com/games/blackjack/appendix/14/

By way of explanation, the "S17" table was used because nearly all Atlantic City casinos stand of soft 17 (usually Ace,6 but could be Ace,4,2 etc.).  Also, first card expectations were based on an "infinite deck" which means that there is exactly a 1/13th possibility of receiving a given card at all times(i.e. there are no effects from removal).  As a result, this is the worst the expectation from a first card ace can become.

Any _finite_ number of decks would result in the removal of the one ace increasing the odds of obtaining a Blackjack (or "Natural 21"); for example, the odds of Blackjack would be 16/51st in a one deck game after a first ace.  With the statistical weight of 1.5 because of the 50% bonus for making 21 in two cards, any _finite_ number of decks would yield an expected value for a first ace which is larger than 50.4%.  Professor Shackleford's c.v. can be read here:

http://wizardofodds.com/site/about/

The professor mentions that his expectations agree with "Stanford Wong's" similar expectations for a six deck game within .3%.  Wong's real name is John Ferguson, he holds a Ph.D. in Finance from Stanford, is a former professor, and is a renowned expert blackjack player, so his expected values, like Shackleford's, cannot seriously be questioned.

As a final proof from a learned journal, here is a table of

<u>dealer's</u> expectations for a given first card for the original study on Blackjack in the Journal of the American Statistical Association (1956):

http://www.bjmath.com/bjmath/basic/cantey.pdf#page=11

The dealer has a 36.3% advantage over the player with an ace as a first (or "up") card.  Since the game of Blackjack is reasonably symmetrical and the dealer cannot request a 50% bonus from the player the 30.6% of the time s/he has a Blackjack with an ace first card (see table at 435, pdf p. 7, of JASA article), it is clear the player's expectation is higher than the 36.3% the dealer enjoys.

The player's advantage can be interpolated from the dealer's as 36.3% * (69.4%*1 + 30.6%*1.425[9]) = 41%.  The other 9%, which can also be interpolated, is easily explained by the fact the player can split if s/he receives an ace for his or her second card (two 11s rather than one 12), can double down on many Ace, non-ten (soft) hand and can obtain better results by hitting soft 17 rather than standing as the dealer must do.

At this point in the suit, all the Plaintiff need prove is that the damages are positive and "ascertainable."  The former is perhaps best shown by the fact that the Marina stopped the deal – they would not have done so had Mankodi been dealt a non-

---

[9] This number is not 1.5 because about 5% of the time, the player will only tie the dealer because both have a Natural 21.

ten, non-ace as those cards (2-9) all have negative expectations

(see Shackleford, Appendix 14, <u>supra</u>).  The latter, the

Plaintiff hopes, is shown with a great deal of <u>certainty</u> by the

math with citations to various scholars above.

**Point XII: Per Count Thirteen, The Plaintiff Can Make Out a**
**Cause of Action for a Regulatory Violation When, as here, the**
**Regulatory Authority with Primary Jurisdiction Has Ruled There**
**was a Violation and the Court Must Only Address the Statutory**
**and Common Law Damages that Flow from the Violation.**

There may not be much difference between the positions of

the Defendant and Plaintiff on this issue.  We agree <u>Annitto v.</u>

<u>Trump Marina Hotel Casino, A-1233-04T1, 2006 N.J. Super. Unpub.</u>

<u>LEXIS 1769 (App.Div. July 25, 2006)</u> is instructive.  The

defense, however, would like to ignore that the Appellate

Division ordered the court below, on remand, to consider if any

regulatory violations needed to be referred to the CCC. <u>Annitto</u>,

p. 10 (end of Part III) ("[T]he Law Division judge shall

consider whether any aspect of plaintiff's charges of regulatory

violations should be referred to the Casino Control Commission,

which has primary but not exclusive jurisdiction over such

claims.").

It is clear, if the CCC ruled in Annitto's favor, he could

sue for those violations – albeit, admittedly, under a Common

Law or Statutory cause of action <u>for damages</u>.  <u>Id</u>. at 11 (very

bottom of page) ("In other words, violation of a casino

regulation will not create a cause of action for damages where such a cause of action did not otherwise exist.  But an independently viable common law cause of action is neither eliminated nor superseded just because the allegedly blameworthy conduct also violates a casino regulation.").

It is hard to say such a position is not allowing a cause of action for a regulatory violation, so long as the CCC rules in the Plaintiff's favor.  This is especially unclear given that Mr. Annitto's claims in tort for emotional distress where "deemed abandoned."  Id. at 9.  And his other tort claims for damages for gambling losses were dismissed due to Annitto's clear, massive amount of contributory negligence in not controlling his own behavior.  Id. at 16-17.  In addition, Annitto specifically abstains from answering the tort based on regulatory violation issue.  Id. at 16 (first new para.).  The court merely recognized there were good arguments on both sides of the issue specifically pointing to the 2-1 opinion in Hakimoglu v. Trump Taj Mahal Assocs., 70 F.3d 291, 292 (3d Cir. N.J. 1995), aff'g 876 F. Supp. 625 (D.N.J. 1994) (majority opinion by Alito with dissent by Becker).  Id. at 13-16.

