IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| PREVIN MANKODI,<br><br>                              Plaintiff,<br><br>v.<br><br>TRUMP MARINA ASSOCIATES, LLC, A NEW JERSEY LLC, SUSAN FLOORPERSON, and J. DEALER, Trump Marina Associates' employees whose real names are not known,<br><br>                              Defendants. | Civil Action No.: 1:11-cv-04478 (JHR-KMV)<br><br><br>***Electronically filed*** |

---

**DEFENDANT, TRUMP MARINA ASSOCIATES, LLC'S
BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

LEVINE, STALLER, SKLAR, CHAN,
& BROWN, P.A.
3030 Atlantic Avenue
Atlantic City, NJ 08401
(609) 348-1300
Counsel for Defendant,
Trump Marina Associates, LLC

On the Brief:

Mary Beth Clark, Esq.
Anthony Morgano, Esq.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 3

    A.  Background Facts ................................................................................ 3

    B.  Facts Giving Rise To The Complaint ................................................. 3

PROCEDURAL HISTORY ..................................................................................... 6

LEGAL ARGUMENT ............................................................................................. 8

    POINT I
    SUMMARY JUDGMENT STANDARD ........................................................... 8

    POINT II
    BECAUSE VIDEO SURVEILLANCE BELIES PLAINTIFF'S CLAIMS,
    THE  COURT SHOULD NOT ENTERTAIN PLAINTIFF'S "VISIBLE
    FICTION." ...................................................................................................... 9

    POINT III
    SUMMARY JUDGMENT MUST BE GRANTED ON PLAINTIFF'S CLAIMS
    FOR BATTERY AND FALSE IMPRISONMENT BECAUSE DEFENDANT'S
    ACTIONS WERE REASONABLE AND LEGALLY JUSTIFIED ........................ 11

    A.   Applicable Law ................................................................................ 11

    B.   Legal Justification ........................................................................... 12

    C.   On This Record, There Is No Genuine Issue Of Material Fact As To
         Whether Defendant Was Legally Justified In Detaining Plaintiff ................. 14

    POINT IV
    COUNT SIX MUST BE DISMISSED AS A MATTER OF LAW ........................... 21

    POINT  V
    PLAINTIFF'S COMPLAINT MUST BE DISMISSED FOR FAILURE TO
    ESTABLISH WITH REQUISITE CERTAINTY THAT HE SUFFERED ANY
    DAMAGES .................................................................................................... 24

    POINT VI
    PLAINTIFF IS NOT ENTITLED TO PUNITIVE DAMAGES ................................ 24

i

CONCLUSION..........................................................................................................26

TABLE OF AUTHORITIES

**Federal Cases**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ................................................. 8, 9

Barletta v. Golden Nugget Hotel Casino, 580 F. Supp. 614 (D.N.J. 1984) ................... 12

Campione v. Adamar of New Jersey, Inc., 302 N.J. Super. 99 (App. Div. 1997) ............ 4

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ................................................................. 9

Cottrell v. Good Wheels, 458 Fed. Appx. 98 (3d Cir. 2012) ........................................... 11

Cruzan v. Director, Missouri Department of Health, 497 U.S. 261 (1990) ..................... 11

Friedman v. Borgata Hotel. Casino & Spa, 2009 WL 901023 (D.N.J. Apr. 1, 2009) .......................................................................................................................... 13

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ....................... 8

Orsatti v. New Jersey State Police, 71 F.3d 480 (3d Cir. 1995) ....................................... 9

Scott v. Harris, 550 U.S. 373 (2007) ................................................................................ 9

Valhal Corp. v. Sullivan Assoc., Inc., 44 F.3d 195 (3d Cir. 1995) ................................... 8

**State Cases**

Bell Atlantic Network Services. Inc. v. P.M. Video Corp., 322 N.J. Super. 74 (App. Div. 1999) ............................................................................................................ 25

Berg v. Reaction Motors Div., 37 N.J. 396 (1962) ......................................................... 25

Caradimitropoulo v. Borgata Hotel Casino & Spa, 2010 N.J. Super. Unpub. LEXIS 2059 (N.J. App. Div. Aug. 20, 2010) ................................................................. 13

Davis vs. Devereux Foundation, 414 N.J. Super. 1 (App. Div. 2010) ............................ 25

Fair Oaks Hosp. v. Pocrass, 266 N.J. Super. 140 (Law Div. 1993) ............................... 12

Ferguson v. Gies, 46 N.W. 718, 720 (Mich. 1890) ......................................................... 21

Hahn v. Bergen Regional Medical Center, 2011 WL 2472694 (App. Div. 2011) ............ 12

Herman v. Sunshine Chemical Specialties, Inc., 133 N.J. 329 (1993)...........................25

Larry v. State, 2011 WL 6782438 (N.J. App. Div. Dec. 28, 2011)...................................12

Leang v. Jersey City Board of Education, 198 N.J. 557 (2009) ...............................11, 12

Lewis v. Read, 80 N.J. Super. 148 (App. Div.), certif. granted,
41 N.J. 121 (1963)...........................................................................................................24

Mesgleski v. Oraboni, 330 N.J. Super. 10, 748 A.2d 1130 (App. Div. 2000) ................12

Perna v. Pirozzi, 92 N.J. 446 (1983)...............................................................................11

State v. Gooze, 14 N.J. Super. 277 (App. Div. 1951) .....................................................25

State v. Loquidice, 2010 WL 86663 (N.J. App. Div. 2010)......................................14, 22

State v. Slobin, 682 A.2d 1205 (N.J. App. Div. 1996)...............................................13, 23

State v. Seifert, 85 N.J.L. 104 (Sup. Ct. 1913)................................................................11

Tessmar v. Grosner, 23 N.J. 193 (1957) ........................................................................24

Uston v. Resorts International Hotel, Inc., 89 N.J. 163 (1982)...........................21, 22, 23

**Statutes and Codes**

N.J.S.A. 2A:15-5.12 ........................................................................................................25

N.J.S.A. 5:12-71.1 ..................................................................... 11, 13, 20, 21, 22, 23

N.J.A.C. 19:47-2.1 et seq. ................................................................................................4

**Rules**

Fed.R.Civ.P. 56(a)..............................................................................................................8

Fed.R.Civ.P. 56.1 ...............................................................................................................3

**Other Authority**

N.J. Model Civil Jury Charge 3.14B ................................................................................12

## PRELIMINARY STATEMENT

Plaintiff was given a" second bite of the apple" in this case by the Third Circuit and he failed to utilize that opportunity to present facts to support his claims. That is because, as Defendant has known all along, there are no facts to support his baseless claims. After three of Plaintiff's common law claims that were dismissed by the District Court were reinstated by the Court of Appeals, this case moved forward to discovery. However, Plaintiff provided no new discovery to support his claims other than what he had offered in opposition to the Defendant's Motion to Dismiss and briefs to the Third Circuit. He took no depositions, and in response to interrogatories, requests for production and admissions, he provided no new documents, no new facts and no new witnesses. The only deposition taken during discovery was Plaintiff's. Factually, we are at the exact same place as we were when the initial Motion to Dismiss was granted. This court has no option but to again dismiss Plaintiff's factually unsubstantiated claims.

Previn Mankodi ("Mankodi" or "Plaintiff") is a known and admitted card counter. The events that gave rise to Plaintiff's Complaint are simple and cannot be contradicted on this record. These events are affirmed and supported by reports from the Division of Gaming Enforcement, the Casino Control Commission and by Trump Marina security reports and surveillance videotape. The evidence adduced in discovery plainly demonstrates that Plaintiff went ballistic following a hand of blackjack, accusing the casino of cheating him, and using foul and abusive language toward Trump Marina employees subsequently disrupting gaming operations.

Moreover, this case cannot be viewed in a vacuum. The backdrop of this case is that two months prior to Plaintiff's admittedly "angry" tirade at a Trump Marina shift

supervisor on the casino floor, Ray Kot, a pit manager at Defendant's sister property, was shot and killed in the casino by a regular patron, who like Mankodi, claimed the casino cheated him.  So in the early hours of August 3, 2009, when Plaintiff would not calm down and would not control his foul language aimed at a casino supervisor, security was notified and Mankodi was escorted out of the building.

The events that form the basis for the Plaintiff's Complaint occurred when Plaintiff returned to the casino a mere two hours later.  Plaintiff admits he returned to continue his dispute and he concedes that he was not going to leave the property voluntarily. The same security officers who had previously escorted Plaintiff out of the casino intercepted him as he made his way back to the same casino pit. These same guards advised Mankodi that no one from management would talk to him that evening, and that he had to again leave the casino. Plaintiff refused.  At that point, security had no other option but to escort Plaintiff off the casino floor, and when he flailed and thrashed about, to detain him until he could be interviewed by the Division of Gaming Enforcement and for a second time remove him from the property.

At all times, Trump Marina acted reasonably and was justified in its actions taken to ensure the safety and security of both its patrons and its employees.  Since no genuine issues of material fact exist, Defendant, Trump Marina, is entitled to summary judgment as a matter of law.

## STATEMENT OF FACTS[1]

**A.**   **Background Facts**

Unfortunately, over the past several years, the Atlantic City casinos have been the site of violent acts taken against casino employees by angry gamblers.  Sadly, the most well-known example of this happened at Defendant Trump Marina's sister property, Trump Taj Mahal. On May 27, 2009, Ray Kot, a Taj Mahal casino shift manager, was shot to death inside the Trump Taj Mahal casino by a regular patron who claimed the casino and Mr. Kot had cheated him. Defendant's Rule 56.1 Statement of Undisputed Material Facts (hereinafter "Def. SOF") at ¶ 1. The facts surrounding Mr. Kot's murder were well known in Atlantic City and in the casino industry.  Id.

Plaintiff is a highly educated, experienced, and sophisticated gambler.  Def. SOF at ¶ 5.  He is also a known card counter.  Id.  In fact, he has co-authored a book and numerous articles on card counting and beating the odds at casinos and has been interviewed by several magazines. Def. SOF at ¶¶ 7, 8.  Prior to August 2009, he had been in the Atlantic City casinos over 100 times. Def. SOF at ¶ 10.  Indeed, he had previously been evicted from other casinos in Florida, Louisiana, Nevada and Mississippi. Def. SOF at ¶ 9.

**B.**   **Facts Giving Rise To The Complaint**

The undisputed facts establish that on August 3, 2009, Plaintiff was consuming alcohol and playing blackjack at the Trump Marina Casino and Resort ("Trump Marina" or "Defendant") in Atlantic City, New Jersey. He was recognized by Trump Marina staff

---

[1] The undisputed material facts supporting Defendant, Trump Marina's Motion for Summary Judgment are set forth in the accompanying Defendant's Rule 56.1 Statement of Undisputed Material Facts ("Def. SOF") with citations to the Affidavit of Counsel and are incorporated herein by reference pursuant to Fed.R.Civ.P. 56.1(a).

as a card counter. Def. SOF at ¶¶ 14, 15, 16.  Defendant took lawful countermeasures[2] to limit this known card counting ability to beat the odds of the casino, including shuffling before every hand. Def. SOF at ¶ 17.  When a hand in play was stopped and Plaintiff's bet returned to him because the cards had not been shuffled, Plaintiff immediately protested in an abusive and threatening fashion, disrupting play and yelling obscenities at casino staff. Def. SOF at ¶¶ 19, 20. Plaintiff used profanity and made threatening comments as he loudly claimed the casino had cheated him.  Def. SOF at ¶¶ 20-26, 32, 34, 35, 36.

Assistant Shift Manager Michael J. Mascio asked Plaintiff not to curse. In response, Plaintiff told Mascio to go "F--- himself." Def. SOF at ¶ 22. Plaintiff's refusal to calm down and his profane and abusive language caused the Assistant Shift Manager to call security. Def. SOF at ¶¶ 26, 27, 36, 37, 38. Plaintiff was escorted out of the building by security and told not to return. He was, however, first permitted to report the disputed hand of blackjack to the Casino Control Commission's ("CCC") on-site agent on his way out.  Def. SOF at ¶ 30.  The CCC agent noted in his report that Plaintiff was visibly "angry." Def. SOF at ¶ 35.

The claims remaining in Plaintiff's Complaint arose solely from the events that occurred when Plaintiff returned to the property to continue his dispute a mere two hours after he had been ejected the first time. Def. SOF at ¶ 40.  Thus, despite having

---

[2] Defendant is lawfully entitled to implement countermeasures against card counters, including shuffling the cards after each hand. As the Court in Campione v. Adamar of New Jersey, Inc., 302 N.J. Super. 99 (App. Div. 1997) explained, "the Casino Control Commission has authorized the use of certain measures to defeat card counters... The Commission empowered the casinos to employ the following countermeasures: (1) a method of shuffling the blackjack decks called the "Bart Carter Shuffle," N.J.A.C. 19:47-2.1; (2) increasing the number of decks from which the cards are dealt, N.J.A.C. 19:47-2.2; (3) the continuous shuffling shoe, N.J.A.C. 19:47-2.20; and (4) limiting the number of wagers per player, N.J.A.C. 19:47-2.14." Id. at 103.

been escorted out of the casino two hours earlier by security officers, Plaintiff returned to further press his dispute.  Id.  Upon reentry, Plaintiff immediately returned to the same gaming pit of the casino that he previously had been asked to leave. Def. SOF at ¶ 41.  He was intercepted by the same security guards who had escorted him out of the casino just hours earlier. Id.  Security repeatedly requested that he leave the casino for a second time. Def. SOF at ¶¶ 42, 43, 44, 45.  Plaintiff was given an opportunity to leave voluntarily, but he refused.  Id. Plaintiff admitted at his deposition that he "was not walking out" of the casino even though security advised him no one was going to talk to him and they told him he had to leave the premises.  Def. SOF at ¶ 46.

After Plaintiff continuously refused to comply with security's instructions to leave the casino, security attempted to escort him off the property for a second time that night. Def. SOF at ¶ 48. Plaintiff resisted - flailing his arms and thrashing about - and twisted away from security, leaving security with no option but to restrain and handcuff him. Def. SOF at ¶ 49.  For his safety and for the safety of the patrons and employees in the casino, Plaintiff was restrained, removed from the casino floor and taken to a non-public area. Def. SOF at ¶¶ 50, 51.  Plaintiff remained in this holding area until a New Jersey Division of Gaming Enforcement ("DGE") agent arrived. Def. SOF at ¶ 51. The DGE agent read Plaintiff an eviction notice and casino security personnel escorted him out of the casino for a second time. Def. SOF at ¶ 57.

In his investigation report, the DGE agent described the relevant portion of the night's events as follows:

> …Mankodi became irate and was eventually escorted off the property by security personnel.

Later in the evening, Mankodi returned to the casino to speak with the casino manager. According to security personnel, Mankodi charged towards Pit #1, where he was met by security specialists Duanner Valera, Maximo Valera CCC#159461-21, Antonio Diaz CCC #150555-21, and Dwaun Elam Sr. CCC#146360-21. After being advised that he could not speak to the casino manager, Mankodi used inappropriate language and flailed his arms at security personnel when they attempted to escort him from the casino floor. He was subsequently detained for disorderly conduct.

I advised Mr. Mankodi of the proper procedure in filing a formal complaint with the New Jersey Casino Control Commission. Trump Marina Security Supervisor Mary Cox advised me that no criminal complaints were requested at this time. Mr. Mankodi was formally evicted from the casino by security personnel.

Def. SOF at ¶ 58.

At all times relevant to Plaintiff's reentry to the casino, Trump Marina acted reasonably and was legally justified in requesting that Plaintiff leave the casino for a second time. Trump Marina acted reasonably and was legally justified in removing Plaintiff from the casino floor.   Trump Marina acted reasonably and was legally justified in detaining Plaintiff when he resisted being removed from the casino floor.  Plaintiff's short detention to await the arrival of a DGE agent and be interviewed by that agent was not only reasonable; it was legally justified in order to protect the safety of Defendant's casino guests and casino employees.

## PROCEDURAL HISTORY

Plaintiff filed his Complaint on August 2, 2011, on the eve of the expiration of the statute of limitations.  The Complaint as initially filed asserted twelve causes of action, most of which were predicated upon the disputed hand of blackjack.

In lieu of filing an answer, on February 29, 2012, Trump Marina filed a Motion to Dismiss.  On June 20, 2012, the District Court granted Defendant's Motion to Dismiss,

dismissing all of Plaintiff's claims.   On July 19, 2012, Plaintiff appealed to the United States Court of Appeals for the Third Circuit.   On May 28, 2013, the Third Circuit issued an opinion affirming in part, reversing in part and remanding three claims back to the district court.   That court found the First Cause of Action (battery), Second Cause of Action (false imprisonment), and Sixth Cause of Action (public accommodation claim) sufficiently stated viable causes of action and Plaintiff should be entitled to develop those claims in discovery.   Defendant, Trump Marina filed its Answer on June 26, 2013.