So the question of whether a cause of action exists for a regulatory violation, based on recognizing a Common Law tort for the violation, was specifically left for another day.  The Plaintiff proposes the question is moot in this case as well.

When the CCC has ruled there was a violation (if there was a shuffle mid-hand), theories for breach of contract, conversion (for taking away the Ace the plaintiff had license to use in that particular hand), fraud and consumer fraud adequately protect Mankodi's interests.  The Plaintiff does not waive the cause of action but it seems to be a case of six of one, half a dozen of the other.

**Point XIII: The Law is Clear: Plaintiffs Must Go to the Courts for Money Damages; Sometimes a Referral of Some Questions to the Agency with Primary Jurisdiction may be Warranted with the Court Case Held in Abeyance in the Meanwhile.**

Surprisingly, Plaintiff can rest his case on the <u>Annitto</u> decision in the last section.  Defense counsel has conveniently forgotten the holding in that case: referral of some questions may be warranted.  The case could not and should not be dismissed as the Court was the sole body able to award money damages for the illegal activity.  See also, <u>Reiter v. Cooper</u>, 507 U.S. 258, 268 (1993) (noting that primary jurisdiction "is a doctrine specifically applicable to claims <u>properly cognizable in court</u> that contain some issue within the special competence of an administrative agency").

There are many other cases already mentioned in this brief which also make this point very clearly.  Plaintiff's cited New Jersey cases were decided in this Century.  It speaks volumes that the Defendant has not cited a case decided in the last 14

years – the most recent being <u>Campione</u> – and it is cited only
for a factual description of casino regulation.  Defense Brief,
p. 27.  A majority of the cases are from the 1980s.

It is clear that primary jurisdiction necessarily means
that the cause of action is properly cognizable in court, but,
for a number of policy reasons, the courts <u>may</u> refer a
particular issue to the administrative agency for determination
– if the agency cooperates and answers the question.

**<u>Point XIV: This Case Is Within the Diversity Jurisdiction of
this Court.</u>**

The argument in this Final Point is based on the assumption
that the plaintiff's claims under the Consumer Fraud Act and for
emotional distress will be dismissed.  See Defense Brief, p. 31,
fn. 8.  To that we would add that the claims for battery, false
imprisonment and other torts would also have to be dismissed.

If, and only if, <u>all</u> those tort and CFA claims are
dismissed, the Plaintiff admits that would leave him with a
contract action for $1865 and the plaintiff will refile his
claim in Superior Court.

However, if <u>any</u> of those claims survive, it is clear that
the Plaintiff could recover well over $75,000.  The Third
Circuit has interpreted this requirement to mean that "dismissal
is appropriate only if the federal court is certain that the
jurisdictional amount cannot be met." <u>Suber v. Chrysler Corp.</u>,

104 F.3d 578, 583 (3d Cir. 1997) (quoting Columbia Gas

Transmission Corp. v. Tarbuck, 62 F.3d 538, 541 (3d Cir. 1995)).

Therefore, "in order to find [that] a plaintiff's claim [is]

lacking in 'good faith', the court must be able to conclude from

the record before him that the plaintiff cannot recover a sum by

way of damages above the [$ 75,000] jurisdictional floor."

Jaconski v. Avisun Corp., 359 F.2d 931, 935 (3d Cir. Pa. 1966).

          As a showing of this good faith the Plaintiff will cite to

the following similar cases in which the Plaintiffs were awarded

well over $75,000 – especially when adjusted for inflation.

These cases are Campione v. Adamar, Inc., 155 N.J. 245, 249

(N.J. 1998) ($ 1,519,873.43 = $2,593,255 in 2012 dollars),

Simone v. Golden Nugget Hotel & Casino, 844 F.2d 1031, 1032 (3d

Cir. Pa. 1988) ($1.15M = $2.45 in 2012 dollars)and Prinz v.

Greate Bay Casino Corp., 705 F.2d 692, 693 (3d Cir. Pa. 1983)

($105,000 = $241,500 in 2012 dollars).   Admittedly, these cases

had their problems on appeal mainly because of the complexity

and jurisdiction of Campione's discrimination claim, the

question of whether Simone followed security willingly and

Prinz's having plead guilty to trespass which vitiated his

entire claim.   However, none of these problematic issues are

present in this case.

          Finally, if the Court does question the Plaintiff's

damages, he requests a R. 12(b)(1) hearing to introduce

additional evidence of damages over $75,000 on the Counts which are not dismissed.

## Conclusion

For all of the reasons cited in this brief, the Plaintiff asks that all of his causes of action against Marina go forward to discovery and that an extra 56 days be granted for service.

Respectfully Yours,

Thomas B. Duffy