Discovery in this case was quite limited. Defendant produced reports from the Division of Gaming Enforcement, the Casino Control Commission and Trump Marina security, as well as surveillance videotape of the incident. In contradiction, Plaintiff produced virtually no documents that weren't previously submitted in connection with his opposition to Defendant's Motion to Dismiss.   Def. SOF at ¶ 62.   No medical records were produced, as Plaintiff never saw a doctor. No experts were retained. The only deposition taken in this matter was Plaintiff's, despite the fact that Trump Marina identified in discovery, at least fourteen Trump employees who were involved in this matter, a Trump Marina coprorate designee, at least seven employees of the Division of Gaming Enforcement and Casino Control Commission, corporate designee's for both regulatory agencies, as well as members of the press. Def. SOF at ¶¶ 63, 64.

When Plaintiff finally realized at the close of discovery that it might behoove him to take the deposition of a security guard, and raised the issue for the first time on a June 18th, 2014 conference call with the Court, the Court granted Plaintiff an extra month to conduct the deposition of the security guard. Def. SOF at ¶ 65.   In that month, Plaintiff did not notice for deposition the security guard, despite having the last known

address of each and every security guard involved in the incident for over six months. Id. Additionally, Plaintiff never retained an expert witness. Def. SOF at ¶ 62. Factually, the parties are at the exact same place as they were when the initial motion to dismiss was granted in June of 2012. Discovery has concluded and the matter is ripe for summary judgment.

The present motion seeks to dismiss the First, Second and Sixth Causes of Action, as no genuine issues of fact remain.   If granted, Plaintiff's Complaint would be dismissed in its entirety.

## LEGAL ARGUMENT

### POINT I

### SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  A fact is "material" if it will "affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" if it could lead "a reasonable jury [to] return a verdict for the non-moving party." Id. at 250.  On a motion for summary judgment, all reasonable inferences should be resolved in favor of the non-movant.  Valhal Corp. v. Sullivan Assoc., Inc., 44 F.3d 195, 200 (3d Cir. 1995).  "The mere existence of a scintilla of evidence," will not give rise to a genuine dispute for trial.  Anderson, 477 U.S. at 252. Even in the face of such evidence, summary judgment is still appropriate, "where the record . . . could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The moving party bears the initial burden of stating the grounds for the motion and identifying those parts of the record which it believes demonstrate the absence of a genuine issue of material fact.   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion has been made, the adverse party must set forth specific facts establishing that there is a genuine issue for trial.   Anderson, 477 U.S. at 250.   The non-movant's burden is to point to concrete evidence in the record; mere allegations, conclusions, conjecture and speculation will not defeat summary judgment. Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995).

This Complaint is now ripe for summary judgment.   Discovery has concluded and there are no genuine issues of any material fact as to any of Plaintiff's claims.   Plaintiff's claims must be dismissed as a matter of law.

## POINT II

### BECAUSE VIDEO SURVEILLANCE BELIES PLAINTIFF'S CLAIMS, THE COURT SHOULD NOT ENTERTAIN PLAINTIFF'S "VISIBLE FICTION."

The United States Supreme Court has held that videotape evidence may properly be considered at the summary judgment stage of proceedings. Scott v. Harris, 550 U.S. 373, 380 (2007). "When opposing parties tell two different stories, one of which is blatantly contracted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Id. (holding that, based on videotape evidence, a police officer did not use excessive force in ramming a fleeing suspect's car).   Although the court on summary judgment should ordinarily view the facts and all reasonable inferences drawn from those facts in a light most favorable to the non-moving party, where there is video

footage, the Court should not entertain "visible fiction." Id. Rather, the court must "view the facts in the light depicted by the videotape." Id. As such, to the extent that any of the relevant facts cited by the parties differ, the court should resolve any such disputes by relying on the facts depicted in the video.

In this case, Defendant has produced surveillance video tape showing Plaintiff's outburst following the disputed hand of blackjack. The video tape depicts security arriving at the table, removing Plaintiff from the casino floor, escorting him to the casino control booth, and then out toward an exit. The video tape then demonstrates that Plaintiff returned to the casino two hours later. The video then shows the guards intercepting Plaintiff as he walks toward the same pit he had previously been ejected from. Importantly, the video tape also demonstrates that security personnel engaged in a several minute long conversation with Plaintiff. When Plaintiff refused to comply with security's request to leave the casino floor, a security officer attempts to escort him off the floor. It is at this point that Plaintiff begins to flail his arms, and thrash about, causing security to restrain and handcuff him. Although there is no audio in the recording, the recording confirms the reports of the Casino Control Commission, the Division of Gaming, and Trump Marina's security records. To the extent that the parties disagree as to any relevant facts, the Court should view the facts in light of the video tape produced, rather than drawing all inferences in favor of Plaintiff.

## POINT III

### SUMMARY JUDGMENT MUST BE GRANTED ON PLAINTIFF'S CLAIMS FOR BATTERY AND FALSE IMPRISONMENT BECAUSE DEFENDANT'S ACTIONS WERE REASONABLE AND LEGALLY JUSTIFIED.

Summary judgment should be granted on the First and Second Causes of Action in Plaintiff's Complaint asserting claims for battery and false imprisonment, respectively. Plaintiff's claims for battery and false imprisonment fail because Defendant's actions were reasonable and legally justified in light of its rights and obligations pursuant to N.J.S.A. 5:12-71.1.

### A.    Applicable Law

The tort of battery is the "nonconsensual touching of another." Leang v. Jersey City Board of Education, 198 N.J. 557, 591 (2009); Perna v. Pirozzi, 92 N.J. 446, 460-61 (1983). In order to succeed on a claim for battery, the plaintiff must show that the defendant touched him with **unlawful** force, and that the plaintiff was in fact the victim of some actual unwanted or uninvited touching or striking **without legal justification**. See, e.g., State v. Seifert, 85 N.J.L. 104, 106 (Sup. Ct. 1913) (emphasis added); see also Cruzan v. Director, Missouri Department of Health, 497 U.S. 261, 369 (1990)(at common law, "the touching of one person by another without consent and without legal justification was a battery."). Authority or legal justification therefore nullifies a claim for battery. Id.

"False arrest, or false imprisonment, is the constraint of a person without legal justification." Cottrell v. Good Wheels, 458 Fed. Appx. 98 (3d Cir. 2012)(citing Leang v. Jersey City Board of Education, 198 N.J. 557, 591 (2009)). In false imprisonment, "the essence of the tort consists in depriving the plaintiff of his liberty without lawful

justification." <u>Mesgleski v. Oraboni</u>, 330 N.J. Super. 10, 24 (App. Div. 2000); <u>Fair Oaks</u> <u>Hosp. v. Pocrass</u>, 266 N.J. Super. 140, 153 (Law Div. 1993).   Thus, the tort of false imprisonment has two elements: (1) an arrest or detention of a person against his or her will, and (2) the lack of proper legal authority or legal justification. <u>Leang v. Jersey City</u> <u>Bd. of Educ.</u>, 198 N.J. 557, 591 (2009); <u>see also</u> <u>Barletta v. Golden Nugget Hotel</u> <u>Casino</u>, 580 F.Supp. 614, 617 (D.N.J. 1984).

It is a complete defense to a claim of false imprisonment if the second element cannot be met, that is, if the defendant restrained or arrested the plaintiff with legal authority or justification. <u>See</u> <u>Hahn v. Bergen Reg'l Med. Ctr.</u>, 2011 N.J. Super. Unpub. LEXIS 1626, *7-8 (App.Div. June 23, 2011) (attached hereto as Exhibit A). <u>Larry v.</u> <u>State</u>, 2011 N.J. Super. Unpub. LEXIS 3099 (App.Div. Dec. 28, 2011)(attached hereto as Exhibit B)(because plaintiff was not authorized to be in the building, the restraint on her freedom was legal).   "If the Defendant was exercising his/her rights according to law, then the imprisonment was justifiable." <u>See</u>, <u>e.g.</u>, N.J. Model Civil Jury Charges 3.14B (False Imprisonment).

**B.**    <u>**Legal Justification**</u>

As stated above, legal justification is a complete defense to both battery and false imprisonment.   Trump Marina was legally justified in restraining and detaining Plaintiff when he returned to the casino the night of August 3, 2009 to continue his dispute and refused to leave, after having been removed two hours earlier for his abusive, disruptive and disorderly behavior. Trump Marina merely exercised its common law and statutory right to exclude or eject anyone from its premises who disrupts the

operation of the casino pursuant to N.J.S.A. 5:12-71.1. That statute provides in relevant part:

> ...Nothing in this section or in any other law of this State shall limit the right of a casino licensee to exercise its common law right to exclude or eject permanently from its casino hotel any person who <u>disrupts the operations of its premises, threatens the security of its premises or its occupants, or is disorderly or intoxicated</u>.

N.J.S.A. 5:12-71.1.

The right of exclusion stated in N.J.S.A. 5:12-71.1 codifies existing common law, which New Jersey's courts have construed to impose a duty on a property owner to remove disorderly persons for the safety of other invitees. <u>State v. Slobin</u>, 682 N.J. Super. 1205, 1207 (App. Div. 1996).  Consequently, under N.J.S.A. 5:12-71.1 and the common law, casinos have the explicit right and the duty to remove disruptive, disorderly or intoxicated patrons from their premises, thus rendering such actions legally justified. <u>Id</u>.  N.J.S.A. 5:12-71.1 must be construed in a manner reasonably calculated to carry out its objectives and the objectives of the common law of protecting the casino and safeguarding innocent casino patrons and employees.

Further it is clear, that the statute is designed to protect the casino. <u>See Friedman v. Borgata Hotel, & Casino, Spa</u>, 2009 U.S. Dist. LEXIS 29084 (D.N.J. Apr. 1, 2009) (D.N.J. Apr. 1, 2009)(attached hereto as Exhibit C)(N.J.S.A. 5:12-71.1 is for the protection of the casino.")  Accordingly, Plaintiff's claims for battery and false imprisonment fail as a matter of law.

The present case is factually similar to <u>Caradimitropoulo v. Borgata Hotel Casino & Spa</u>, 2010 N.J. Super. Unpub. LEXIS 2059 (N.J. App. Div. Aug. 20, 2010)(attached hereto as Exhibit D).  In dismissing a plaintiff's casino patron's claim of false

imprisonment, the Appellate Division stated that "even if [plaintiff] felt restrained [by casino security], there was justification or probable cause to hold him pending an investigation." Id. The exact same situation exists in the present case. See also State v. Loguidice, 2010 N.J. Super. Unpub. LEXIS 57 (App. Div. Jan. 12, 2010)(stating that Defendant "did not comply with all lawful conditions imposed on access to the Trump Marina when he disregarded express notice give to him" that he was not permitted to return to the casino because of his disruptive behavior.)

In this case, Plaintiff, who was admittedly angry and had been drinking, and who had been previously ejected from the casino, was given an opportunity to voluntarily leave the casino for a second time.  When he refused, security acted to gain control of the situation for the safety of guests and staff on the property.  The present facts are supported by Plaintiff's own admissions, the casino's Security Department records, the CCC's records, the DGE investigator's report and the videotape footage of the events on the casino floor.  Under these facts, as set forth below, the Defendant was legally justified in removing Plaintiff from the casino's public floor, calling the DGE, detaining him for a short period of time to determine whether he was a danger to anyone on the property or to the security of the premises, and then ejecting him from the property for a second time that day

**C.** **On This Record, There Is No Genuine Issue Of Material Fact As To Whether Defendant Was Legally Justified In Detaining Plaintiff.**

At the time of the events in this case, it was well known, given the recent shooting death of Ray Kot, that human loss and devastating tragedy can occur due to the actions of angry and disruptive patrons.  The safety and security of the casino, its

patrons and its staff cannot be ignored in considering the reasonableness and legal justification for the casino's actions.

The uncontroverted events that occurred on August 3, 2009 lead to the inescapable conclusion that Trump Marina acted reasonably and was legally justified in removing Plaintiff from the casino floor and detaining him just long enough to be interviewed by the Division of Gaming Enforcement and then ejected a second time from the casino.

Plaintiff is a highly educated individual with a Masters degree in both economics and business, having attended the University of Chicago, University of Cambridge in the United Kingdom and Stanford University. Def. SOF at ¶ 4.   At the time of the August 3, 2009 incident, he was a professional gambler, a self-professed card counter, and an avid blackjack player who frequently played with partners and groups of card counters. Def. SOF ¶ 5.   By playing in groups, Plaintiff would "pool" resources, such that he would share risk across members of a team and would split profits and losses accordingly.   Def. SOF ¶ 6.   Plaintiff has co-authored a book and numerous articles and been interviewed by magazines on card counting and on the advantages of group play against casinos. Def. SOF ¶ 7.  By his own admission, Plaintiff has gambled in Atlantic City casinos over 100 times. Def. SOF ¶ 10.  Importantly, this was not Plaintiff's first casino eviction.  Def. SOF ¶ 9.  Plaintiff had previously been evicted from three other casinos in Florida, Louisiana, Nevada and Mississippi. Id. As such, Plaintiff was well aware of how to act, and how not to act, in a casino.

Defendant's legal justification arises from the undisputed facts of that night.  On August 3, 2009, Plaintiff was working in tandem with his gambling partner, James

Grosjean, in various casinos in Atlantic City. Def. SOF ¶ 13.  Plaintiff readily admits that he had been drinking that night while playing at Trump Marina.  Def. SOF ¶ 16.  While playing blackjack at a high-limit pit at Trump Marina, the casino identified Plaintiff as a card counter and thereupon employed lawful card-counting counter measures against him, including shuffling after every hand.  Def. SOF ¶ 17.

At approximately 1:50 a.m., the dealer failed to shuffle the deck before dealing Plaintiff a card.  Def. SOF ¶ 18.   Defendant's Assistant Shift Manager, Michael J. Mascio, instructed the dealer to rescind the hand, return Plaintiff's bet, and shuffle the cards.  Def. SOF ¶ 19.  It was at this point that Plaintiff began his loud, angry, out of control tirade against casino staff.   Plaintiff immediately protested the hand in a loud manner, disrupting play and yelling obscenities at casino staff.  Def. SOF ¶ 20.   When Shift Manager Mascio asked Plaintiff to stop cursing, Plaintiff responded by telling Mascio to go "F--- himself."  Def. SOF ¶¶ 21, 22.  Plaintiff went "ballistic" and refused to stop.  Def. SOF ¶ 23.  When Plaintiff refused to calm down and continued to carry on in an irate manner, Mascio informed him that he could no longer play any games on the casino floor.  Def. SOF ¶ 25.  Plaintiff would not stop, continued to curse, shout and threaten casino employees, and would not leave, thus requiring security to be called. Def. SOF ¶¶ 25, 26, 27.

Plaintiff admits that he was "outraged" and "angry" because of the disputed hand. Def. SOF ¶ 24.  His own counsel admitted in writing that he was "clearly angry" and that this anger was "directed at Trump Marina."  Def. SOF ¶ 34.  Plaintiff, in his Complaint, readily admits that casino staff demanded that he leave the casino.  Def. SOF ¶ 36. The CCC's report of its on site agent reflects that Plaintiff was asked to leave because

of his irate behavior and abusive language toward casino staff.  Def. SOF ¶ 35.  Under the circumstances and in light of the murder of casino employee Ray Kot by an angry gambler, who claimed he had been cheated, just two months earlier, Defendant acted responsibly and was legally justified in demanding Plaintiff leave the casino.

When security arrived and demanded that Plaintiff leave the casino, he requested that he be allowed to report the incident to the CCC's on-site agent.  Def. SOF ¶¶ 27, 29.  This request was granted.  Def. SOF ¶¶ 28-31.  Indeed, Plaintiff's Complaint stated that security advised him that he could report the incident to the State employee and thereafter he had to leave the casino.  Def. SOF ¶ 30.

When Plaintiff arrived at the CCC booth accompanied by security personnel, he continued to rant about the disputed hand, and "demanded that an agent immediately investigate his complaint."  Def. SOF ¶¶ 32, 33.  The CCC's agent's report described Plaintiff as "angry" and "demanding."  Def. SOF ¶ 32.  When security advised the CCC's agent that Plaintiff was being escorted out due to his disruptive behavior, the on-site agent gave Plaintiff a card, directed him to contact the CCC's Legal Division, and further advised him that his complaint could not be immediately investigated.  Def. SOF ¶ 37. The CCC agent's report confirmed that Plaintiff was asked to leave "due to his abusive language toward the Pit Manager [Mr. Mascio]."  Def. SOF ¶ 35.  Plaintiff admits that "defendant's security informed [him] that due to his protests they were demanding that he forthwith leave the defendant's casino."  Def. SOF ¶ 36.  Plaintiff was escorted to the casino exit and directed by security to leave the property.  Def. SOF ¶ 38.  The record undisputedly demonstrates that Plaintiff complied with security's demand and left the casino. Id.

It was not until Plaintiff returned to the casino less than two hours later - <u>after</u> security had demanded that he leave - that Defendant Trump Marina was justifiably forced by Plaintiff's own actions to restrain and detain him for a limited time.   Upon reentry into the casino, Plaintiff admits he sought to return to the same blackjack pit seeking to continue to address his complaint that the casino had cheated him. Def. SOF ¶¶ 39, 43, 44.    Plaintiff admitted that once he returned, he was not leaving until his complaint was addressed.  Def. SOF ¶ 46.  When Plaintiff returned to the property after he was asked to leave several hours earlier, he was not an invitee; he had already been asked -- in fact "demanded," -- to leave.  When Plaintiff returned, he was a trespasser.

The very same security guards who previously escorted Plaintiff off the property intercepted him when he attempted to re-enter the same casino pit to speak to the same shift manager about how he was cheated. Def. SOF ¶ 41.  Security advised Plaintiff that he was not permitted on the property, and again demanded that he leave.  Def. SOF ¶¶ 42, 43. Security spent the next several minutes attempting to convince Plaintiff to leave voluntarily. Def. SOF ¶ 43.  He refused. <u>Id</u>. Plaintiff even admitted at his deposition that he "was not [voluntarily] walking out."  Def. SOF ¶ 44.  He was determined to have his complaint heard right then and there as he did not like to be ignored.  Def. SOF ¶¶ 46, 47.

After Plaintiff continuously refused to comply with security's instructions to leave the casino, security attempted to escort him off of the property for a second time that night. Def. SOF ¶ 48.  Plaintiff resisted, flailing his arms, twisting away from security, and forcing security to restrain and handcuff him.  Def. SOF ¶ 49.  Ultimately, it was Plaintiff's own actions that forced security to restrain him.  Plaintiff was restrained and

removed from the casino floor to ensure that he was not a danger to anyone on the property, including other casino guests and casino staff.  Def. SOF ¶ 50.  Because Plaintiff would not leave, security took him to a non public office where they awaited the arrival of a Division of Gaming Enforcement ("DGE") agent.  Def. SOF ¶ 51.

Plaintiff was detained only so long as it took for a DGE agent to arrive and interview him.  Def. SOF ¶ 52.  During that time, no one touched, abused or yelled at Plaintiff.  Id.  The DGE agent who spoke to Plaintiff was detailed to Trump Marina in response to a disorderly person's complaint. Def. SOF ¶ 53.  Trump Marina security had not yet identified Plaintiff at this point as he had refused to provide security personnel with any identifying information. Def. SOF ¶ 54.  The DGE agent identified Plaintiff as Previn Mankodi.  Def. SOF ¶ 53.  The DGE agent questioned Plaintiff and he told the DGE his version of the events of that evening.   Def. SOF ¶ 56.  Thereafter, the DGE agent read Plaintiff an eviction notice and casino security personnel escorted him out of the casino for a second time that night.  Def. SOF ¶ 57.

In his investigation report, the DGE agent described the relevant portion of the night's events as follows:

> …Mankodi became irate and was eventually escorted off the property by security personnel.
> Later in the evening, Mankodi returned to the casino to speak with the casino manager. According to security personnel, Mankodi charged towards Pit #1, where he was met by security specialists Duanner Valera, Maximo Valera CCC#159461-21, Antonio Diaz CCC #150555-21, and Dwaun Elam Sr. CCC#146360-21. After being advised that he could not speak to the casino manager, Mankodi used inappropriate language and flailed his arms at security personnel when they attempted to escort him from the casino floor. He was subsequently detained for disorderly conduct.
> I advised Mr. Mankodi of the proper procedure in filing a formal complaint with the New Jersey Casino Control Commission. Trump Marina

Security Supervisor Mary Cox advised me that no criminal complaints were requested at this time. Mr. Mankodi was formally evicted from the casino by security personnel.

Def. SOF ¶ 58.

Based on its common law and statutory rights and duties, Trump Marina acted legally, reasonably and responsibly in its initial demand that Plaintiff leave the premises when his unceasing protests over a blackjack hand became disruptive, and when he started using abusive and threatening language toward casino staff. See N.J.S.A. 5:12-71.1. This is especially so in light of the murder of Ray Kot two months earlier by a casino patron who claimed he was cheated.

By reappearing less than two hours later and not only refusing to leave the premises despite the demands of security personnel, but resisting security's attempt to escort him off the property, Plaintiff placed the casino in the position of having to restrain and detain him for the purpose of determining whether he was a danger to other casino patrons or staff or to the security of the premises under N.J.S.A. 5:12-71.1 and the common law. Plaintiff has offered no evidence to suggest that Defendant was not legally justified in its removal and detention of him, that an improper level of force was applied by the security guards in their efforts to detain him, nor has he produced an expert with respect to same.

The record in this case clearly reflects that Plaintiff, both initially and upon reentry, was disruptive to the operation of the casino and could reasonably be viewed as threatening to the security of the premises, casino patrons and casino staff. N.J.S.A. 5:12-71.1. Under these circumstances, and at that time, it takes no imagination to understand why Trump Marina's security officers took Plaintiff's reappearance as a

serious security threat.  Only two months prior, on May 27, 2009, casino shift manager Ray Kot, was tragically shot and killed on the casino floor by a gambling patron who was angry and who had accused the casino of cheating him.   Def. SOF ¶ 11. Obviously, Plaintiff's claims of being cheated and his visible (and admitted) anger were all too familiar a set of circumstances . . . deadly circumstances. Accordingly, Trump Marina clearly had statutory immunity to restrain and detain Plaintiff to make sure he was not a danger to the premises, other patrons or staff. Thus, Plaintiff's claims for battery and false imprisonment must be dismissed as a matter of law.

POINT IV

**COUNT SIX MUST BE DISMISSED AS A MATTER OF LAW.**

In the Sixth Cause of Action, Plaintiff alleges that as a "public amusement," Defendant does not under common law have the right to eject persons from its premises. The Third Circuit Court of Appeals found this Sixth Cause of Action to allege a claim for breach of the duty of public accommodation.  Clearly, this claim is defeated by the statutory immunity granted Defendant under the express terms of N.J.S.A. 5:12-71.1, which was addressed extensively in the prior section. Because the undisputed material facts reveal that Defendant Trump Marina acted reasonably and lawfully in restraining and ejecting Plaintiff from its property, Plaintiff's claim for breach of the duty of public accommodation must be dismissed as a matter of law.

The Third Circuit's analysis of the Sixth Cause of Action is instructive:

> Under New Jersey law, "when property owners open their property to the general public in pursuit of their own property interests, they have no right to exclude people unreasonably." Uston v. Resorts Int'l Hotel, Inc., [89 N.J. 163], 445 A.2d 370, 375 (N.J. 1982).  However, property owners may exclude people - those whose actions disrupt the regular and essential

21

operations of the premises, or threaten the security of the premises and its occupants, "for instance, - the disorderly, the intoxicated, and the repetitive petty offender." Id.   A plaintiff may recover damages for a breach of the duty of public accommodation.   See id. at 374 (citing Ferguson v. Gies, 46 N.W. 718, 720 (Mich. 1890)).  "Whether a decision to exclude is reasonable must be determined from the facts of each case." Id. at 375.

In Uston, the defendant casino was found to have acted unreasonably by excluding a card counter who **did not** threaten the security of the casino or its occupants, or disrupt the functioning of the casino operation.  Uston, 89 N.J. at 375. Justice Pashman, in authoring that decision, clearly stated its limitations:

> No party in this appeal questions the right of property owners to exclude from their premises those whose actions "disrupt the regular and essential operations of the [premises]," or threaten the security of the premises and its occupants.  In some circumstances, proprietors have a duty to remove disorderly or otherwise dangerous persons from the premises. These common law principles enable the casino to bar from its entire facility, for instance, the disorderly, the intoxicated, and the repetitive petty offender.

Id. at 173 (citations omitted).  See also State v. Loguidice, 2010 N.J. Super. Unpub. LEXIS 57 (App.Div. Jan. 12, 2010)(attached hereto as Exhibit E).  As set forth above in detail, the Plaintiff here had admittedly been drinking, he was admittedly angry, his loud, profane and threatening language was disruptive to casino operations and his irate behavior, described as "going ballistic," was disorderly and potentially dangerous. Thus, under Uston, Defendant not only had a right to restrain and remove Plaintiff, it had a duty to do so in order to protect the safety and security of the other guests and Defendant's employees.

These principles as enunciated in Uston, were subsequently codified in the Casino Control Act, which was amended in 1995 to make clear that casinos retained the common law right to exclude customers as recognized in Uston.  See N.J.S.A. 5:12-

71.1.   The Act expressly recognizes a casino's existing common law right to exclude and eject patrons and rejects any law to the contrary:

> Nothing in this section or in a any other law of this state shall limit the right of a casino licensee to exercise its common law right to exclude or eject permanently from its casino hotel any person who disrupts the operations of its premises, threatens the security of its premises or its occupants, or is disorderly or intoxicated.

Id.; see also State v. Slobin, 294 N.J. Super. 154, 158 (App. Div. 1996)(N.J.S.A. 5:12-71.1 is a codification of existing common law).   This provides statutory immunity to casinos who eject, intoxicated, disorderly and disruptive patrons like the Plaintiff.

Our courts have construed the common law right of property owners set forth in Uston and N.J.S.A 5:12-71.1 to impose a duty on the property owner to remove disorderly persons for the safety of other invitees.   See Id. at 157-8.   Consequently, under N.J.S.A. 5:12-71.1, casinos have not only the right but the explicit duty to remove disruptive, disorderly or intoxicated patrons from their premises and thereby makes such actions reasonable, not unlawful.   To not eject potentially dangerous patrons like Plaintiff, subjects Defendant to liability from other patrons and its own employees for its failure to keep its place of public accommodation/workplace safe.

Thus, the Casino Control Act provided Defendant express statutory authority to exercise its common law licensee right to exclude and eject Plaintiff, a disruptive and threatening gambler, particularly after he was removed, and then returned and refused to leave the casino.   N.J.S.A. 5:12-71.1.   At no time were the Defendant's actions unreasonable; rather, under the undisputed factual circumstances here, Defendant had a duty to eject the Plaintiff in order to maintain a safe and secure environment. Accordingly, the undisputed material facts establish that Defendant's actions were at all

times reasonable and lawful, thus Plaintiff's claim in the Sixth Cause of Action must be dismissed as a matter of law.

### POINT V

### PLAINTIFF'S COMPLAINT MUST BE DISMISSED FOR FAILURE TO ESTABLISH WITH REQUISITE CERTAINTY THAT HE SUFFERED ANY DAMAGES.

Generally, courts have not allowed a plaintiff to recover "damages based upon mere speculation." Lewis v. Read, 80 N.J. Super. 148, 174 (App. Div.), certif. granted, 41 N.J. 121 (1963).   The New Jersey Supreme Court has explained that the "rule relating to the uncertainty of damages applies to the uncertainty as to the fact of damage not as to its amount." Tessmar v. Grosner, 23 N.J. 193, 203 (1957).   In essence, as long as certainty exists as to the fact that damage has occurred, uncertainty regarding the amount of damages will not bar recovery.   Here we have uncertainty as to the fact that any damage has occurred, which is fatal to Plaintiff's claims.

Plaintiff has presented no discovery in this case related to damages.   Indeed, Plaintiff admits that he has not received any treatment from a medical professional for any injuries suffered as a result of Defendant's alleged wrongful conduct.   Def. SOF ¶¶ 59, 60.   Plaintiff has no injuries and no damages.   Consequently, he cannot establish the existence of damages.   Thus, his claims must be dismissed as a matter of law.

### POINT VI

### PLAINTIFF IS NOT ENTITLED TO PUNITIVE DAMAGES.

To the extent that Plaintiff's remaining causes of action assert claims for punitive damages, Plaintiff has not met the threshold for same. "A condition precedent to a

punitive-damages award is the finding that the defendant is guilty of actual malice. Herman v. Sunshine Chemical Specialties, Inc., 133 N.J. 329, 337 (1993). "There must have been a "positive element of conscious wrongdoing." Berg v. Reaction Motors Div., 37 N.J. 396, 414 (1962). The requirement may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." Bell Atlantic Network Services. Inc. v. P.M. Video Corp., 322 N.J. Super. 74, 103 (App. Div. 1999). Neither mere negligence nor gross negligence can support an award of punitive damages. Id.

It is well established that to constitute willfulness, "there must be design, purpose, intent to do wrong and inflict injury." State v. Gooze, 14 N.J. Super. 277, 283 (App. Div. 1951). "To constitute wantonness, the party doing the act, or failing to act, must be conscious of his conduct, and, without having the intent to injure, must be conscious, from his knowledge of existing circumstances and conditions that his conduct will naturally and probably result in injury." Id. in order to assess punitive damages in a vicarious liability case, the plaintiffs need to prove "actual participation by upper management or willful indifference." Davis vs. Devereux Foundation, 414 N.J. Super. 1, 17 (App. Div. 2010). Plaintiff prove these elements with clear and convincing evidence. N.J.S.A. 2A:15-5.12.

Here, however, Plaintiff has fail to demonstrate that any of the acts on the part of Defendant were willful or wanton. There has not been a scintilla of evidence proffered that Defendant intended to cause any injury to Plaintiff. To the contrary, the evidence produced demonstrates that Defendant was acting only in response to a situation of Plaintiff's own creation. There is certainly no proffered proof that any of the acts on the

part of Trump Marina constitutes a "willful" or "wanton" disregard of Plaintiff's rights.

Accordingly, all claims for punitive damages should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant, Trump Marina Associates, LLC's Motion

for Summary Judgment should be granted.

LEVINE, STALLER, SKLAR, CHAN
& BROWN, P.A.
Attorneys for Trump Marina Associates, LLC


By:   /s/ Anthony Morgano

Anthony Morgano, Esq.

Dated:   August 8, 2014

## UNPUBLISHED CASES:

Hahn v. Bergen Regional Medical Center, 2011 WL 2472694, at 3 (App. Div. 2011)

Friedman v. Borgata Hotel. Casino & Spa, 2009 WL 901023, at *6 (D.N.J. Apr. 1, 2009)

Larry v. State, 2011 WL 6782438, at *3 (N.J. App. Div. Dec. 28, 2011)

Caradimitropoulo v. Borgata Hotel Casino & Spa, 2010 N.J. Super. Unpub. LEXIS 2059 (App. Div. Aug. 20, 2010)

State v. Loguidice, 2010 WL 86663, at 4 (App. Div. 2010)





Positive
As of: August 8, 2014 11:17 AM EDT

# Hahn v. Bergen Reg'l Med. Ctr.

Superior Court of New Jersey, Appellate Division
June 6, 2011, Argued; June 23, 2011, Decided
DOCKET NO. A-2869-09T1, A-6282-09T1, A-1924-10T4

**Reporter:** 2011 N.J. Super. Unpub. LEXIS 1626

PHILIP E. HAHN, Plaintiff-Appellant, v. BERGEN REGIONAL MEDICAL CENTER, and OTSUKA AMERICA PHARMACEUTICAL, INC., Defendants-Respondents.PHILIP E. HAHN, Plaintiff-Appellant, v. BERGEN REGIONAL MEDICAL CENTER, ESTATE OF ZARKO CUCULIC, M.D., and BRISTOL-MYERS SQUIBB COMPANY, Defendants-Respondents.PHILIP E. HAHN, Plaintiff-Appellant, v. BERGEN REGIONAL MEDICAL CENTER, Defendant-Respondent.PHILIP E. HAHN, Plaintiff-Appellant, v. BERGEN REGIONAL MEDICAL CENTER, ESTATE OF ZARKO CUCULIC, M.D., and BRISTOL-MYERS SQUIBB COMPANY, Defendants-Respondents.PHILIP E. HAHN, Plaintiff-Appellant, v. BERGEN REGIONAL MEDICAL CENTER, Defendant-Respondent.PHILIP E. HAHN, Plaintiff-Appellant, v. TEANECK RETINA ASSOCIATES, and STUART NOORILY, M.D., Defendants-Respondents.

**Notice:** NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION.

PLEASE CONSULT NEW JERSEY *RULE 1:36-3* FOR CITATION OF UNPUBLISHED OPINIONS.

**Subsequent History:** Related proceeding at *Hahn v. Johnson & Johnson, 2011 N.J. Super. Unpub. LEXIS 2489 (App.Div., Oct. 3, 2011)*

**Prior History:** [*1] On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket Nos. L-1852-07, L-1855-07, L-2935-07, L-8812-07, L-6110-08 and L-5251-09.
*Hahn v. Bergen Reg'l Med. Ctr., 2008 N.J. Super. Unpub. LEXIS 1668 (App.Div., May 30, 2008)*

| Core Terms |
| --- |

affidavit of merit, summary judgment, psychiatric, common knowledge, medication, patient, retinal, retina, false imprisonment, trial court, schizophrenia, detachment, immunity, expert testimony, standard of care, distress, orders

**Counsel:** Philip E. Hahn, appellant, argued the cause Pro se in A-2869-09T1, A-6282-09T1 and A-1924-10T4.

Robert J. Logan argued the cause for respondents Bergen Regional Medical Center and Estate of Zarko Cuculic, M.D. in A-2869-09T1 (Vasios, Kelly & Strollo, P.A., attorneys; Mr. Logan, of counsel and on the brief).

David R. Kott argued the cause for respondent Bristol-Myers Squibb Company in A-2869-09T1 (McCarter & English, L.L.P., attorneys; Mr. Kott, of counsel; Mr. Kott and Sara F. Merin, on the brief).

James S. Richter argued the cause for respondent Otsuka America Pharmaceutical, Inc. in A-2869-09T1 (Winston & Strawn, L.L.P., attorneys; Matthew A. Campbell of the Washington, D.C. bar admitted pro hac vice, and Timothy M. Broas, of counsel; Mr. Richter and Melissa Steedle Bogad, on the brief).

Samuel M. Goffinet argued the cause for respondent Bergen County Medical Center in A-6282-09T1 (Ahmuty, Demers & McManus, attorneys; Mr. Goffinet, on the brief).

Patricia M. Wason argued the cause for respondents Teaneck Retina Associates and Stuart [*2] Noorily, M.D. in A-1924-10T4 (Post, Polak, Goodsell, MacNeill & Strauchler, P.A., attorneys; Ms. Wason, on the brief).

**Judges:** Before Judges Lisa, Reisner and Alvarez.

| Opinion |
| --- |

PER CURIAM
Appellant, Philip E. Hahn, filed six separate Law Division actions, all of which were ultimately dismissed by summary judgment by way of various Law Division orders. The suits arose out of two psychiatric commitments of plaintiff at Bergen Regional Medical Center (BRMC), the first on April 14, 2005, and the second on February 21, 2007, and related medical issues. We now consolidate these three back-to-back appeals for disposition in a single opinion. For the reasons that follow, we affirm all of the orders under review.

Tony Morgano

2011 N.J. Super. Unpub. LEXIS 1626, *2

I

A.

The first appeal, under Docket No. A-2869-09T1, involves four separate lawsuits brought by plaintiff, which were consolidated in the Law Division. These suits related to plaintiff's commitment of April 14, 2005. That commitment occurred after the police were called to plaintiff's home because of a violent incident reported by plaintiff's mother. After being assessed by a mental health screener at BRMC, plaintiff was found to be "extremely" dangerous. A staff physician, Dr. Zarko Cuculic, diagnosed plaintiff [*3] with paranoid schizophrenia and prescribed Abilify, a brand name for a drug that is marketed by Bristol-Myers Squibb Company (BMS) and Otsuka America Pharmaceutical, Inc. (OAP) for the treatment of schizophrenia and bipolar disorder.

After plaintiff's initial involuntary commitment, a hearing was conducted on April 18, 2005, pursuant to *Rule 4:74-7*, as a result of which the court determined that plaintiff possessed the capacity to voluntarily admit himself as a psychiatric patient. Plaintiff was represented by counsel at the hearing, although he later stated that he was not aware he had counsel, that his judgment had been impeded by the effects of medication, and that he never attended the hearing. Nevertheless, plaintiff acknowledged that he signed a form authorizing his voluntary admission. We have not been provided with a transcript of the April 18, 2005 hearing.

On April 25, 2005, while at BRMC, plaintiff was diagnosed with retinal detachment. The next day, he was given a "pass" to leave BRMC for the purpose of being evaluated by Dr. Stuart Noorily, a retinal specialist at Teaneck Retina Associates. Plaintiff went to his appointment with Dr. Noorily, after which he returned to BRMC. [*4] Apparently, plaintiff was evaluated but not treated by Dr. Noorily.

On May 6, 2005, plaintiff was discharged from BRMC. Based upon his own research, plaintiff was of the belief that Abilify aggravated a pre-existing retinal detachment in his right eye. He contended that his vision in that eye deteriorated as a result. He based his research on his college chemistry studies and authored what he designated as his "own expert report" in that regard.

B.

Plaintiff filed four complaints arising out of these circumstances: (1) On March 12, 2007, in L-1852-07, he sued BRMC, claiming that he was misdiagnosed with a psychiatric illness and therefore improperly admitted to that facility. On August 10, 2007 plaintiff amended this complaint to include the claim that BRMC negligently medicated him with Abilify, and to include OAP as a defendant. (2) On March 12, 2007, in L-1855-07, he sued BRMC for failing to notify him of the injury to his retina and failing to warn him of possible damage to his retina from Abilify. On August 14, 2007, plaintiff amended this complaint to include claims against Dr. Cuculic and BMS. (3) On April 23, 2007, in L-2935-07, plaintiff sued BRMC alleging that he was falsely [*5] imprisoned. (4) On November 30, 2007, in L-8812-07, plaintiff sued BRMC, Dr. Cuculic and BMS, alleging that he was improperly treated with Abilify and suffered damage to his retina as a result.

Plaintiff never filed an affidavit of merit with respect to any of these claims, nor did he file any expert reports (other than the one he authored).

On January 23, 2009 the court entered orders dismissing the claims against OAP and BMS in L-1852-09 and L-8812-07 because they were barred by the statute of limitations. Plaintiff's motion for reconsideration was denied on March 30, 2009.

BRMC and Dr. Cuculic filed for summary judgment on November 10, 2009 and argument was heard on December 18, 2009. On January 7, 2010, the court issued a comprehensive written decision concluding that none of the complaints against BRMC and Dr. Cuculic were viable and could not survive dismissal motions because of the absence of an affidavit of merit and expert reports. The court also found that the claims against BRMC and Dr. Cuculic were barred by the statutory immunity provided to psychiatric facilities and their employees under *N.J.S.A. 30:4-27.7*. Finally, the court found that the complaint in L-8812-07, which [*6] was filed more than two years after the cause of action accrued, was time-barred under *N.J.S.A. 2A:14-2*. The court entered a dismissal order on January 7, 2010.

Plaintiff subsequently filed a series of motions, which included: for summary judgment in L-1855-07; to amend the complaint and award judgment in L-1855-07; for reconsideration of the January 7, 2010 order granting summary judgment to defendants; and for reconsideration of the court's January 23, 2009 denial of plaintiff's request for a hearing under *Lopez v. Swyer, 62 N.J. 267, 300 A.2d 563 (1973)*. On March 22, 2010 the court issued a thorough written decision denying all of these motions.

C.

Plaintiff argues that BRMC and Dr. Cuculic are liable for his alleged injuries because they failed to comply with statutory requirements pertaining to psychiatric admissions. We agree with the trial court that, based upon

Tony Morgano

2011 N.J. Super. Unpub. LEXIS 1626, *6

this record, there is no basis to disturb the statutory immunity protecting such parties. When a psychiatric facility acts in good faith and takes reasonable steps to assess and admit an individual for mental health purposes, it is immune from suit. *N.J.S.A. 30:4-27.7*. Mental healthcare workers enjoy absolute immunity from civil or criminal **[*7]** liability for their involvement in the commitment of mentally ill individuals if they act in good faith and take reasonable steps to effectuate commitment. *Leang v. Jersey City Bd. of Ed., 198 N.J. 557, 594, 969 A.2d 1097 (2009)*. To defeat a motion for summary judgment, a plaintiff must present competent expert testimony establishing the appropriate standard of care and that the defendant breached that standard. *Ziemba v. Riverview Med. Ctr., 275 N.J. Super. 293, 301-03, 645 A.2d 1276 (App. Div. 1994)*.

An individual can be involuntarily committed only upon referral from a screening service or by court order. *N.J.S.A. 30:4-27.9(b)*. If a person is voluntarily admitted, he or she must be informed orally and in writing of the discharge procedures and the possibility that the facility may initiate involuntary proceedings. *Ibid*. A voluntarily admitted patient shall be discharged within forty-eight hours of the patient's request, during which the treatment team may, if it deems appropriate, seek involuntary commitment. *N.J.S.A. 30:4-27.20*. All requests by patients for discharge, whether verbal or in writing, must be maintained in the patient's file. *Ibid*.

False imprisonment is constraint of a person without legal justification. **[*8]** *Leang, supra, 198 N.J. at 591*. Two elements must be established: detention against the person's will, and lack of legal justification or authority. *Ibid*.

In this case, the undisputed evidence in the record establishes that plaintiff was involuntarily committed after an emergency call by his mother and after being evaluated by a mental health screener and found to be dangerous. There was no evidence that any employee of BRMC acted in bad faith. The court correctly concluded that BRMC and Dr. Cuculic complied with all statutory requirements. Accordingly, they were protected by the statutory immunity. Likewise, plaintiff's contention that he was not properly advised of his right to be discharged after being admitted voluntarily or that he was wrongfully precluded from being discharged sooner lack record support. Indeed, after plaintiff signed the voluntary admission form, he was granted a pass and left the facility for his appointment with Dr. Noorily. He then voluntarily returned to the facility.

We also reject plaintiff's argument that the court erred by dismissing his claims for lack of an affidavit of merit. A plaintiff claiming damages for personal injuries resulting from an alleged **[*9]** act of malpractice by a licensed professional must provide an affidavit of merit. *N.J.S.A. 2A:53A-27*. The affidavit must contain a statement by an expert in the field that there exists a reasonable probability that the licensed professional did not adhere to acceptable professional standards of care or treatment practices. *Ibid*.

Plaintiff relies on the "common knowledge" exception to the affidavit of merit requirement. *See Hubbard ex. rel. Hubbard v. Reed, 168 N.J. 387, 394-96, 774 A.2d 495 (2001)*. In *Hubbard*, a dentist extracted the wrong tooth from the plaintiff. *Id. at 390*. The Court found that the common knowledge doctrine was available in such a case because the "'jurors' common knowledge as lay persons [was] sufficient to enable them, using ordinary understanding and experience, to determine a defendant's negligence without the benefit of the specialized knowledge of experts.'" *Id. at 394* (quoting *Estate of Chin v. Saint Barnabas Med. Ctr., 160 N.J. 454, 469, 734 A.2d 778 (1999)*).

We agree with the trial court that this case clearly does not fall within the common knowledge doctrine. Absent an expert witness, jurors would lack the requisite knowledge to enable them to evaluate whether the hospital was negligent **[*10]** in admitting plaintiff, whether the doctor was negligent in prescribing Abilify, and whether the drug companies were negligent in their warnings or lack of warnings to plaintiff regarding retinal detachment. Expert opinions were required to establish a standard of care and how defendants breached it.

Specifically, L-1852-07 asserted that plaintiff was misdiagnosed, which required an expert to discuss the standard of care for diagnosing schizophrenia; L-1855-07 involved allegations of non-compliance with psychiatric standards of care upon admission and the need to inform plaintiff of the seriousness of his retinal condition; L-2935-07 asserted false imprisonment, which required an expert opinion on standards of admission to psychiatric facilities; and L-8812-07 asserted claims regarding improper medication with Abilify, which would require expert opinion on appropriate standards.

Therefore, each complaint involved assertions that a physician, the hospital, or the pharmaceutical companies had not adhered to professional standards. The trial court correctly found that an affidavit of merit was necessary for each allegation in these complaints. The same analysis holds true for the absence **[*11]** of expert reports. Without expert testimony, plaintiff would not have been able to reach a jury on any of these claims. Accordingly, he could not withstand summary judgment on any of the claims.

We also agree with the court that plaintiff's claims against BMS and OAP, as well as his claims against Dr. Cuculic in

Tony Morgano

2011 N.J. Super. Unpub. LEXIS 1626, *11

L-8812-07, were time-barred. These claims were filed more than two years after plaintiff admittedly received package warnings that accompanied the medication in April 2005, and more than two years after Dr. Cuculic's alleged improper treatment. There was no basis for tolling and no basis for a *Lopez* hearing.

II

Plaintiff's appeal under Docket No. A-1924-10T4 pertains to his suit against Dr. Noorily and his practice, Teaneck Retina Associates, in L-5251-09, for failing to inform him of his retinal detachment. This complaint was related to the events we described in Part I of this opinion. More particularly, the complaint alleged that, on April 26, 2005, Dr. Noorily "fail[ed] to inform the plaintiff that a retinal detachment was a medical emergency because it appeared as though the plaintiff could not pay for the emergency operation," thus causing harm to plaintiff consisting of [*12] "a partial loss of vision in the plaintiff's right eye." The court dismissed the claim because of plaintiff's failure to file an affidavit of merit. Orders to that effect were issued in favor of Teaneck Retina Associates on February 5, 2010, and in favor of Dr. Noorily on October 29, 2010.

For the reasons we have previously discussed, plaintiff's contention that this claim fell within the common knowledge exception to the affidavit of merit requirement is lacking in merit. Like the trial court, we find completely unpersuasive plaintiff's contention that this is a common knowledge case and that it falls under principles of informed consent, for which no medical expert is required. This contention disregards the need to establish by expert medical testimony what a detached retina is, how it is diagnosed and treated, and what the standard of care is for an ophthalmologist when addressing such a condition. These kinds of questions require expert testimony and cannot be submitted to lay jurors under the common knowledge doctrine. *See Hubbard, supra, 168 N.J. at 390.* Further, although medical malpractice claims involving a deviation from a standard of care and claims alleging failure to obtain [*13] informed consent are based on "different theoretical underpinnings," it is clear that they "'are simply sub-groups of a broad claim of medical negligence.'" *Howard v. Univ. of Med. & Dentistry of N.J., 172 N.J. 537, 545, 800 A.2d 73* (quoting *Teilhaber v. Greene, 320 N.J. Super. 453, 463, 727 A.2d 518 (App. Div. 1999)).*

This case was properly dismissed because of plaintiff's failure to file an affidavit of merit.

III

Finally, we consider plaintiff's appeal, under Docket No. A-6282-09T1, of the dismissal of his claim, in L-6110-08,

against BRMC for false imprisonment, assault with a hypodermic needle, and intentional infliction of emotional distress by injecting him with a sedative. The court granted summary judgment dismissing the claim by order of June 25, 2010. Plaintiff's motion for reconsideration was denied by order of August 10, 2010.

This claim arises out of plaintiff's confinement of February 21, 2007. He had been observed striking himself in the head with his fists, shouting, expressing the belief that he was being followed, and pounding nails into his second-floor bedroom floor to prevent people from entering his room through the floor. His parents initiated the effort for psychiatric evaluation. The screener [*14] evaluated plaintiff, reviewed his prior history, and concluded that plaintiff suffered from paranoid schizophrenia and required involuntary commitment because he was a danger to himself and others. Police transport was arranged, and plaintiff was committed to BRMC. While committed, plaintiff was administered medication with a hypodermic syringe. Plaintiff was released on March 6, 2007, after his condition stabilized and he was no longer deemed a danger to himself or others.

Again, plaintiff produced no affidavit of merit in this case regarding his care while committed at BRMC.

Plaintiff argues that his commitment was improper because statutory requirements for commitment were not followed, and that he submitted sufficient evidence of his claims of false imprisonment, assault, and intentional infliction of emotional distress to withstand summary judgment. The trial court rejected these arguments, and so do we.

Plaintiff did not make a prima facie showing of the elements of false imprisonment. All required procedures were followed, as a result of which his commitment was lawful. Therefore, he has not made a showing of a lack of proper legal authority or justification for his detention.

Likewise, [*15] plaintiff's claim of assault is deficient. An individual who has been lawfully involuntarily committed to a psychiatric hospital has a right "[t]o be free from unnecessary or excessive medication." *N.J.S.A. 30:4-27.11d(a)(1).* However, "[i]n an emergency . . . medication may be administered over a patient's objection at the written order of a physician" to lessen the danger that the patient presents to himself or others. *Ibid.* That was the case here. Therefore, plaintiff's lack of consent for the administration of medication by way of a hypodermic syringe did not constitute assault.

Finally, plaintiff's claim of intentional infliction of emotional distress was properly dismissed. To prevail on

Tony Morgano

Page 5 of 5

2011 N.J. Super. Unpub. LEXIS 1626, *15

such a claim, a plaintiff "must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." _Buckley v. Trenton Sav. Fund Soc'y, 111 N.J. 355, 366, 544 A.2d 857 (1988)_. Under the circumstances here, it is plain to us that plaintiff has made no showing that BRMC's actions were extreme and outrageous or that they caused any severe emotional distress to plaintiff.

For the reasons we have previously discussed, an affidavit of merit was required. The underpinnings of [*16] the claims plaintiff made in this complaint required expert testimony regarding the relevant standard of care for the emergency treatment of someone with paranoid schizophrenia, acting out in the manner in which plaintiff was acting when confined, and how the BRMC staff deviated from that standard. See _N.J.S.A. 2A:53A-27_. The diagnosis and treatment of paranoid schizophrenia, accompanied by conduct such as that exhibited by plaintiff, is clearly beyond the common knowledge of the average juror. Accordingly, plaintiff's failure to file an affidavit of merit provided an additional basis for the dismissal of this complaint.

Further, BRMC was entitled to the statutory immunity we have previously described. As we previously discussed regarding some of plaintiff's other claims, he is required to produce competent expert testimony to make a showing of bad faith to defeat the immunity statutorily granted to BRMC. He has not done so.

IV

Plaintiff argues that dismissal of his various claims by the court was improper because he (or an adverse party) had requested a trial by jury. He therefore contends the judges lacked authority to make the decisions which could be made only by a jury. This argument [*17] ignores our well settled summary judgment jurisprudence, under which courts are authorized to enter judgment when no genuine issue of material fact exists and the requesting party is entitled to judgment as a matter of law. _R. 4:46-2_; _Brill v. Guardian Life Ins. Co., 142 N.J. 520, 540, 666 A.2d 146 (1995)_. When summary judgment is granted, we review the matter de novo and apply the same standard as the trial court. _Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J. Super. 162, 167, 704 A.2d 597 (App. Div.), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998)_. We are satisfied from our review of the record that summary judgment was properly granted in these cases.

Any other arguments plaintiff has made in any of these appeals which we have not specifically addressed lack sufficient merit to warrant discussion in a written opinion. _R. 2:11-3(e)(1)(E)_.

The orders under review in all six of plaintiff's lawsuits, contained in the three appeals disposed of in this opinion, are affirmed.

Tony Morgano

*B*



Neutral

As of: August 8, 2014 12:04 PM EDT

# Larry v. State

Superior Court of New Jersey, Appellate Division

October 24, 2011, Argued; December 28, 2011, Decided

DOCKET NO. A-1286-10T2

**Reporter:** 2011 N.J. Super. Unpub. LEXIS 3099; 2011 WL 6782438

VIRGINIA LARRY, Plaintiff, and DOREEN GRIFFIN, Plaintiff-Appellant, v. STATE OF NEW JERSEY, Defendant-Respondent.

**Notice:** NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION.

PLEASE CONSULT NEW JERSEY *RULE 1:36-3* FOR CITATION OF UNPUBLISHED OPINIONS.

**Subsequent History:** Certification denied by *Larry v. State, 2012 N.J. LEXIS 603 (N.J., May 22, 2012)*

**Prior History:** [*1] On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-2154-08.

| Core Terms |
| --- |

summary judgment, infliction of emotional distress, cause of action, escort

**Counsel:** Doreen Griffin argued the cause Pro se.

Peter D. Wint, Assistant Attorney General, argued the cause for respondent (Paula T. Dow, Attorney General, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Mr. Wint, on the brief).

**Judges:** Before Judges Grall and Alvarez.

| Opinion |
| --- |

PER CURIAM

Plaintiff Doreen Griffin appeals the October 1, 2010 grant of summary judgment dismissing her complaint alleging intentional infliction of emotional distress, negligent infliction of emotional distress, and false imprisonment against defendant State of New Jersey. For the reasons that follow, we affirm.

Plaintiff was employed in the New Jersey Department of Law and Public Safety with an office in the Hughes Justice

Complex. In May 2007, co-workers lodged complaints of harassment against her, and her co-worker Virginia Larry, also a named plaintiff,[1] with the Department's Manager of Human Resources.

In the presence of a Human Resource staff person and a New Jersey State trooper, plaintiff was called into her Section Chief's office, advised she was **[*2]** suspended, and directed to leave the building immediately. The trooper opened the door for plaintiff, walked with her to her office so she could clear out her desk, and accompanied her out of the building. Human Resources had contacted the State Police upon the lodging of the co-workers' complaints, and the State Police were included in the subsequent investigation.

On June 18, 2007, the first day plaintiff was scheduled to return to work, she fainted on the steps outside the Hughes Justice Complex. At that juncture she did not know the disposition of the complaints. Plaintiff was examined by the State doctor and did not return to work until the following day. She was then informed the allegations against her were not substantiated.

In the ensuing weeks, plaintiff saw a psychologist for some fifteen sessions as she reported experiencing depression and other symptoms she claims were caused by the suspension. She was prescribed an anti-depressant for her symptoms. Plaintiff's civil complaint soon followed.

The trial judge granted defendant's motion for summary judgment because he concluded that even viewing the facts in the light most favorable to plaintiff, the circumstances fell short **[*3]** of a prima facie case of intentional or negligent infliction of emotional distress, or false imprisonment. He also found that plaintiff did not satisfy the verbal threshold.

We review the grant of summary judgment using the same standard as the trial court utilized in its issuance. *Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J. Super. 162, 167, 704 A.2d 597 (App. Div.), certif. denied,*

---

[1] The appeal as to plaintiff Virginia Larry has been withdrawn.

Tony Morgano

2011 N.J. Super. Unpub. LEXIS 3099, *3

_154 N.J. 608, 713 A.2d 499 (1998)_. Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. _R. 4:46-2(c)_. Viewing the facts in the light most favorable to the nonmoving party, where it is clear that there is but one "single, unavoidable resolution of the alleged dispute[,]" summary judgment should be granted. _Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995)_. We conclude the court correctly granted summary judgment because the dismissal of the complaint was the "single, unavoidable resolution of the [] dispute." _See ibid._

In order to establish intentional infliction of emotional distress, a plaintiff must prove:

> (1) that the actor intended to inflict[] emotional distress or that he knew or should have known that emotional [*4] distress was the likely result of his conduct . . . ;
>
> (2) that the conduct was "extreme or outrageous";
>
> (3) that the actions of the defendant were the cause of the plaintiff's distress . . . ; and
>
> (4) that the emotional distress suffered by the plaintiff was severe.
>
> [_Cole v. Laughrey Funeral Home, 376 N.J. Super. 135, 147, 869 A.2d 457 (App. Div. 2005)_] (citation omitted).]

Focusing our attention only on the second element, it is clear that plaintiff cannot satisfy the test. In order for the conduct to qualify, it "'must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency . . . .'" _Taylor v. Metzger, 152 N.J. 490, 509, 706 A.2d 685 (1998)_ (quoting _Buckley v. Trenton Sav. Fund Soc'y, 111 N.J. 355, 366, 544 A.2d 857 (1988)_ (quotation omitted)). Indeed, the conduct must be "atrocious." _Taylor, supra, 152 N.J. at 509_. The question of whether the conduct is extreme or outrageous is one of law based on the facts. We concur with the motion judge that the facts do not fall into that category. _See id. at 509-10_.

There can be no doubt, as the motion judge observed, that to be escorted from your place of employment by a State trooper is embarrassing. But it is not the equivalent of atrocious [*5] conduct - plaintiff was neither handcuffed nor restrained in any way. It simply guaranteed that the removal would be accomplished "in an orderly manner." The fact that she was escorted from the building was simply not "beyond all possible bounds of decency." Consequently, summary judgment was correctly granted as to this cause of action.

Similarly, plaintiff cannot establish the elements of a cause of action for negligent infliction of emotional distress. In order to establish those elements, a plaintiff must prove: (1) that defendant owed plaintiff a duty of reasonable care; (2) that the duty was breached; (3) that the plaintiff suffered severe emotional distress; and (4) that the breach of the duty was the proximate cause of the injury. _G.D. v. Kenny, 411 N.J. Super. 176, 195, 984 A.2d 921 (App. Div. 2009)_ (citing _Russo v. Nagel, 358 N.J. Super. 254, 269, 817 A.2d 426 (App. Div. 2003)), aff'd 205 N.J. 275, 15 A.3d 300 (2011)_. A cause of action exists where there is "emotional injury [] deemed a foreseeable consequence of negligent conduct . . . ." _Jablonowska v. Suther, 195 N.J. 91, 101, 948 A.2d 610 (2008)_. "[L]iability should depend on the defendant's foreseeing fright or shock severe enough to cause substantial injury in a person normally [*6] constituted." _Decker v. Princeton Packet, Inc., 116 N.J. 418, 429, 561 A.2d 1122_ (quoting _Caputzal v. The Lindsay Co., 48 N.J. 69, 76, 222 A.2d 513 (1966))_. In this case, the employer had no reason to foresee that its actions would lead an employee in plaintiff's position to experience fright or shock sufficient to cause substantial injury.

Plaintiff's employer, defendant, considered a State Police escort necessary to prevent any contact between plaintiff and her co-workers which might be perceived as harassing or construed as potentially intimidating. In addition to the obligation to act in a reasonable manner towards plaintiff, defendant also had obligations towards the complainants and all others in the workplace. The selection of the State Police as the agency to escort plaintiff out of the building, therefore, was simply not a breach of any duty defendant may have had towards plaintiff, and is as a result not actionable. Consequently, plaintiff has no cause of action for negligent infliction of emotional distress.

The final claim which we address is plaintiff's assertion that she was falsely imprisoned by defendant. This cause of action also lacks any support in the record. "False imprisonment" has been defined [*7] as "'unlawful restraint upon a man's freedom of locomotion.'" _Marion v. Borough of Manasquan, 231 N.J. Super. 320, 330, 555 A.2d 699 (App. Div. 1989)_ (quoting _Earl v. Winne, 14 N.J. 119, 128, 101 A.2d 535 (1953))_. It can be accomplished through force or threats. _Earl, supra, 14 N.J. at 128_. Here, the State trooper escort did not restrain plaintiff's freedom of locomotion. Indeed, the State trooper opened the door for plaintiff to exit her Section Chief's office after she was informed of the suspension. Additionally, as the judge noted:

> Any employee working at [the Hughes Justice Complex] is only allowed access to the building if they are properly employed and

Tony Morgano

2011 N.J. Super. Unpub. LEXIS 3099, *7

hold a valid identification pass. Here, plaintiffs were being suspended and, therefore, had no authorization to be present in the building unattended . . . .

For that reason, no factfinder could conclude that plaintiff's movements were unlawfully restricted. Accordingly, this cause of action also falls short.

Because plaintiff has no viable claim against defendant, there is no need for us to reach the issue of whether she could meet the verbal threshold for a damage award as required by *N.J.S.A. 59:9-2(d)*. Under these circumstances, defendant was entitled to **[*8]** summary judgment as a matter of law.

Affirmed.

Tony Morgano

C

❶

Cited
As of: August 8, 2014 12:05 PM EDT

# Friedman v. Borgata Hotel, & Casino, Spa

United States District Court for the District of New Jersey
April 1, 2009, Decided; April 1, 2009, Filed
Civil No. 08-2986 (NLH)(JS)

**Reporter:** 2009 U.S. Dist. LEXIS 29084; 2009 WL 901023

PAUL N. FRIEDMAN, Plaintiff, v. BORGATA HOTEL, CASINO & SPA, MARINA DISTRICT DEVELOPMENT COMPANY, LLC, CITY OF ATLANTIC CITY, NEW JERSEY TRANSIT CORPORATION, SARGENT ABRAM HAMILTON, PATROL OFFICER MCGEE, RAY RENNIE, OFFICER FRANCO SYDNOR, OFFICER MARY GRACE COOK, OFFICER SALVATORE J. RANDO, JR., SECURITY OFFICER CRABTREE, Defendants.

---

| Core Terms |
| --- |

qualified immunity, motion to dismiss, state-created, casino, definite statement, intoxicate, unreasonable seizure, constitutional right, seizure, plaintiff's claim, bus terminal

**Counsel:** [*1] Michael G. Donahue, Esquire, Stark & Stark, Princeton, NJ, On behalf of plaintiff.

John J. Van Dyken, Esquire, Russell L. Lichtenstein, Esquire, Cooper, Levenson, April, Niedelman & Wagenheim, PA, Atlantic City, NJ, On behalf of defendant Borgata Hotel, Casino & Spa, Marina District Development Company, LLC and Ray Rennie.

Anthony A. Swan, Esquire, City of Atlantic City, Atlantic City, NJ, On behalf of defendant City of Atlantic City.

Rahat N. Babar, Esquire, Department of Law & Public Safety, Trenton, NJ, On behalf of defendants New Jersey Transit Corporation, Sargent Abram Hamilton, Patrol Officer McGee, Security Officer Crabtree.

A. Michael Barker, Esquire, Barker, Scott & Gelfand, Linwood Greene, Linwood, NJ, On behalf of defendants Officer Franco Sydnor, Officer Mary Grace Cook, Officer Salvatore J. Rando, Jr.

**Judges:** NOEL L. HILLMAN, U.S.D.J.

**Opinion by:** NOEL L. HILLMAN

---

| Opinion |
| --- |

**HILLMAN, District Judge**

This matter has come before the Court on the motion of defendants Officer Franco Sydnor, Officer Mary Grace Cook, and Officer Salvatore J. Rando, Jr. to dismiss plaintiff's civil rights claims against them, or in the alternative, for a more definite statement. For the reasons set forth below, defendants' motion will [*2] be granted in part and denied in part.

## BACKGROUND

On July 1, 2006, plaintiff Paul Friedman registered as a guest at the Borgata Hotel, Casino & Spa in Atlantic City, New Jersey. After checking into his room, he and friends had dinner at a restaurant in the hotel, and after dinner, he gambled in the casino. At dinner and while he was gambling, plaintiff was served and consumed alcohol.

During the course of the evening, plaintiff became visibly intoxicated. At around 9:40 p.m., plaintiff was removed from the event center where he was attending a live musical performance and taken into custody by Borgata staff. He was detained in a holding cell and handcuffed to the bench. The Atlantic City Police Department was called, and officers Franco Sydnor, Mary Grace Cook, and Salvatore J. Rando, Jr. responded. The Borgata staff asked the defendant officers to escort plaintiff from the property. Plaintiff, who was visibly intoxicated, was placed in a patrol car and was given the option of getting a ride to the Atlantic City bus terminal or being arrested for trespass.

Apparently having chosen the first option, during the ride to the bus station, plaintiff, in his intoxicated state, removed his shirt [*3] and shoes. Once they arrived at the station, defendant officers released plaintiff onto the sidewalk. At that point, defendant New Jersey Transit Police officers refused to let plaintiff enter the terminal, and the Atlantic City police officers who had driven plaintiff there left him on the sidewalk outside the terminal. Shortly thereafter, the defendant officers were summoned by two unidentified individuals who found plaintiff, still shirtless and shoeless, lying unconscious and non-responsive in a nearby parking lot. Plaintiff was

2009 U.S. Dist. LEXIS 29084, *3

transported to the Atlantic City Medical Center and admitted to the Intensive Care Unit.

Because of this incident, plaintiff has filed an eight-count complaint asserting various federal and state constitutional claims, as well as several state law claims against numerous defendants. The defendant Atlantic City police officers have filed the instant motion to dismiss plaintiff's constitutional claims. In the alternative, they request a more definite statement of plaintiff's claims. Plaintiff has opposed their motion.

## DISCUSSION

### I. Jurisdiction

Plaintiff has brought his claims pursuant to 42 U.S.C. § 1983, as well as pursuant to the New Jersey constitution and [*4] New Jersey state law. This Court has jurisdiction over plaintiff's federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367.

### II. Standard for Motion to Dismiss

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005). It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under the liberal federal pleading rules, it is not necessary to plead evidence, and it is not necessary to plead all the facts that serve as a basis for the claim. Bogosian v. Gulf Oil Corp., 561 F.2d 434, 446 (3d Cir. 1977). However, "[a]lthough the Federal Rules of Civil Procedure do not require a claimant to set forth an intricately detailed description of the asserted basis for relief, they do require that the pleadings give defendant fair notice of [*5] what the plaintiff's claim is and the grounds upon which it rests." Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 149-50 n.3, 104 S. Ct. 1723, 80 L. Ed. 2d 196 (1984) (quotation and citation omitted).

A district court, in weighing a motion to dismiss, asks "'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim.'" Bell Atlantic v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1969 n.8, 167 L. Ed. 2d 929 (2007) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)); see also Phillips v. County

of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (stating that the "Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating [] a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element"). A court need not credit either "bald assertions" or "legal conclusions" in a complaint when deciding a motion to dismiss. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429-30 (3d Cir. 1997). The defendant bears [*6] the burden of showing that no claim has been presented. Hedges v. U.S., 404 F.3d 744, 750 (3d Cir. 2005) (citing Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)).

Finally, a court in reviewing a Rule 12(b)(6) motion must only consider the facts alleged in the pleadings, the documents attached thereto as exhibits, and matters of judicial notice. Southern Cross Overseas Agencies, Inc. v. Kwong Shipping Group Ltd., 181 F.3d 410, 426 (3d Cir. 1999). A court may consider, however, "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). If any other matters outside the pleadings are presented to the court, and the court does not exclude those matters, a Rule 12(b)(6) motion will be treated as a summary judgment motion pursuant to Rule 56. Fed. R. Civ. P. 12(b).

### III. Analysis

Plaintiff claims that the defendant officers violated his federal and state constitutional rights to be free from unreasonable seizure. He also claims that his equal protection and due process rights were [*7] violated. The defendant officers argue that even taking all of plaintiff's allegations as true, they are entitled to qualified immunity, and therefore, plaintiff's constitutional claims against them should be dismissed. In the alternative, defendants argue that plaintiff should be ordered to file a more definite statement of the claims against them.

Plaintiff counters that his complaint adequately states a claim for the violations of his constitutional rights. [1] Specifically, plaintiff argues that his complaint pleads a state-created danger claim and an unreasonable seizure claim which are sufficient to survive a motion to dismiss. Correspondingly, plaintiff argues that his complaint is

---

[1]  In his brief, plaintiff states that he withdraws his equal protection claim against these three defendants.

2009 U.S. Dist. LEXIS 29084, *7

sufficiently pled, and, thus, there is no need to provide a more definite statement. [2]

## A. Motion to dismiss based on qualified immunity

It is well known that 42 U.S.C. § 1983 creates a cause of action against those who, [*8] acting under color of law, violate an individual's constitutional rights. The qualified immunity analysis provides the basis to determine whether a claim for a constitutional violation by a law enforcement officer is viable. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). "Qualified immunity balances two important interests--the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009). The doctrine provides a government official immunity from suit rather than a mere defense from liability, and, thus, the issue of whether qualified immunity applies should be decided at the earliest possible stage in litigation. Id.

In order to determine whether a government official is entitled to qualified immunity, two questions are to be asked: (1) has the plaintiff alleged [*9] or shown a violation of a constitutional right, and (2) is the right at issue "clearly established" at the time of the defendant's alleged misconduct? Id. at 816. These questions may be answered in order, but courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id. at 818 (receding from Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (1998), which required the two questions to be answered sequentially). If the answer to either question is "no," the analysis may end there. See id. at 823 (finding that because the unlawfulness of the officers' conduct was not clearly established, the

officers were entitled to qualified immunity, without having to answer the question of whether the officers violated the plaintiff's constitutional rights).

Here, there are two constitutional rights at issue: (1) whether these officers created a danger that deprived plaintiff of his due process rights of life and liberty ("state-created danger" theory), and (2) whether plaintiff was subject to unreasonable seizure. [3]

### (1) State-created danger

Even though the due process clause generally does not confer an affirmative right to governmental aid, a person may have a cause of action against the state or governmental [*11] actor if "state authority is affirmatively employed in a manner that injures a citizen or renders him 'more vulnerable to injury from another source than he or she would have been in the absence of state intervention.'" Bright v. Westmoreland County, 443 F.3d 276, 280 (3d Cir. 2006) (citing DeShaney v. Winnebago Cty. Soc. Servs. Dept., 489 U.S. 189, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989) and quoting Schieber v. City of Philadelphia, 320 F.3d 409, 416 (3d Cir. 2003)).

To state a meritorious "state-created danger" claim, a plaintiff must prove: (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all. Id. (citations omitted).

Defendants argue [*12] that plaintiff has failed to plead facts that would support a state-created danger claim. Specifically, defendants argue that plaintiff has failed to allege that they had actual knowledge or concrete awareness that leaving plaintiff at the Atlantic City bus

---

[2]   Defendants/Cross-Claimants New Jersey Transit, Sergeant Abram Hamilton, and Officer Stephen McGee filed an opposition to defendant officers' motion, arguing that it is premature.

[3]   Plaintiff has asserted the same claims under [*10] the state constitution. Because the analysis of claims under state constitutional law is similar to the analysis under the Fourth Amendment, no separate analysis will be undertaken for claims arising under the New Jersey Constitution. See Hedges v. Musco, 204 F.3d 109, 121 (3d Cir. 2000) (granting defendants' motion for summary judgment on plaintiffs' claims under Article I, paragraph 7 of the New Jersey Constitution, because it was already established that there was no federal constitutional violation) (citing Desilets v. Clearview Regional Bd. of Educ., 265 N.J. Super. 370, 627 A.2d 667, 673 (N.J. Super. Ct. App. Div. 1993) ("We are not persuaded that the New Jersey Constitution provides greater protection under the circumstances of this case than its federal counterpart. We note that in its T.L.O. opinion the New Jersey Supreme Court analyzed the search and seizure issue under the Fourth Amendment to the United States Constitution, and did not suggest that New Jersey's organic law imposed more stringent standards.")).

terminal, which was patrolled by New Jersey Transit police officers, would later expose plaintiff to injury somewhere near the bus terminal. Defendants further argue that plaintiff cannot meet the other three elements of the state-created danger test--defendants' actions do not shock the conscience, there was no special relationship, and plaintiff cannot prove that there was a direct causal relationship between the alleged affirmative acts on their part and the plaintiff's unforeseen harm. Consequently, defendants argue that because plaintiff cannot maintain a state-created danger claim, he has no valid constitutional violation claim, and they are therefore entitled to qualified immunity.

Defendants' arguments are unavailing at this motion-to-dismiss stage. First, with regard to the first element, the Third Circuit has not yet clarified whether actual knowledge of a risk is required to establish deliberate indifference in a state-created [*13] danger claim. Patrick v. Great Valley School Dist., 296 Fed. Appx. 258, 262 n.3 (3d Cir. 2008) (citing Sanford v. Stiles, 456 F.3d 298, 310 (3d Cir. 2006)("We leave to another day the question whether actual knowledge is required to meet the culpability requirement in state-created danger cases. On the one hand, the Supreme Court has held that actual subjective knowledge of a risk is required for at least some Eighth Amendment claims. However, the Court has also held that the 'obviousness' of a risk can be sufficient for liability in other cases. . . . [W]e have not addressed the question as it relates to underlying state-created danger claims[, and] [t]here is currently a divide among the circuits on this issue."). Because the law is not clear as to the first element, plaintiff's complaint cannot be dismissed based on the lack of an allegation that defendants had actual knowledge of the danger they were creating.

Second, plaintiff has pleaded sufficient facts that, if believed by a jury, could support that defendants' conduct "shocks the conscience." Whether a state actor's conduct shocks the conscience depends on the particular factual circumstances. Patrick v. Great Valley School Dist., 296 Fed. Appx. 258, 261 (3d Cir. 2008) [*14] (citations omitted). "When a state actor is in a high-pressure situation in which rapid decision-making is required, such as a high-speed car chase, the required mens rea will typically be intent-to-harm." Ye v. U.S., 484 F.3d 634, 639 (3d Cir. 2007). Where a state actor has the time to act deliberately and is not under pressure to make split-second

decisions, "deliberate indifference is sufficient to support an allegation of culpability." Phillips v. County of Allegheny, 515 F.3d 224, 240 (3d Cir. 2008).

Here, plaintiff claims that the officers dropped him off on the sidewalk outside the bus terminal, extremely intoxicated, alone, at night, and without wearing his shirt or shoes, which he had removed in the patrol car. Plaintiff also claims that the defendant officers witnessed the New Jersey Transit police officers refuse to allow him into the bus terminal, but abandoned him there anyway. These allegations, if true, could be held to constitute deliberate indifference. [4]

Further, these allegations are also sufficient to prove the third and fourth elements of a state-created danger claim. A reasonable jury could conclude, based on plaintiff's allegations alone, that he was a "foreseeable victim," and that "but for" defendants' actions, he would not have been injured. Both of these elements are discussed in a case similar to the one here. In Kneipp v. Tedder, 95 F.3d 1199, 1201 (3d Cir. 1996), a husband and wife brought a complaint against a city and its police officers, alleging that the officers caused the plaintiff harm when they detained her and her husband when they were walking down the street. The officers allowed her husband to leave, but later on, when she was forced to walk home alone in an intoxicated state, she fell down an embankment, suffering brain damage. Kneipp, 95 F.3d at 1201-02. With regard to the third element, the court found that a reasonable jury could find the officer exerted sufficient control over the plaintiff to establish the requisite [*16] relationship. Id. With regard to the fourth element, the court concluded that "a jury could find this element satisfied where officers used their authority to separate an intoxicated woman from her husband and send her home unescorted," and "but for the intervention of the police, [her husband] would have continued to escort [her] back to their apartment where she would have been safe." Id. [5]

Taking plaintiff's allegations as true, defendants had control over him by placing him in a patrol car at the casino, and then driving him to the bus terminal, where he was dropped off at the curb. Further, but for the defendants transporting plaintiff to the bus terminal, he would not

---

[4]   In the Third Circuit, deliberate indifference has been defined in the Eighth Amendment context with regard to prisoners' claims of deliberate indifference to a serious medical need. In that context, deliberate indifference [*15] has been defined as more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm. Farmer v. Brennan, 511 U.S. 825, 837-38, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).

[5]   The court also found that a reasonable jury could conclude that the injury was foreseeable, and that a material issue existed over whether the officers acted in willful disregard of the plaintiff's safety. Kneipp, 95 F.3d at 1209.

2009 U.S. Dist. LEXIS 29084, *16

have been left unconscious and non-responsive in a parking lot. [6]

Thus, even though facts gathered through discovery may alter the above analysis, plaintiff has pled enough facts in his complaint to be entitled to offer evidence to further support his state-created danger claim. See Bell Atlantic v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1969 n.8, 167 L. Ed. 2d 929 (2007); see also Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) ("Stating ? a claim requires a complaint with enough factual matter (taken as true) to suggest the required element."). [7] Moreover, even though qualified immunity should be decided at the earliest stage in the litigation, at this stage, and in this case, it is too early. Consequently, [*18] defendants' motion to dismiss must be denied.

**(2) Unreasonable seizure**

Defendants also argue that plaintiff's unreasonable seizure claim must be dismissed because his removal from the hotel was reasonable, and his removal was made pursuant to N.J.S.A. 5:12-71.1, which recognizes the right of the casino to eject any person because he is intoxicated. While there appears to be substantial [*19] merit to the defense that the initial removal of the plaintiff from the casino was objectively reasonable, this argument is unavailing at this stage of the proceedings.

First, the Casino Control Act, N.J.S.A. 5:12-1 to -210, is the codification of the "common law right [of a casino licensee] to exclude or eject permanently from its casino hotel any person who disrupts the operations of its premises, threatens the security of its premises or its occupants, or is disorderly or intoxicated." This law is for the casino, and it does not provide permission for a city police department, otherwise acting unreasonably, to drive an intoxicated patron to the bus station and leave him there.

Second, whether defendants' seizure of plaintiff was reasonable is a determination that must be made by a jury, or on summary judgment when more facts have been gathered. To state a claim for unreasonable seizure under the Fourth Amendment, a plaintiff must show that a seizure occurred and that it was unreasonable. [8]Kopec v. Tate, 361 F.3d 772, 776-77 (3d Cir. 2004) (citations omitted). The test of reasonableness under the Fourth Amendment is whether under the totality of the circumstances, "the officers' actions [*20] are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." Id. (citing Graham v. Connor, 490 U.S. 386, 397, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)). "[R]easonableness under the Fourth Amendment should frequently remain a question for the jury." Id. (citation omitted). However, "defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's [seizure] was objectively reasonable under the circumstances." Id.

At this stage in the case, the Court cannot determine whether the defendant officers were reasonable in their seizure of plaintiff, because the only information the Court has to consider is plaintiff's allegations in his complaint.

---

[6]  Defendants argue that due to his level of intoxication, plaintiff would not have been better off had he remained at the hotel. The Court notes that even though plaintiff may have ended up in the hospital in any event, being [*17] "unconscious and non-responsive" in a parking lot next to a bus terminal is not the same as being in that state at a luxury hotel, where plaintiff had a room. In any event, what might have happened to the plaintiff had he been left at the hotel is not really the issue at bar. Plaintiff was allegedly removed, in essence involuntarily, from the hotel because he was highly intoxicated and therefore possibly dangerous to himself or others. It is hard to understand how he could have been any less dangerous, or be in less danger, in the same condition on a public street.

[7]  Defendants also argue that even if it was to be held that they created a danger, they are entitled to qualified immunity because there was no clearly established law that would have put them on notice that leaving plaintiff at a bus terminal in the presence of other officers was a violation of his constitutional rights. Defendants do not support this argument with any basis in law, and just because there may be an absence of case law affirming such specific conduct, it does not make it constitutional. Stated differently, defendant as moving party has failed to demonstrate at this stage that there was no clearly established right to be free from a state-created danger after having been seized by the police. In fact, the existence of the Kneipp decision and deliberate indifference law suggest otherwise.

[8]  Defendants also argue that because they would have had probable cause to arrest plaintiff for trespassing, their seizure, and any arrest, of plaintiff would not have been unreasonable. Although this may be true--a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed, Devenpeck v. Alford, 543 U.S. 146, 152-53, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004)--defendants did not arrest plaintiff for trespass. Instead of arresting plaintiff and bringing him to the station, they, according to plaintiff, dropped him off at a bus station, only to be discovered unconscious [*21] in a parking lot moments later. Whether their conduct was reasonable cannot be determined at this motion-to-dismiss stage; however, simply because they had another reasonable option does not cloak all their conduct in reasonableness.

Tony Morgano

Although it seems questionable whether plaintiff can challenge the reasonableness of the officers removing plaintiff from the casino in the first instance, it cannot be determined at this stage in the case whether the seizure of plaintiff continued to be reasonable past that point. [9]See Illinois v. Caballes, 543 U.S. 405, 407, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005) (citing United States v. Jacobsen, 466 U.S. 109, 124, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984) ("It is nevertheless clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."). Consequently, defendants' motion to dismiss plaintiff's unreasonable seizure claim based on qualified immunity must be denied. [10]

**B. Motion for more definite statement**

In the event that their motion to dismiss is denied, defendants ask the Court to order plaintiff to file a more definite statement of his claims. Federal Rules of Civil Procedure Rule 12(e) provides that a "party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." This Rule is juxtaposed with Rule 8(a)(2), which is a liberal pleading standard, and only requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Further, there is no requirement for a heightened pleading standard in cases in which a defendant pleads qualified immunity. Thomas v. Independence Tp., 463 F.3d 285, 294 (3d Cir. 2006).

Here, it is evident by defendants' detailed and lengthy motion to dismiss that plaintiff's complaint was sufficient [*24] to allow defendants to prepare a response. Indeed, they are so aware of the facts and legal claims that they have moved to dismiss those claims while accepting all the allegations as true. Accordingly, it is axiomatic that plaintiff's complaint is not "so vague or ambiguous" that defendants could not prepare a proper response. Consequently, the Court will not order plaintiff to prepare a more definite statement of his claims.

**CONCLUSION**

For the reasons expressed above, defendants' motion to dismiss plaintiff's state-created danger and unreasonable seizure claims is denied without prejudice to defendants' right to refile their motion, but it is granted as to plaintiff's equal protection claim. Defendants' motion for a more definite statement pursuant to Fed. R. Civ. P. 12(e) is also denied. An appropriate order will be entered.

Date: April 1, 2009

At Camden, New Jersey

/s/ Noel L. Hillman

NOEL L. HILLMAN, U.S.D.J.

---

[9]   The Court [*22] also notes that it appears that even though it may have been objectively reasonable for the officers to have seized plaintiff and removed him from the casino, it could be argued that the reason plaintiff was evicted from the casino--his extreme intoxication--is the same reason why he should not have been left at the bus station. Viewed in that light, plaintiff's claims of unreasonable seizure and state-created danger could be said to be alternative, albeit conflicting, causes of action. Of course it is proper at this stage to plead alternative theories but the true gravamen of plaintiff's complaint may not be that he was seized, but that once having been seized, the state became his protector. As we note in the body of the opinion, even in a case in which qualified immunity may provide the defendants with a complete or partial defense these issues are best resolved after at least some discovery and not at the pleading stage.

[10]   Defendants also argue that even if it was to be held that they were unreasonable in their seizure of plaintiff, they are entitled to qualified immunity because there was no clearly established law that would have put them on notice that escorting plaintiff from [*23] one public place to another public place was a violation of plaintiff's Fourth Amendment rights. As with their argument concerning the constitutionality of their conduct under plaintiff's state-created danger claim, defendants do not support this argument with any basis in law.



No *Shepard's* Signal™
As of: August 8, 2014 11:38 AM EDT

# Caradimitropoulo v. Borgata Hotel Casino & Spa

Superior Court of New Jersey, Appellate Division
March 3, 2010, Submitted; August 20, 2010, Decided
DOCKET NO. A-4205-08T2

**Reporter:** 2010 N.J. Super. Unpub. LEXIS 2059; 2010 WL 4054351

MICHAEL EVANS CARADIMITROPOULO, Plaintiff-Appellant, v. BORGATA HOTEL CASINO & SPA, Defendant-Respondent.

**Notice:** NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION.

PLEASE CONSULT NEW JERSEY *RULE 1:36-3* FOR CITATION OF UNPUBLISHED OPINIONS.

**Prior History:** [*1] On appeal from the Superior Court of New Jersey, Law Division, Civil Part, Essex County, Docket No. L-488-07.

---

**Core Terms**

---

touching, deposition, hostess, security officer, eviction, casino, walked, male, companions, premises, arrest, defendant's conduct, summary judgment, security guard, front door, non-consensual, allegations, interaction, approached, defamation, emotional, detained, escorted, breasts, groping

**Counsel:** Lombardi & Lombardi, P.A., attorneys for appellant (Michael F. Lombardi, on the brief).

Camacho Mauro Mulholland, LLP, attorneys for respondent (Eric S. Malinowski, on the brief).

**Judges:** Before Judges Stern and Graves.

---

**Opinion**

---

PER CURIAM

Plaintiff appeals from an order of March 20, 2009 granting defendant's motion for summary judgment and dismissing his complaint. He alleges he was falsely accused of "groping" a hostess as he endeavored to enter a reception "after-party" held at the Club MIXX at the Borgata Hotel in Atlantic City. He was directed by security officers to an office, asked to show his driver's license, and told no

charges were to be filed, but was escorted off the premises and directed never to return to the Borgata under penalty of being arrested for trespassing. The plaintiff's expert, Andrew P. Sutor, opined that defendant "failed to utilize . . . security camera resources prior to detaining and formally ejecting the plaintiff." Sutor, a "Security and Safety Consultant," also opined that defendant "failed to have official law enforcement . . . properly investigate this incident."

The [*2] primary questions before us are: (1) was there a dispute as to whether there was any touching of Shannon Niland, a hostess of the Mur.Mur Club, much less an intentional one; (2) whether Ms. Niland or any other employee of the Borgata made a false statement or accusation about same; and (3) did defendant's employees and agents act reasonably.[1] Plaintiff insists there is a factual dispute regarding whether any touching occurred and, if so, whether it was intentional. Plaintiff further insists the judge's decision was premised on the finding of a factually disputed intentional touching that justified defendant's conduct and that, even if there was some unintentional "brushing," defendant's conduct was unreasonable. Further, according to plaintiff, defendant's Crowd Control Specialist Leonard Bennett, who was present at the scene, testified he observed no inappropriate touching but had nevertheless reported and participated in plaintiff's detention based on a groping that never occurred. Plaintiff alleged that defendant's conduct resulted in defamation, intentional infliction of emotional harm, a false arrest, false imprisonment, invasion of privacy and negligence, all resulting in injury [*3] to plaintiff, as embodied in counts two through seven. (Count one states "factual allegations").

Defendant asserts the judge could reasonably conclude based on the deposition testimony of Niland, Bennett and plaintiff's companion, Bernard Lynch, that there was a touching and therefore everything else which flowed

---

[1] The spelling of Ms. Niland's name is not consistent in the record and briefs. We use the spelling on the cover of her deposition. "Mur.Mur" is also spelled differently throughout the record, and we use the spelling Niland and Bennett used in their employee reports.

Tony Morgano

2010 N.J. Super. Unpub. LEXIS 2059, *3

therefrom constituted reasonable conduct and could not satisfy the elements required for any of the alleged torts. [2]

The facts developed on the motion for summary judgment included the following:

On the evening of September 22, 2006, plaintiff attended a reception at the Tropicana Hotel Convention Center for the Utility Contractors Association as an invited guest. An "after-party" [*4] for the event was held at Club MIXX, a nightclub within the Borgata. While looking for Club MIXX with his companions, plaintiff was walking past a different Borgata nightclub, the Mur.Mur, when Niland, a hostess of the Mur.Mur Club, signaled for his attention to determine whether he needed help finding something in the Borgata.

According to Ms. Niland, at that time plaintiff approached her and touched her by "plac[ing] both hands on the top of [her] sides (between [her] stomach and breasts)." Niland reported that the way plaintiff touched her was "forceful and intrusive," and plaintiff said that if she "would join them," he would "come into the club." However, as we understand it, plaintiff testified at his deposition that he did not touch Ms. Niland, but his hand "came into contact" with a different hostess when she was "lifting up the entranceway" to Club MIXX, and his "hand hit underneath her breast and went up" when he arrived at that club. Plaintiff asserts that he accidentally touched the second hostess. However, the Borgata and its security personnel did not take any action with respect to plaintiff's touching of the second hostess. [3]

Plaintiff was approached by two security guards who instructed him to accompany them to another area of the

Borgata. When he asked for an explanation, one of the employees informed him that Ms. Niland [*6] had accused him of groping her while she stood in front of the Mur.Mur Club. Plaintiff denied the allegation and urged the security guards to review the Borgata's video surveillance recording of the area in which he had been standing during the encounter with Ms. Niland. Plaintiff claims that the security guards insisted he come with them to a separate, confined area of the Borgata, while he and his companions protested that he had done nothing wrong.

At his deposition, plaintiff testified

> [I]t was made like, you know, I had to stay there. I was under the assumption I had to stay there because of security. . . . I had the feeling that if I tried to break lo[o]se and run they would probably try to tackle me, that's [the] feeling I had, but they didn't say I had to stay.[ [4] ]

Plaintiff also acknowledged at the deposition that he "wanted to stay at the Borgata" and told the security guards "no problem, [*7] I'll go wherever you want me to go."

According to plaintiff's brief, "after being separated from his companions [he] was escorted by approximately six security officers through the casino in the presence of friends and business acquaintances and brought to the security office." Plaintiff further alleges that one of the security officers informed him that he was being permanently evicted from the Borgata premises, and that if

---

[2]   Defendant's position on this appeal is not helped by its "counterstatement of material facts" which cites only to the motion judge's opinion, as opposed to any of the depositions, interrogatories, or expert reports before the trial judge.

[3]   In his response to defendant's "statement [*5] of uncontested material facts," plaintiff countered:

> Plaintiff, Michael Evans Caradimitropoulo, denies touching Shannon Niland. She invited plaintiff to approach her by waving to him; he approached her and she, in a bizarre fashion, recoiled from him as he asked her where the entrance to a different night club was. Plaintiff thereafter walked away toward the entrance to a different night club, Club[] MIXX, where the second interaction occurred. The Court is requested to view the interaction between plaintiff and Ms. Niland depicted on the videotape, Exhibit A. Plaintiff denies emphatically that he touched Shannon Niland . . . .

> Subsequent to the interaction between plaintiff and Shannon Niland plaintiff accidentally made physical contact with a different hostess at Club MIXX. . . . In the second incident plaintiff accidentally bumped into a different hostess. . . . The hostess involved in the second incident confirmed with security that the bump was accidental and not intentional . . . .

[4]   It is not clear what this answer actually relates to, as it follows a question about whether anyone at the Borgata told him he could not leave and his partial answer that he "was under the assumption [he] had to stay there because of security." He added that he "wanted to stay at the Borgata."

Tony Morgano

2010 N.J. Super. Unpub. LEXIS 2059, *7

he ever returned he would be criminally charged with trespassing. [5]

In contrast to plaintiff's account of the events in dispute, Ms. Niland stated that her encounter with plaintiff happened in the following manner, according to her "Associate Voluntary Statement":

> The group of male guests walked slowly past [Club Mur.Mur] . . . . I asked the group of males if the[y] wished be "joining us for the evening." One male in the group approached me, and [*8] placed both hands on the top of my sides (between my stomach and breasts). He commented that he would come into the club if I would join them. The way that the customer touched me was forceful and intrusive. I immediately pulled away from the customer, . . . and stated "absolutely NOT," in response to the customer's actions. His friends observed this incident, and pulled him away from the front door. I asked front door security, Leonard Bennett (who had witnessed the event), to call Russ Goss to the front door and to follow the group of males. . . . One male in the group (who had pulled away the male with whom I had the incident) approached me and said that while his friend's behavior was inappropriate, that he had apologized. (The male who had grabbed me appeared intoxicated, when they returned to the door.) I explained to the guest that I wanted security to handle the matter. After security removed the group from the front door of [Mur.Mur], Michael Shultz [the Borgata security director] called me. [After Shultz] explained the process of filing a complaint, I informed Michael Shultz that I did not wish to press charges.

Bennett, the "front door security" employee whom Ms. Niland referred [*9] to in her statement, also provided a written statement in which he claimed to have witnessed the encounter between plaintiff and Ms. Niland. He generally corroborated her version of the events:

> As I answered questions from another guest in front of Club Mur.Mur I turned to my right to

make sure no one was smokin[g] and as I turned I [saw] a gentl[e]man grab Shannon by her upper torso area and [make] a derog[a]tory remark that I could not hear because I had my earpiece in. At that point I detained the gentl[e]man and then called for my supervisor.

Plaintiff's companions, Chad Sorrell, Bernard Lynch, and Dan Lechner each witnessed the interactions between plaintiff and Ms. Niland and provided depositions regarding their observations. Lechner testified that the security staff "wouldn't let [plaintiff] just walk away" and that the guards informed him that he could not "go anywhere" but had "to stick around." Sorrell testified, however, that based on his observations, plaintiff "bumped into" a hostess, but did not know at which club it occurred. He did say the incident occurred while "we went through the ropes," which under plaintiff's version, would be at the Club MIXX.

Lynch, the third individual [*10] with the plaintiff, testified that plaintiff's experience at the Borgata has "become an embarrassment for him in business." However, Lynch did acknowledge that "[a]t some point, though, he [plaintiff] did touch her."

Bennett also gave deposition testimony. Bennett corroborated Ms. Niland's claim that plaintiff touched her on the side of her torso while plaintiff stood in front of the entrance to the Mur.Mur Club. He testified that he was about "five, eight feet away" from Ms. Niland when he observed plaintiff touch her in "the mid . . . side area" and "around the chest area." Bennett further testified that he thought the "touching lasted less than five seconds." When plaintiff's friends said "we'll take him," Bennett responded, "No, he has to wait until I call my supervisor." [6]

Russell A. Goss, a senior security employee, testified he did not have a clear memory of his interactions related to plaintiff's incident at the Borgata. However, he confirmed that generally, a patron of the casino who becomes disorderly would be escorted to a "back [*11] office." Goss also testified that

> [u]sually it's an eviction, that's where we take everybody to process. We'll take photos of the person for our eviction form. Fill out an eviction form itself. Request the customer to

---

[5]  There are no record citations given for this proposition or for the claim he was escorted to a taxi and "forced to leave the casino grounds in a taxi." The plaintiff's deposition does reflect he was told he could not return to the Borgata, but plaintiff does not explain what appear to be inconsistencies in his deposition.

[6]  On several occasions part of a question to Bennett asked if he perceived the touching to be "inappropriate." It appears that he says he did not.

Tony Morgano

2010 N.J. Super. Unpub. LEXIS 2059, *11

sign it stating they understand they are being evicted. Sometimes they refuse, that doesn't change the eviction.

Joseph Vanderslice, the "highest ranking security official" for the Borgata nightclubs, testified that he made the decision to evict plaintiff from the casino. Vanderslice testified that prior to plaintiff's departure from the premises, he presented plaintiff with an eviction form to sign, which plaintiff refused to sign. However, plaintiff was subsequently escorted from the Borgata.

Finally, Ms. Niland testified plaintiff touched her "[c]lose to [her] breasts on [her] side" and claims his hands touched "both sides[,]" but that plaintiff did not actually touch her breasts, but "came very close." Her reactions to the touching were that she became "extremely shaken. . . . had a shortness of breath. . . . was very nervous. . . . [and] really upset." She testified that security staff advised her she could file criminal charges against plaintiff, but she decided not [*12] to do so, and continued to work the rest of her shift that night. In the remainder of her deposition testimony she confirmed the facts as she had recorded them in her written statement on the evening of September 22, 2006.

Following his negative experience at the Borgata, plaintiff attended nine psychological counseling sessions with C.L. Buddy Westbrook, a licensed professional counselor. Thereafter, on December 13, 2007, Westbrook prepared a report indicating that he had diagnosed plaintiff with an "[a]djustment disorder with mixed anxiety and depressed mood." According to Westbrook's report, plaintiff had experienced "anxiety, anger, and fears, . . . along with ruminating thoughts" and Westbrook was "certain that [plaintiff's] condition . . . was directly related to the incident at the Borgata Casino."

In his oral opinion of March 20, 2009, the motion judge stated that with respect to the defamation claim:

> I specifically find that the plaintiff failed to provide . . . any competent evidence or proof that the defendant made a defamatory statement that was, in fact, false. . . . Accordingly, since there was no false statement made by the defendant, . . . there could be no communication [*13] of a false statement to a third person.

Regarding plaintiff's claim of intentional infliction of emotional distress (IIED), the judge granted summary judgment partly because neither the Borgata nor Ms. Niland had committed "any intentional outrageous conduct." He also determined plaintiff had "failed to

establish a prima facie case with reference to the second requirement [of the IIED cause of action], that is, a showing of severe distress proximately caused by defendant's conduct."

The judge further found defendant was entitled to judgment as a matter of law on plaintiff's false arrest and false imprisonment claims:

> The plaintiff, in sum, has failed to demonstrate either an arrest or detention against his will and/or lack of legal authority or justification.
>
> I further find that the security staff, in fact, had legal justification to detain the plaintiff for purposes of investigating the complaint of the defendant, [Ms. Niland], consisting of a non-consensual touching and/or assault . . . .
>
> Again, . . . the plaintiff consented or agreed to the investigation and to the direction or requirements placed upon him by the defendant security staff. . . .
>
> [P]laintiff did not object or contest at [*14] any time during the course and/or conduct of the investigation -- or any detention resulting therefrom. . . . he voluntarily accompanied the security officer . . . to the security offices located in the rear of the casino.

The judge similarly rejected plaintiff's cause of action asserting that the Borgata committed an invasion of his privacy, finding "the record is devoid of any proof or of evidence of an intentional intrusion into the solitude, seclusion or private affairs of another." Finally, after analyzing the elements of a negligence cause of action in cases involving premises liability, the court dismissed plaintiff's negligence claim as well. The motion judge concluded that "the defendant, Borgata, under the facts and circumstances of this case[,] owed no duty of care to the plaintiff." Accordingly, the trial court ruled "the defendant is entitled to summary judgment as a matter of law" and granted its motion.

At oral argument on the motion, the judge fully understood that "[p]laintiff seems to indicate 'there were two separate instances of contact with two separate and different hostesses.'" Unfortunately, much of the judge's opinion is premised on the finding that "there clearly [*15] was a non-consensual touching of the defendant, [Shannon Niland], by plaintiff." The judge found a "preponderance of the evidence provided clearly indicates that the defendant, [Shannon Niland], was, in fact, subjected to . . . non-consensual touching," and that was confirmed by the

2010 N.J. Super. Unpub. LEXIS 2059, *16

depositions including the "plaintiff himself." We cannot agree there was no factual dispute as to a non-consensual touching of Ms. Niland, as opposed to plaintiff's statement there was a non-consensual touching of the second hostess. However, we agree that the remainder of the judge's reasons, as supplemented herein, warrants affirmance of the judgment.

As to the defamation claim, there is no proof that Borgata or any of its employees published a written or oral statement to a non-witness to the event other than internally to co-workers for legitimate business purposes. [7] In fact, the defamation count asserts only that "[d]efendant Jane Doe # 1, did make a false and defamatory claim to Borgata security that plaintiff groped her, which he did not do" and that the false claim "*communicated to Borgata security* injured the plaintiff's reputation and caused plaintiff to experience emotional upset and anguish" [*16] (emphasis added). [8] Thus, as a matter of law, the allegations did not justify a claim of defamation. *Feggans v. Billington, 291 N.J. Super. 382, 391-94, 399-400, 677 A.2d 771 (App. Div. 1996)*. Moreover, defendant's conduct was not shown to be either outrageous or intended to produce emotional distress so as to permit recovery for emotional distress damages. *See Buckley v. Trenton Savings Fund Soc'y, 111 N.J. 355, 366, 544 A.2d 857 (1988)*.

By plaintiff's own admissions, the remaining counts were properly dismissed. Plaintiff admitted he told defendant's security officers "I'll go wherever you want me to go." He went with the officers voluntarily because he maintained he did nothing wrong and in an effort to resolve the manner amicably and remain in the hotel-casino with his companions. But even if he felt restrained, there was justification or probable cause to hold him pending an investigation of Ms. Niland's allegations. Thus, the false arrest and false imprisonment claims were properly dismissed. *Mesgleski v. Oraboni, 330 N.J. Super. 10, 24-25, 748 A.2d 1130 (App. Div. 2000)*; *Barletta v. Golden Nugget Hotel Casino, 580 F. Supp. 614, 617-18 (D.N.J. 1984)*. [9]

We also reject plaintiff's claim of negligence in failing to make a complete investigation before taking action. It is the endeavor to make the investigation which plaintiff contests in the other claims. In fact, plaintiff would have been restrained longer, while videotapes were reviewed and outside law enforcement offices responded to investigate, under the approach plaintiff now proposes. In any event, the circumstances do not reflect a breach of any duty owed to plaintiff.

We acknowledge that this case presents many factual disputes including whether *Ms. Niland* was touched, where plaintiff was detained, and if plaintiff had any confrontation in front of the Club MIXX. However, the existence of a factual dispute does not require a trial if there are no *material* disputes of fact. In essence, we agree with the motion judge's decision that the statements of Ms. Niland to her co-employees were not actionable and defendant and its security officers acted appropriately in response to Ms. Niland's report.

Finally, we need not examine if *N.J.S.A. 5:12-71.1* trumps the claims [*19] plaintiff advances by authorizing the conduct undertaken here.

Affirmed.

---

[7]   As requested in plaintiff's brief, we have viewed the videotape presented. As we understand the briefs and arguments, the relevant part concerning the incident occurred outside the Mur.Mur Club. Suffice it to say, we completely agree with the judge that "[t]he surveillance tape of the incident is . . . inconclusive and offers no support for either party's position." The tape must relate to the underlying incident because the video also shows that the person we presume to be plaintiff walked away and could well have reached Club MIXX before the security guards assembled, and also shows plaintiff walking to the security office. He was accompanied by one officer walking at his side and others following at a distance. There was nothing which, in our view, showed to an objective [*17] observer that he was detained or restrained unless that was already known.

[8]   At oral argument on the motion, plaintiff's counsel stated that Bennett told Bernard Lynch that plaintiff groped Niland when explaining the detention.

[9]   To the extent *Barletta* denied summary judgment on the facts, we note that dispute was between two patrons and the security officer was called in when Bartch insisted that action be taken, and Barletta be arrested. *Id. at 616-17*. Here, we again emphasize that [*18] part of plaintiff's deposition stated he voluntarily went with the security officers and that he did touch *a* hostess.

Tony Morgano



No *Shepard's* Signal™
As of: August 8, 2014 12:57 PM EDT

## State v. Loguidice

Superior Court of New Jersey, Appellate Division
December 16, 2009, Argued; January 12, 2010, Decided
DOCKET NO. A-4662-08T4

**Reporter:** 2010 N.J. Super. Unpub. LEXIS 57; 2010 WL 86663

STATE OF NEW JERSEY, Plaintiff-Respondent, v.
JOSEPH LOGUIDICE, Defendant-Appellant.

**Notice:** NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION.

PLEASE CONSULT NEW JERSEY *RULE 1:36-3* FOR
CITATION OF UNPUBLISHED OPINIONS.

**Prior History:** [*1] On appeal from the Superior Court of
New Jersey, Law Division, Atlantic County, Municipal
Appeal No. A-106-08.

| Core Terms |
| --- |

casino, trespass, defiant, municipal court, premises, notice,
credibility, municipal, hotel

**Counsel:** Thomas B. Duffy argued the cause for appellant.

Kerry DiJoseph, Deputy Attorney General, argued the
cause for respondent (Anne Milgram, Attorney General,
attorney; Ms. DiJoseph, of counsel and on the brief).

**Judges:** Before Judges Axelrad and Sapp-Peterson.

| Opinion |
| --- |

PER CURIAM

Defendant Joseph Loguidice appeals from a judgment of
conviction entered in the Law Division after an appeal and
trial de novo, pursuant to *R. 3:23-8(a)*, on the record from
a proceeding in the Atlantic City municipal court.
Defendant was found guilty of defiant trespass, *N.J.S.A.
2C:18-3(b)*. The Law Division judge modified the
municipal court sentence to bar defendant from entering
the Trump Marina, rather than all three Atlantic City
Trump properties, for a two-year period. We affirm.

Defendant was charged with defiant trespass on March 30,
2008, when he refused to leave the Trump Marina Casino

after security staff requested that, as a prior evictee, he
leave the premises. The municipal court trial took place on
July 17, October 16, and November 24, 2008. The State's
position was that defendant had actual notice that he was
 [*2] not to return to the property when he was evicted and
escorted out of the casino on August 4, 2007, following a
dispute on the casino floor that resulted in the Director of
Slot Operations, Patricia Richter, filing a criminal
complaint against defendant for terroristic threats. [1]
According to the State, defendant had additional, actual
notice that he was not to return to the Trump Marina as a
result of the agreement that was entered on the return date
of that charge. The January 10, 2008 Atlantic City
municipal court transcript of dismissal that was stipulated
into evidence provided as follows: [2]

[MUNICIPAL PROSECUTOR]: Judge, the
Loguidice case, I think we have a resolution.
Mr. Zarych [defense counsel] . . . (Off the
record; back on the record with colloquy
missing.)

MR. ZARYCH: . . . contact with Pat Richter
(phonetic) in the case. The casino has made it
clear, I'll put it on the record, that they do not
wish to have Mr. Loguidice on the property.
And also we would stipulate the probable
cause for the filing of the complaint by the
State Police. So that's it.

[JUDGE BRUCE WEEKES]: Is that right,
[Prosecutor]?

[PROSECUTOR]: That's correct, Your Honor.
I've also spoken to Ms. Richter [*3] and she's
satisfied. She's not under any pressure to
make the request of the State.

THE COURT: Okay. Mr. Loguidice, that
matter is dismissed.

MR. ZARYCH: Thank you, Your Honor.

---

[1]  The complaint alleges that while on the floor of the Trump Casino/Hotel defendant said to her, "I will slit your throat."

[2]  Based on testimony at the defiant trespass trial, it appears the first municipal court trial had commenced prior to January 10,
2008, and was resolved on a continuation date of the trial. It further appears that either a representative or attorney for the casino
was present during the proceedings and participated in settlement discussions.

Tony Morgano

2010 N.J. Super. Unpub. LEXIS 57, *3

THE COURT: Are you Ms. Richter?

MS. RICHTER: Yes, sir.

THE COURT: Okay. You understand that this matter is being dismissed and you're not being forced to ask me to do that?

MS. RICHTER: No, sir.

THE COURT: Okay. All right. That matter is dismissed.

MR. ZARYCH: Judge, I think since the trial, since the trial already commenced I think that --

. . . .

MR. ZARYCH: Could we have a verdict of not guilty?

THE COURT: It's dismissed.

MR. ZARYCH: Dismissed?

THE COURT: Yeah.

MR. ZARYCH: Thanks, Your Honor.

The State presented the testimony of Mark Sciore, a surveillance shift manager [*4] at Trump Marina, who testified he observed defendant in the casino on March 30, 2008, and preserved the surveillance coverage showing defendant near the kiosks in the atrium, which tape was stipulated into evidence. Defendant then stipulated that he was there on that date. The State also presented the testimony of Gregory Robertson, a security supervisor at Trump Marina, who stated that he advised defendant "he was a prior evictee and could not be on [the] property," and when defendant refused to leave, Robertson signed the defiant trespass charge against him.

Defendant testified that he did not believe that when the prior charge was dismissed against him in municipal court on January 10, 2008, there was an agreement that he was not to enter the Trump Marina, nor was he informed by Zarych that he could not return. It was his understanding that he and Richter "made a mutual understanding to stay away from each other" and, therefore, if either would encounter the other in the casino, he or she would "walk the other way." Defendant acknowledged the stipulation to the existence of probable cause for his arrest. According to defendant, he interpreted the clause "they do not wish to have [*5] [you] on the property" to mean that they "don't like me very much" and that the word "wish" was unclear

to him, stating that, "I wish the stock market would go up so I could make some money. I mean what does that mean, wish?" Defendant acknowledged, however, that he entered the Trump Marina casino after January 10, 2008, and was told by security staff on two occasions before he was charged with this offense to leave and not return. Defendant explained, however, that he thought the casino's requests were "ridiculous" and "unfair," and that he returned on March 30, based on his research and reading of the case of *State v. Morse*, [3] believing he was entitled to be on the premises provided he was not causing trouble.

Defendant also produced Zarych, who testified that, in advance of putting the agreement on the record, he remembered discussing with defendant the probable cause stipulation but he did not recall whether or not he spoke with defendant [*6] about the casino's "wish" that he not return to the premises. Zarych testified he did not view the latter statement as having the "force of law" as a barment although he acknowledged that the casino representative expressed that "they didn't want him in the casino." Zarych did relate that after January 10, 2008, his office received a phone call from a Trump Marina representative that defendant was often seen in the casino, and it was Zarych's impression "they were getting irritated with him" and "it was sort of a plea to head off potential trouble," possibly out of concern with contact with Richter. Zarych testified he was never asked by the caller to tell defendant not to go back to the casino and he did not tell him that.

Judge Weekes found defendant guilty of defiant trespass, and imposed as a sentence that defendant stay away from the Trump Marina, Trump Plaza, and Trump Taj Mahal for two years and pay court costs. The municipal court judge found, despite Zarych's present recollection, that the transcript reflected the dismissal of the charge was expressly conditioned on defendant's stipulation, presented through counsel, that the State had probable cause for the filing of the complaint [*7] and, based on a commonsense reading of the "wish clause," that defendant not return to the Trump premises. The judge concluded that defendant returned to the Trump Marina on March 30, 2008, in violation of the statute, "after he knew he shouldn't have been there." Defendant appealed to the Law Division.

After a trial de novo, Judge Neustadter commented on his independent review of the trial transcript of the municipal court proceeding and credibility assessment of the witnesses, giving due, though not controlling, deference to Judge Weeke's credibility findings, with which he agreed.

---

[3] *State v. Morse*, 276 N.J. Super. 129, 647 A.2d 495 (Law Div. 1994) involved a blackjack player who was repeatedly barred from entering a casino but prevailed in court on the theory that the casino is open to the public and may not bar patrons except for cause.

2010 N.J. Super. Unpub. LEXIS 57, *7

Based on a review of the July 10, 2008 transcript, the Law Division judge found there was an altercation on the Trump Marina premises in 2007, for which defendant "wasn't convicted of anything at that time but it was clear that the hotel didn't want [defendant there]." The judge explained that defendant "denied the -- charges and they settled it and the agreement was that [defendant] would not come back into the Trump Marina and they would drop the charges and they did drop the charges." The judge further found that defendant, who was present in court on that date, had actual notice that he was not to come  [*8] to the casino and was bound by the agreement. Nevertheless, he returned there on March 30, 2008, and remained despite being informed by security that he was a prior evictee and not permitted on the premises, resulting in the defiant trespass charge. Judge Neustadter rejected defendant's argument that the stated agreement did not clearly provide he was barred from the casino or that the State "just gave up [Richter's] charge for no reason at all, or that they had a weak case." He concluded that "interpret[ing] [the record] in the full context and reasonably and logically," there was a quid pro quo of the State's dismissal of the criminal charge against defendant in exchange for which he would not return to the place where the charge had emanated, namely, the Trump Marina. The judge found defendant guilty of defiant trespass and imposed the modified barment sentence. This appeal ensued.

On appeal, defendant raises the following arguments for our consideration:

Point I: As a Matter of Civil Contract Law, the "Wish" Statement of Prior Counsel Was Not An Agreement "To Stay Out Of" the Trump Marina Casino.

Point II: The "Wish" Clause Was Insufficient as a Matter of Law to Give Notice Against  [*9] Trespass under Our Law.

Point III: If the "Wish" Clause Were an Agreement, It was a "Plea Agreement" Under Our Supreme Court's Guidelines, and the Defendant had a Right to an Interpretation of His Prior Agreement BEFORE This Case Started as Counsel Had Requested.

Point IV: If the "Wish" Clause Were an Agreement, It Was a "Plea Agreement" Under Our Supreme Court's Guidelines, and the Defendant's Conviction Should Be Dismissed Because He Was Never Informed of the "Penal Consequences" of His Prior Plea Agreement.

Point V: Ignorance, Mistake & Knowledge Defenses Give Mr. Loguidice a Valid Defense

to This Complaint Even If His Understanding of the Facts or the Law Happened To Be Mistaken.

We have considered these arguments in light of the record and applicable legal standard and do not find them to be persuasive.

In reviewing de novo Law Division trials of municipal court appeals, we consider only whether there is "sufficient credible evidence present in the record" to uphold the findings of the Law Division, not the municipal court. *State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964)*; Pressler, *Current N.J. Court Rules*, comment 7 on *R. 3:23-8* (2009). The Law Division judge is bound to give "due, although  [*10] not necessarily controlling, regard to the opportunity of [a municipal court judge] to judge the credibility of the witnesses." *Johnson, supra, 42 N.J. at 157*. We do not "'weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence.'" *State v. Locurto, 157 N.J. 463, 472, 724 A.2d 234* (1999) (quoting *State v. Barone, 147 N.J. 599, 615, 689 A.2d 132 (1997)*).

Defendant was convicted of defiant trespass, *N.J.S.A. 2C:18-3(b)(1)*, which provides, in relevant part, as follows:

. . . A person commits a petty disorderly persons offense if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given by:

(1) Actual communication to the actor; . . .

It is an affirmative defense to prosecution of the charge that:

(2) The structure was at the time open to members of the public and the actor complied with all lawful conditions imposed on access to or remaining in the structure; or

(3) The actor reasonably believed that the owner of the structure, or other person empowered to license access thereto, would have licensed him to enter or remain . . . .

*[N.J.S.A. 2C:18-3(d)(2),(3).]*

Based on the testimony of both of the casino employees,  [*11] and defendant's own admission, the State proved beyond a reasonable doubt that defendant entered and remained in the Trump Marino Casino on March 30, 2008, despite being requested to leave by the security officer. We

Tony Morgano

2010 N.J. Super. Unpub. LEXIS 57, *11

are satisfied the record also supports the findings beyond a reasonable doubt that defendant had notice by actual communication prior to then that he was not permitted to return to the casino, i.e., "licensed or privileged" to enter or remain. On August 4, 2007, defendant had a confrontation with a casino employee that was sufficiently serious for him to be escorted from the casino and for her to file criminal charges against him. As the case was not tried to conclusion, we do not know the merits of either side's position. The record is clear, however, that defendant, represented by counsel, chose to settle the case rather than complete the trial, his attorney set forth the conditions of dismissal, and the criminal charge was dismissed against defendant. No plea agreement was entered as defendant did not plead guilty to the charge. [4] Although the "wish" clause was inarticulately worded, the record as a whole amply supports the Law Division judge's finding that "it was clear that the hotel didn't want [defendant there]" and his deference to the credibility assessment and finding by the municipal court judge who presided over both cases that defendant understood that he was not permitted to return to the casino. Moreover, defendant, himself, admitted that he received actual notice from casino security staff to leave the premises and not return on at least two occasions after the January municipal court hearing.

Defendant's reliance on the *Morse* case is misplaced and does not afford him a valid defense to the trespass charge. *Morse* is factually inapposite as there was no showing by the State that the defendant blackjack player had been excluded from the casino for cause. *276 N.J. Super. at 135.* Here, the record demonstrates a reasonable basis presented by the casino for excluding defendant from its premises, i.e., an altercation and alleged [*13] threat to the safety of its management on the floor of the casino in August 2007, which defendant did not challenge. We have held that the defense that the structure was open to the public is not available to a charge of "defiant trespass" when the owner of a casino exercises its common-law right to bar the defendant for disruptive behavior and, when the defendant returns, to demand that he leave. *See State v. Slobin, 294 N.J. Super. 154, 682 A.2d 1205* (App. Div. 1996); *see also Uston v. Resorts Int'l Hotel, Inc., 89 N.J. 163, 173, 445 A.2d 370 (1982)* (setting forth the common law principles that enable a casino to exclude from its facility "the disorderly, the intoxicated, and the repetitive petty offender"). These principles are codified in the Casino Control Act, which establishes the casino's authority to exclude and eject persons not only who have been convicted of criminal offenses, but also recognizes such

licensee's "common law right to exclude or eject permanently from its casino hotel any person who disrupts the operation of its premises, threatens the security of its premises or its occupants, or is disorderly or intoxicated." *N.J.S.A. 5:12-71.1.* Defendant did not comply with "all lawful conditions imposed [*14] on access to" the Trump Marina when he disregarded the express notice given to him at the January 8, 2008 municipal court proceeding and by security personnel before and after that date, that he was not permitted to return to the casino because of his disruptive behavior in August 2007. *N.J.S.A. 2C:18-3(d)(2).*

Nor did defendant establish the statutory defenses of ignorance or mistake to the defiant trespass charge. The statute provides that "[a] belief that conduct does not legally constitute an offense is a defense to a prosecution for that defense based upon such conduct when:"

> The actor otherwise diligently pursues all means available to ascertain the meaning and application of the offense to his conduct and honestly and in good faith concludes his conduct is not an offense in circumstances in which a law-abiding and prudent person would also so conclude.
>
> [*N.J.S.A. 2C:2-4(c)(3)*.]

The defendant carries the burden of proving the ignorance of mistake or law defense by clear and convincing evidence. *Ibid.*

Relying on one's own personal interpretation of judicial decisions does not constitute a defense of mistake of law. *State v. Guice, 262 N.J. Super. 607, 616, 621 A.2d 553* (Law Div. 1993). Instead, "some [*15] knowledge of the law, verified by an independent and typically competent source, is required." *Id. at 617* (internal quotation marks and citations omitted).

Defendant's sole basis for this defense is that after the January 2008 municipal court hearing and then after being told twice by security staff not to return to the casino, he "did some research" and "got a couple of friends" who gave him the *Morse* case, which he read, to determine whether he had "a legal right to be in a casino." The record is devoid of any evidence that prior to his arrest for defiant trespass, defendant consulted with Zarych or another attorney or other competent, knowledgeable source respecting this issue. Yet, without any knowledge of law,

---

[4]  "Plea agreements are to be distinguished from the discretion of a prosecutor to charge or unilaterally move to dismiss, amend or otherwise [*12] dispose of a matter." Pressler, *Current N.J. Court Rules,* Appendix VII, comment on Guidelines for Operation of Plea Agreements in the Municipal Court of New Jersey at 2240 (2009).

Tony Morgano

2010 N.J. Super. Unpub. LEXIS 57, *15

and in flagrant disregard of the prior warnings, defendant decided that as a member of the public he had a right to re-enter the casino provided he did not cause any trouble. As defendant did not act diligently and did not make reasonable conclusions which a law-abiding and prudent person would also make, he cannot avail himself of this defense to the defiant trespass charge as a matter of law. We are satisfied that the credible evidence in the record supports, beyond a reasonable **[*16]** doubt, all the elements of defiant trespass within the meaning of *N.J.S.A. 2C:18-3(b)(1)* and the finding of guilt. Therefore, we need not address the balance of defendant's arguments. *R. 2:11-3(e)(2)*.

Affirmed.

Tony Morgano